UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN CORTINA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ANAVEX LIFE SCIENCES CORP., CHRISTOPHER U. MISSLING, SANDRA BOENISCH, and ATHANASIOS SKARPELOS,<br><br>Defendants. | Case No. 1:15-cv-10162-JMF<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiff Lam Truong and Plaintiffs Arina Davliatshina and Michael Yu (collectively, “Plaintiffs”), by and through their counsel, individually and on behalf of all others similarly situated, for their Amended Complaint for Violation of the Federal Securities Laws (the “Complaint”) against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, conversations with witnesses, a review of Defendants’ public documents, conference calls and announcements made by the defendants, United States Securities and Exchange Commission (“SEC”) filings, wire and press releases published by and regarding Anavex Life Sciences Corp. (“Anavex” or the “Company”), analysts’ reports and advisories about the Company, and information readily obtainable on the Internet.

Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1. This is a class action lawsuit alleging violations of the federal securities laws on behalf of all persons or entities that purchased or acquired Anavex securities between May 17, 2013 and December 30, 2015 (the "Class Period"). As alleged in detail below, Defendants engaged in a fraudulent and manipulative scheme to inflate the price of Anavex's common stock. Defendants perpetrated their scheme through despicable promotional material designed to prey on naïve investors with families affected by Alzheimer's Disease. By promoting the Company's "clinical trial" as the cure to Alzeimer's Disease, Defendants were able to benefit significantly at the expense of Plaintiffs and the investors they represent in this class action lawsuit.

2. Alzheimer's Disease is progressive brain disorder that damages and destroys brain cells. The disease leads to memory loss, changes in thinking, and, as the disease progresses, an inability to complete even the simplest of daily tasks. Alzheimer's Disease usually develops slowly, but worsens over time as brain cells die. More than 5 million Americans are living with Alzheimer's disease. Alzheimer's Disease is fatal and, currently, there is no cure.[1]

3. Defendants sought to profit from this. Below is an excerpt from an analyst news release published by K Street Financial:

> To anyone with elderly friends or family, there is no word as terrifying, or permanent, as ***Alzheimer's.***
>
> It's the number 6 killer of Americans, but unlike the other major life-shortening diseases, the problem isn't getting smaller . . . It's getting bigger.
>
> But just imagine if we knew how to stop it. How much would that be worth?
>
> Right now, Alzheimer's costs Americans an average of $216 billion per year.
>
> That's the price of care; the price of medicine; and the cost of lost wages . . . And as our population grows older, the problem is getting bigger.

---

[1] *See* Alzheimer's Association, Facts and Figures (available at http://www.alz.org/facts/overview.asp).

> By 2050 that $216 billion will grow to an estimated $1.2 trillion.
>
> And the saddest part . . . There is still no cure.
>
> But all that might be about to change.
>
> Because **AVXL** [Anavex] is about to bring its experimental drug into stage 2 clinical trials. This is where the profits could go gangbusters.

4. Following several pages of unrestrained promotion and optimism, K Street Financial states in very fine print that it "has been compensated $25,500 by Investor Media Services to build awareness for AVXL [Anavex]."

5. K Street Finanical, the author of the analyst release excerpted above, authored a number of releases pertaining to Anavex. In fact, K Street Financial's "analyst reports" led to a decision by the British Columbia Securities Commission to issue a Halt Trade Order suspending trading of Anavex's stock *during the Class Period* in June 2013.

6. Advertisements like the one above persisted throughout the Class Period, increasing in frequency around key corporate events. For example, in the months preceding the Company's "uplisting" from over-the-counter trading to the NASDAQ Stock Market, over a dozen articles were released by one single promoter alone—Dr. Kanak Kanti De. Dr. De's articles were merciless in terms of undue praise and optimism.

7. The content and frequency of Dr. De's articles was so extreme that it actually led other stock analysts to question Dr. De's motives and investigate his supposed credentials. In an article titled "Anavex: Rebounding With The Help Of A Glorified Stock Promoter Who Just Fooled The Bulls Again," Melissa Davis, former journalist for the popular investor news outlet *The Street Sweeper*, exposed Dr. De for being a fraud who was shamelessly promoting Anavex's stock for a profit. Dr. De, who held himself out to be a medical doctor with an advanced understanding of the science behind Anavex's drug candidates, attempted to rebut Ms. Davis'

accusations by producing a "diploma" from the University of Calcutta evidencing his medical degree. Upon closer examination, however, the "diploma" was clearly a forgery—the vice chancellor that appeared to have signed the diploma did not begin working at the University of Calcutta until nearly 20 years after the date Dr. De supposedly graduated. Further, according to the Medical Council of India, Dr. De is not a registered medical doctor. Dr. De has yet to respond to additional requests concerning his credentials or affiliation with Anavex.

8. The questions surrounding Anavex and its suspicious market activity has led to the commencement of a formal investigation by the SEC. On December 29, 2015, Anavex disclosed in its annual report (Form 10-K) for fiscal 2015 that it had received a subpoena from the SEC concerning "the recent unusual activity in the market for the Company's shares."

9. As suspicions have grown around Anavex's stock, its price has declined severely. From an intra-Class Period high of $14.33 per share, Anavex's stock price has plummeted to just over $4.00 per share. Plaintiffs and the investors they represent have lost millions of dollars as a result of Defendants' deception and manipulation.

## **JURISDICTION AND VENUE**

10. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12. Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b), as defendant Anavex is headquartered in this district and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

13. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14. Lead Plaintiff Lam Truong acquired Anavex securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. Lam Truong's certification evidencing his ownership of Anavex securities was previously filed with this Court in connection with his motion for appointment as lead plaintiff (Dkt. No. 22-1), and is incorporated herein by reference.

15. Plaintiff Arina Davliatshina acquired Anavex securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. Arina Davliatshina's certification evidencing her ownership of Anavex securities is attached hereto as Exhibit A.

16. Plaintiff Michael Yu acquired Anavex securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. Michael Yu's certification evidencing his ownership of Anavex securities is attached hereto as Exhibit B.

17. Defendant Anavex is incorporated in Nevada, and the Company's principal executive offices are located at 51 West 52nd Street, 7th Floor, New York, New York 10019. Anavex's common stock trades on the NASDAQ under the ticker symbol "AVXL."

18. Defendant Christopher U. Missling ("Missling") has served as the Company's Chairman, Chief Executive Officer ("CEO") and President since July 2013.

19. Defendant Sandra Boenisch ("Boenisch") has served as the Company's Principal Financial Officer since October 2015.

20. Defendant Athanasios Skarpelos ("Skarpelos") is a director of the Company and served as the Company's Principal Executive Officer, Principal Financial Officer and Principal Accounting Officer at all relevant times until July 2013.

21. The defendants referenced above in ¶¶ 18-20 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22. Anavex is a small company with no history of revenue. Originally named Thrifty Printing Inc., Anavex began as a provider of online photofinishing services. Then, in early 2007, Anavex announced that it would be changing its name (to Anavex) and reemerging as a biopharmaceutical company. The press release announcing the change stated, in pertinent part, as follows: "We have changed our name to reflect the new direction of the Company which is intended to be development of medicinal drugs under a letter of intent announced December 28, 2006. Under the letter of intent, the [C]ompany is to acquire a portfolio of innovative drug compounds."

23. Anavex has generated nothing in terms of revenue since entering the biopharmaceutical industry. In its annual report (Form 10-K) for the fiscal year ended September 30, 2014, filed with the SEC on December 29, 2014, Anavex described itself as a "clinical stage biopharmaceutical company engaged in the development of drug candidates to treat Alzheimer's disease," among other illnesses. Anavex's "pipeline" at the time of its 2014 annual report included a number of drugs, only one of which was in the clinical phase, ANAVEX 2-73. ANAVEX 2-73

began a Phase IIa clinical trial in December 2014, and remains in Phase IIa to this day. Anavex's other drugs were pre-clinical, meaning that testing in humans had yet to begin. Anavex advised investors in the annual report that it "[has] not generated any revenues to date and [has] no operating history." By the time of its 2014 annual report, Anavex had amassed an accumulated deficit of $52.5 million and was uncertain as to its ability to remain a going concern.

24. Anavex's only source of revenue is financing from Lincoln Park Capital and other equity financing activities that are largely dependent the price of Anavex's stock. For example, on July 8, 2013, Lincoln Park Capital signed a $10 million equity investment deal with Anavex. Pursuant to the Agreement, Anavex was able to force Lincoln Park Capital to purchase shares of Anavex common stock for the then-prevailing market price, provided Anavex's stock price remained above a certain threshold. Anavex's other financing deals were similarly dependent upon the price of its common stock, as the ultimate objective for every investor in every deal was the ability to sell Anavex stock for a profit.

25. At the time of the Lincoln Park Capital deal described above, Anavex stock traded on an over-the-counter market. Anavex would not start trading on the NASDAQ until October 2015. In between the Lincoln Park Capital deal and Anavex's ultimate "uplisting" to the NASDAQ, Defendants engaged in an extreme stock promotion and market manipulation scheme.

**Evidence of Illegal Stock Promotion**

26. Anavex's common stock has been the subject of numerous promotional campaigns dating back to well before the start of the Class Period.

27. In late-June/early-July 2010, investors began receiving a "teaser" advertisement for a company that boasted both a promise for families of Alzheimer's sufferers and the promise of riches for those who invested. The advertisement was from Brian Hicks for an investor letter

called the *Hicks and Lowe Report*. The advertisement stated: "The Grey Plague's Last Victim . . . On May 31st, 2016, 70-year-old Jay Vanaken will become the last American to die of Alzheimer's disease. . . . And by the time it happens, this micro-pharma's miraculous cure could bank you 898 times your money — or MORE." The advertisement continued, eventually identifying Anavex as the company at issue: "The company is a biotech called Anavex Life Sciences (AVXL). You can currently buy Anavex while it's still trading under $3 a share. I expect Anavex to be trading for more than $28 a share within 24 months."

28. Later that same year, in November 2010, Agora Financial released a "Breakthrough Technology Alert" teasing investor expectations about Anavex. The advertisement stated: "Of all the technologies that we cover here, I think Sigma receptor science may be the most difficult to properly explain. This may be because the body is full of so many receptors that do so many things. One company is pushing the envelope of sigma receptor science in this direction. As you know, it is Anavex Life Sciences Corp. (OTCBB: AVXL). . . . ."

29. In March 2011, Agora Financial released another "Breakthrough Technology Alert" about Anavex. The advertisement introduced Anavex as a "Breakthrough Compan[y]" that "hopes to some day stop Alzheimer's in its tracks. . . . This company just received approval to begin Phase I trials. . . . The most amazing part is – for the first time ever – researchers are working on a drug that treats the root causes of Alzheimer's, not just the symptoms . . . ."

30. On May 30 2012, Agora Financial released another "Breakthrough Technology Alert" about Anavex. The promotional letter provided investors with overwhelming expectations about the Company's stock, including statements such as: "CEO Reveals: Shocking New Alzheimer's Treatment to Hit Phase I Trials in September . . ."; "Phase I trials are the first official step to finding out if new drugs and treatments are safe and if they work. Merely getting a hopeful

new drug to Phase I is a big story…"; "The story of the tiny company that could offer real hope for Robert is a double-big story because this company's research is so unique. In fact, it's completely novel. It's new."; and "Plus – this company's best Alzheimer's treatment has already completed Phase I trials." True to form, the advertisement then boasts prospects of extreme profit: "Right now this tiny research company I want to tell you all about trades for around $.70 a share"; "As it enters more trials as I expect it could in the coming weeks, the increased exposure alone could shoot it to $10-$15. This is a conservative projection."; "In time, if this new way of possibly treating Alzheimer's is successful, $30-$50 a share is reasonable. This is also a conservative guess."; "Then, if all goes well – by the time folks like Robert can receive this treatment – by the time this tiny company is RESTORING lives… well, the sky's the limit."

31. On November 16, 2012, Agora Financial released yet another "Breakthrough Technology Alert" teasing investor expectations about Anavex. The advertisement touts a recent press release from the Company, summarizing it in overwhelmingly positive light: "This company is showing promise of stopping the onset of Alzheimer's before it's taken its deadly grip."; "This is a matter of public record."; "If the evidence the company has so far holds up, we could be very near the end for Alzheimer's."

32. In June 2013, Anavex was the subject of a promotional campaign from a company called K Street Financial and/or Wyatt Investment Research. The promotion contained claims pertaining to the Company's business, activities, future prospects, and share price valuations. This promotional campaign was noticed by the British Columbia Securities Commission, which halted trading of Anavex stock. The Company ultimately responded by denying the claims made in the advertisements and disputing any allegations that it was responsible for them.

33. In August 2013, K Street Financial (the same company responsible for the promotional campaign that led to the British Columbia Securities Commission's halt trading order) issued a release titled "Tiny Bio-Tech Firm Set To Make A $216 Billion Industry Obsolete." The article focused on Anavex and the prospect of wealth it could bring to early investors. Despite the fact that Anavex was at that point in time literally years away from clinical trials, the article promotes Anavex's drug candidate (ANAVEX 2-73) as the "best hope against" Alzheimer's Disease. In fine print below the advertisements, a disclosure reads that the author "has been compensated $25,500 by Investor Media Services to build awareness for AVXL." Within several days, the article was re-released by The Stock Junction and/or Champlain Media for additional compensation in the amount of $115,000 as well as another website called the Ultimate Penny Stock which does not make any disclosures concerning compensation.

34. On November 17, 2014, Anavex was the subject of an online promotional video featured by Wide World of Stocks.

35. In December 2014, Mauldin Economics issued a "Transformational Technology Alert" about Anavex. The advertisement began by telling investors that "Alzheimer's Is the Most Terrifying and Destructive Disease in America Today. This Tiny Company Could Give Millions New Hope…"

36. On March 23, 2015, Anavex was the subject of an online promotional video provided by CEO LIVE Insider Report.

37. On July 19, 2015, a company called King Penny Stocks issued a "Biotech Breakout Special Report" on Anavex. The alert promotes Anavex's upcoming presentation of data from the Company's ongoing clinical Phase IIa trial. The following day, on July 20, 2015, the article was re-released on StockPromoters.com.

38. On July 23, 2015, Dr. Kanak Kanti De published a report titled "Premarket Biotech Digest: The M&A Frenzy, Anavex's Phase 2a Data, Big Day For Earnings." The report provided a "Focus" summary of Anavex, stating that "Initial data shows early evidence of improving cognition in patients with Alzheimer's disease."

39. The following day, on July 24, 2015, Dr. Kanak Kanti De published a four-page interview with Defendant Missling. Dr. De asks a number of positive questions, or "softballs," that provide Missling with the opportunity to promote the Company. For example, Dr. De asks Missling:

> KKD - So, A2-73 may work in early stages of the disease, when plaque buildup isn't considerable, but needs a plaque reducing agent in more advanced stages?
>
> CM- Possibly, however, preclinically ANAVEX 2-73 might be sufficient to also reduce abeta by itself. Hence, could be applicable both in MCI and mild-to-moderate Alzheimer's disease. The current Phase 2a is in mild-to-moderate Alzheimer's disease.
>
> KKD - However, since there's no biomarker to properly identify onset of Alzheimer's disease, A2-73 as a monotherapy doesn't work right now, and you need donepezil?
>
> CM - That answer will come from this current Phase 2a. However, preclinical evidence shows ANAVEX 2-73 works very well alone and might have a further boost in combination with donepezil.

40. On July 25, 2015, Dr. Kanak Kanti De published an article titled "Anavex May Actually Cure Alzheimer's."

41. On July 28, 2015, Defendant Missling was featured in a six-minute interview by Shelly Craft on Stock News Now. Defendant Missling boasted the progress of Anavex's ongoing Phase IIa clinical trial of ANAVEX 2-73 in Australia. The interview provided no substantive information, only optimism about the ability to predict positive clinical results from the pre-clinical data. At one point during the interview, Mr. Craft asks Missling to describe "what's happened in

the last quarter that's *revolutionary* for the company," and then proceeds to joke with Missling that he should "stay within reason" and not "say anything that [he] can't say."

42. On July 30 and 31, 2015, a stock promotion company known as MantleMedia LLC issued a release referring to Anavex as a "Biotech Breakout," noting that the Company's stock "continues to reward investors and traders as it rises off support . . ." The MantleMedia release was distributed through two websites owned and operated by MantleMedia LLC—KingPennyStocks.com and StockRunway.com. The MantleMedia release claimed that Anavex has "an extremely positive news profile with strong progress being made on its clinical data" and that the Company's "Bull Chart is ready for a new leg higher." In fine print, the MantleMedia release stated that KingPennyStocks.com and/or StockRunway.com were in the "business of marketing and advertising companies for monetary consideration" and that the websites are "often times compensated to feature certain companies." Several lines below these disclosures, the fine print claims that MantleMedia LLC was not compensated "for this two day advertisement article."

43. On August 6, 2015, Dr. Kanak Kanti De published an article titled "Premarket Biotech Digest Part 2: My Top Bio picks 2015 Performance, Anavex Biggest Mover, Multiple Earnings." The article focuses on Anavex, noting that its stock price has "gone up 200%" since Dr. De bought the stock "less than a month ago." The article continues, stating that "Ordinarily, when a nanocap stock goes up like this, sane investors run for cover. However, AVXL is a different story because of two things- one, their disease-modifying potential science, and two, the huge market for Alzheimer's." After discussing Anavex's "science," Dr. De states that: "That science, I understand: it helps me understand the 200% rise in less than a month since I started covering this stock, and bought it."

44. Two weeks later, on August 17, 2015, Dr. Kanak Kanti De issued another article about Anavex. Again, Dr. De focuses on the Company, noting the stock's "volatility" and encouraging "long-term investors" to "focus on [Anavex's] fundamentals, which are quite strong for a company its size."

45. On September 4, 2015, Dr. Kanak Kanti De published another article again "focus[ing]" on Anavex. The article boasted, "As I noted above, it is about what individual companies are doing in the biotech sector that matters. And Anavex Life Sciences (OTCQX:AVXL) is an excellent example. Last month, as the sector struggled, AVXL shares actually gained nearly 50%. All of the gains were driven by the promise of the company's lead product candidate in Alzheimer's disease."

46. On September 29, 2015, Dr. Kanak Kanti De published another "focus" article on Anavex, promoting the fact that "Anavex Life Sciences (NASDAQ:AVXL) has achieved a major milestone following the completion of patient enrollment for Phase 2a Alzheimer's trial. The enrollment has been completed ahead of schedule." Dr. De, true to form, discussed the stock price opportunity as well: "After the surge in July though, AVXL shares have traded mostly sideways since August. And this is mainly due to the fact that there has been no major catalyst during this period. The release of top line data later this year could act as a catalyst."

47. On October 7, 2015, Dr. Kanak Kanti De published another article "focus[ing]" on Anavex and its upcoming "uplisting" to NASDAQ. The article states "Shortly after completing patient enrollment for Phase 2a trial for its lead product candidate ahead of schedule, Anavex Life Sciences (NASDAQ:AVXL) has taken a step towards achieving another milestone. The next major milestone, as I had discussed with my subscribers a few days ago, is uplisting to NASDAQ." The article continues, stating that "An uplisting, if completed, will have a positive impact on AVXL

shares, which have already returned nearly 180% in the last three months. It will improve the stock's visibility and help in creating awareness among institutional investors. Both of these factors should have a positive impact on the stock price."

48. On October 14, 2015, Dr. Kanak Kanti De published another article about Anavex. Dr. De's article focuses on the upside for Anavex shares, stating that: "Anavex Life Sciences (OTCQX:AVXLD) saw a sharp pullback on Tuesday after rallying in the previous week. Despite the 10% drop on Tuesday, AVXLD shares are still up more than 31% since October 7. The rally in AVXLD began after the company announced a reverse stock split and its intention to uplist shares to the NASDAQ stock market. The uplisting, if completed, will be a major milestone for Anavex Life Sciences. It will of course improve the stock's visibility. An uplisting will also enable AVXLD to attract institutional investors."

49. In October 2015, at or around the time when Anavex "uplisted" to the NASDAQ market from over-the-counter trading, Agora Financial released a newsletter about Anavex. The newsletter was titled "What This CEO Says on Nov. 7, 2015 Could Revolutionize Modern American Medicine." Unbelievably, the newsletter went on to tell investors that: "When he [the CEO of Anavex] starts speaking, he could change forever everything we think we know about one of the most frightening diseases in world history. . . . What he has to say could revolutionize modern medicine for reasons I'll show you here today. . . . The market frenzy his comments create could also make you incredibly wealthy. . . . That's because, when the markets open on Monday, November 9, the stock of the company this CEO leads could explode rapidly higher. . . . If this CEO's presentation on November 7 goes as well as I expect, starting Monday, November 9, you could take part in an epic share price explosion. . . . I'm talking about the chance at gains of as much as 2,150% or more as this tiny company rockets from under $9.00 to $200 and beyond."

50. At or around the same time as the Agora Financial promotion, Anavex was featured in an email campaign by Stockpalooza.com. The email was sent to investors and notified them to "Put [Anavex] on your radar! [Anavex] have been stabilizing right about $9 dollars with a nice volume to boot!" The release went on to claim that Anavex's prime drug candidate, ANAVEX 2-73, was "well tolerated in doses up to 55mg" and that "[r]esults from pre-clinical studies indicate that ANAVEX 2-73 demonstrates anti amnesic and neuroprotective properties." In fine print, the Stockpalooza Release told investors that it "expected to be compensated Two Hundred Thousand Dollars Cash via Bank Wire Transfer by a third party for a 1 Day Marketing Program regarding [Anavex]. This compensation/expected compensation, expired or not, is a major conflict of interest in our ability to be unbiased. Therefore, this newsletter should be read as a commercial advertisement only."

51. On October 23, 2015, Dr. Kanak Kanti De published an article titled "Anavex Is Not Some Scam Company; It Has Believable Science." Dr. De writes at the outset that the article is a "response to a recent bearish Anavex article on SeekingAlpha." Dr. De then proceeds to defend Anavex on all fronts, noting in the process that his investment in Anavex shares "went up 5-fold" in "3 months."

52. On October 28, 2015, less than a week later, Dr. De wrote another article about Anavex. Dr. De starts the article by touting the fact that Anavex will begin trading on the NASDAQ that day: "It is a big day for Anavex Life Sciences (OTCQX:AVXLD) (NASDAQ:AVXL), a company I have been following for the past three months and one that has been the top performer in my portfolio this year. AVXL begins trading on the NASDAQ today, a development that will increase the stock's visibility among institutional investors." Dr. De then discusses the progress of the Company's clinical trial: "When combined with donepezil, which

reduces already created misfolded protein conglomers, ANAVEX 2-73 could even potentially cure Alzheimer's. And this is why the company has generated so much excitement. With the listing, I believe Anavex will get the much-required exposure among institutional investors."

53. The November 7, 2015 announcement referenced in the Agora Financial newsletter above was actually the Company's November 9, 2015 announcement that "Positive Primary and Secondary Endpoints were Achieved in a Phase 2a Clinical Trial of ANAVEX 2-73 in Alzheimer's Disease." Leading up to this announcement, on November 8, 2015, Anavex was the subject of an unknown number of intense promotional campaigns. A program called HedgeChatter, which is a service that uses data mining algorithms to detect unusual activity or manipulation on stocks across all social media channels, recorded a record-breaking number of messages about Anavex. On Sunday, November 8, 2015, Anavex (a very tiny company with no substantive operations) was being talked about on social media and message boards more than any other company by a very wide margin, *e.g.*, more than Apple, Valeant, and MannKind. The following image is from an article noting the unusual amount of "chatter" about Anavex the day before the Company's November 9, 2015 announcement:




54. According to HedgeChatter, Anavex was the subject of over 1,100 social media messages. This attention was the result of stock manipulation and/or illegal promotion

55. On November 9, 2015, Dr. Kanak Kanti De published another article with a "focus" on Anavex. The article attempts to buoy investor outlook about Anavex after the stock falling 8% in the prior days. Dr. De promotes the Company's ongoing clinical study as well as his personal gains in the stock: "First, if you want to follow someone's advice, take it in its entirety, don't do it piecemeal. I entered this stock early at $0.53 (pre-reverse split price), took my profit multiple times in its run up to $3.5 heaven pre- reverse split price, and now I am running on free money with my remaining AVXL holding. This is my best investment this year, better than Lipocine (NASDAQ:LPCN) and other calls I made this year, and I am very happy with it."

56. On November 10, 2015, the very next day, Dr. Kanak Kanti De wrote another article. The article is devoted to Anavex and features an interview with Dr. Stephen Macfarlane, Anavex's "trial investigator." Dr. De starts the article by disputing any basis for the stock's recent 30% drop: "Anavex Life Sciences (NASDAQ:AVXL) shares are down more than 30% today. The stock has seen an unprecedented drop since Friday. The reason for the sell-off is not clear. Based on Saturday's data, I am still positive about the science behind Anavex 2-73." (The drop, as discussed below, was due to the release of an article detailing the longstanding stock promotional campaign around Anavex.) Dr. De's closing thoughts concerning his interview with Dr. Macfarlane include: "However, nobody bashing the stock seems to be covering the science, telling us, scientifically, why the stock should go down because the results were bad. Nobody is able to say that the results were bad - because they were not. Now we have here the actual expert behind the trials telling us these results were astoundingly good. To paraphrase, in his 16 years of trial experience (Dr Macfarlane conducts many trials, including one sponsored by Eli Lilly), he hasn't seen AD results like this."

57. Dr. Kanak Kanti De published another article on November 12, 2015. Dr. De defendants Anavex from "short sellers" in the article. The article states that: "The attack though has been successful in bringing down AVXL shares from $14 to just above $5. The stock fell to $3.60 this week. I am still long AVXL and the reason is that I like the science behind Anavex 2-73. The drug may still fail to reach commercialization stage as is the case with most clinical stage Alzheimer's drugs, but I don't see any reason to sell it now." Dr. De's article also includes "participant comments" from the "Phase 2a trial participants." The comments are all positive, such as "Feeling a lot better than before. I am enjoying the things I used to do. As you know I am back to playing golf."

58. On November 16, 2015, Dr. Kanak Kanti De published another article, titled "Anavex: Response To 3 Recent Bearish Articles." The article attempts to refute the "sciences-related claims of Mr. Adam Feuerstein." (Adam Feuerstein is a popular analyst/author that focuses on biopharmaceutical companies.) Dr. De's article is approximately nine pages long. It addresses a number of allegations against the Company's clinical study, science, and stock promotion. Dr. De's article responds to each and every allegations. With respect to the allegation about stock promoting and market manipulation, Dr. De states that he "takes these allegations very seriously." Dr. De does not deny the allegations; rather, Dr. De states that: "Anavex, when it was an OTC company, may or may not have some shady past 3-4 years ago, and as an OTC company it may have had to resort to unusual deal making to raise money, but as long as it has undisputed scientific promise, I can live with everything else."

59. On November 16, 2015, the same day as the previous article (posted two minutes later), Dr. Kanak Kanti De published another article featuring an interview with Professor Tangui Maurice (a professor at Montpellier University). Dr. De writes in the article that he is releasing the interview in support of his positive outlook on Anavex.

* * *

60. The examples of promotion provided above were the result of stock manipulation and/or illegal promotion specifically designed to "uplist" the Company's stock to NASDAQ and/or financially benefit Defendants. The stock manipulation and/or illegal promotion was caused, directed, and authorized by Defendants. When the truth concerning Defendants' actions was revealed, investors sustained damages as a result of significant decreases in Anavex's stock price.

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### May 17, 2013 – Quarterly Report

61. Anavex filed a quarterly report (Form 10-Q) with the SEC on May 17, 2013 (the "2Q13 Form 10-Q"). Defendant Skarpelos signed the quarterly report on behalf of Anavex.

62. The financial statements within the 2Q13 Form 10-Q provided the following information about the Company:

- Anavex had 30,240,687 shares of common stock outstanding as of May 17, 2013;
- Anavex's consolidated balance sheet indicated that, as of March 31, 2013, the Company had $487 of cash compared to $2,673,983 of accounts payable and accrued liabilities;
- Anavex's operating loss before other income/expenses was ($127,111) for the quarter ended March 31, 2013;
- For the three- and six-month periods ended March 31, 2013, Anavex paid $15,000 and $33,600, respectively, for investor relations. From January 23, 2004 to March 31, 2013, Anavex paid $865,307 for investor relations; and
- For the three- and six-month periods ended March 31, 2013, Anavex paid $74,401 and $209,812, respectively, for consulting fees. From January 23, 2004 to March 31, 2013, Anavex paid $11,953,903 for consulting fees.

63. The notes to the financial statements in the 2Q13 Form 10-Q indicated that Anavex had "an accumulated deficit of $38,064,543 . . . , had a working capital deficit of $3,434,788 and expect[ed] to incur further losses in the development of its business, all of which cast[ed] substantial doubt about the Company's ability to continue as a going concern."

64. The 2Q13 Form 10-Q discussed Anavex's ability to obtain future financing. In pertinent part, the 2Q13 Form 10-Q stated as follows:

> We will require additional financing to fund our planned operations, including further strengthening our patents, securing patents for other compounds and any further intellectual property that we may acquire and commencing clinical development. **We currently do not have committed sources of additional financing and may not be able to obtain additional financing, particularly, if**

> **the volatile conditions in the stock and financial markets, and especially the market for early development stage pharmaceutical and biotechnology research and development company stocks persist**.

(emphasis added)

65. With respect to the volatile conditions in the stock and financial markets, Anavex stated further in the 2Q13 Form 10-Q that:

> ***Trading of our common stock may be volatile and sporadic****, which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.*
>
> There is currently a limited market for our common stock and **the volume of our common stock traded on any day may vary significantly from one period to another**. Our common stock is quoted on OTC Market's OTCOB. **Trading in stock quoted on OTC Market's OTCOB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects**. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance. Moreover, OTC Market's OTCOB is not a stock exchange, and trading of securities quoted on OTC Market's OTCOB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ. There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(emphasis added)

66. The above statements identified in bold-faced font in paragraphs 64-65 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

67. In conjunction with the 2Q13 Form 10-Q, Defendant Skarpelos also filed Sarbanes-Oxley Act certifications. The certifications attested to the accuracy and completeness of the 2Q13 Form 10-Q. The certifications stated as follows:

> I, Athanasios Skarpelos, certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Anavex Life Sciences Corp.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>>
>> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>>
>> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

> 5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> > (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
> >
> > (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(emphasis added)

68. The above statements identified in bold-faced font in paragraphs 67 were materially false and/or misleading. As explained previously, the 2Q13 Form 10-Q failed to disclose that Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Accordingly, Defendant Skarpelos' attestation to the accuracy of the 2Q13 Form 10-Q was false and/or materially misleading.

**<u>August 14, 2013 – Quarterly Report</u>**

69. Anavex filed a quarterly report (Form 10-Q) with the SEC on August 14, 2013 (the "3Q13 Form 10-Q"). Defendant Missling signed the quarterly report on behalf of Anavex.

70. The financial statements within the 3Q13 Form 10-Q provided the following information about the Company:

- Anavex had 37,237,587 shares of common stock outstanding as of August 12, 2013;
- Anavex's consolidated balance sheet indicated that, as of June 30, 2013, the Company had $1,645 of cash compared to $ 2,799,244 of accounts payable and accrued liabilities;
- Anavex's operating loss before other income/expenses was ($125,982) for the quarter ended June 30, 2013;

- For the three- and nine-month periods ended June 30, 2013, Anavex paid ($2,121) and $31,479, respectively, for investor relations. From January 23, 2004 to June 30, 2013, Anavex paid $863,186 for investor relations; and

- For the three- and nine-month periods ended June 30, 2013, Anavex paid $29,086 and $238,898, respectively, for consulting fees. From January 23, 2004 to June 30, 2013, Anavex paid $11,982,989 for consulting fees.

71. The notes to the financial statements in the 3Q13 Form 10-Q indicated that Anavex had "an accumulated deficit of $38,216,467 . . . , had a working capital deficit of $3,553,364 and expect[ed] to incur further losses in the development of its business, all of which cast[ed] substantial doubt about the Company's ability to continue as a going concern."

72. The 3Q13 Form 10-Q disclosed the 2013 Purchase Agreement with Lincoln Park Capital. In the section titled "Future Financing," Anavex disclosed that it had entered into the 2013 Purchase Agreement. While Anavex also disclosed several of the key terms of the 2013 Purchase Agreement, it did not disclose that Lincoln Park Capital was only obligated to purchase shares if the price of Anavex's common stock remained above $2 per share ($0.50 per share pre-split). Furthermore, while Anavex previously disclosed in the 2Q13 Form 10-Q that future financing was in part dependent upon the volatility in the Company's stock price, Anavex omitted such a disclosure from its "Future Financing" discussion in the 3Q13 Form 10-Q.

73. Anavex's 3Q13 Form 10-Q incorporated risk warnings from the Company's most recent annual report (Form 10-K) for fiscal 2012 filed on December 31, 2012. With respect to the volatile conditions in the stock and financial markets, Anavex's annual report for fiscal 2012 stated:

> ***Trading of our common stock may be volatile and sporadic****, which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.*
>
> There is currently a limited market for our common stock and **the volume of our common stock traded on any day may vary significantly from one period to another**. Our common stock is quoted on OTCQB. **Trading in stock quoted on**

> **OTCQB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects**. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance. Moreover, OTCQB is not a stock exchange, and trading of securities quoted on OTCQB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ. There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(emphasis added)

74. The omissions described in paragraph 72 above and the bold statements identified in bold-faced font in paragraph 73 (to the extent they were incorporated in the 3Q13 Form 10-Q) were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

75. In conjunction with the 3Q13 Form 10-Q, Defendant Missling also filed Sarbanes-Oxley Act certifications. The certifications attested to the accuracy and completeness of the 3Q13 Form 10-Q. The certifications stated as follows:

> I, Christopher Missling, certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Anavex Life Sciences Corp.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the

financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(emphasis added)

76. The above statements identified in bold-faced font in paragraphs 75 were materially false and/or misleading. As explained previously, the 3Q13 Form 10-Q failed to disclose that Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Accordingly, Defendant Missling's attestation to the accuracy of the 3Q13 Form 10-Q was false and/or materially misleading.

**December 30, 2013 – Annual Report**

77. Anavex filed an annual report (Form 10-K) with the SEC on December 30, 2013 (the "2013 Form 10-K"). Defendant Missling signed the annual report on behalf of Anavex.

78. The financial statements within the 2013 Form 10-K provided the following information about the Company:

- Anavex had 37,237,588 shares of common stock outstanding as of December 24, 2013;

- Anavex's consolidated balance sheet indicated that, as of September 30, 2013, the Company had $345,074 of cash compared to $1,741,797 of accounts payable and accrued liabilities;

- Anavex's operating loss before other income/expenses was ($2,137,367) for the year ended September 30, 2013;

- For the year ended September 30, 2013, Anavex paid $128,575 for investor relations. From January 23, 2004 to September 30, 2013, Anavex paid $960,282 for investor relations; and

- For year ended September 30, 2013, Anavex paid $271,898 for consulting fees. From January 23, 2004 to September 30, 2013, Anavex paid $12,015,989 for consulting fees.

79. The notes to the financial statements in the 2013 Form 10-K indicated that Anavex had "an accumulated deficit of $38,064,543 . . . , had a working capital deficit of $3,434,788 and expect[ed] to incur further losses in the development of its business, all of which cast[ed] substantial doubt about the Company's ability to continue as a going concern."

80. The 2013 Form 10-K discussed risks related to Anavex's common stock, including volatility in the price as well as the impact of the price on the Company's ability to obtain future financing. The 2013 Form 10-K stated, in pertinent part, as follows:

> *A decline in the price of our common stock could affect our ability to raise further working capital and adversely impact our operations and would severely dilute existing or future investors if we were to raise funds at lower prices.*
>
> A prolonged decline in the price of our common stock could result in a reduction in our ability to raise capital. Because our operations have been financed through the sale of equity securities, a decline in the price of our common stock could be especially detrimental to our continued operations. Any reduction in our ability to raise equity capital in the future would force us to reallocate funds from other planned uses and would have a significant negative effect on our business plans and operations, including our ability to develop new products and continue our current operations. If our stock price declines, there can be no assurance that we can raise additional capital or generate funds from operations sufficient to meet our obligations. We believe the following factors could cause the market price of our common stock to continue to fluctuate widely and could cause our common stock to trade at a price below the price at which you purchase your shares of common stock:
>
> - actual or anticipated variations in our quarterly operating results;
> - announcements of new services, products, acquisitions or strategic relationships by us or our competitors;
> - changes in accounting treatments or principles;
> - changes in earnings estimates by securities analysts and in analyst recommendations; and
> - general political, economic, regulatory and market conditions.
>
> The market price for our common stock may also be affected by our ability to meet or exceed expectations of analysts or investors. Any failure to meet these expectations, even if minor, could materially adversely affect the market price of our common stock.

81. The above statements in paragraphs 80 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants

knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

82. Similarly, Anavex stated further in the 2013 Form 10-K that:

> ***Trading of our common stock may be volatile and sporadic****, which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.*
>
> There is currently a limited market for our common stock and **the volume of our common stock traded on any day may vary significantly from one period to another**. Our common stock is quoted on OTC Market's OTCOB. **Trading in stock quoted on OTC Market's OTCOB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects**. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance. Moreover, OTC Market's OTCOB is not a stock exchange, and trading of securities quoted on OTC Market's OTCOB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ. There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(emphasis added)

83. The above statements identified in bold-faced font in paragraph 82 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

84. In conjunction with the 2013 Form 10-K, Defendant Skarpelos also filed Sarbanes-Oxley Act certifications. The certifications attested to the accuracy and completeness of the 2013 Form 10-K. The certifications stated as follows:

> I, Christopher Missling, certify that:
>
> 1. I have reviewed this quarterly report on Form 10-K of Anavex Life Sciences Corp. (the "registrant");
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:
>
> > (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

> 5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> > (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
> >
> > (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(emphasis added)

85. The above statements identified in bold-faced font in paragraph 84 were materially false and/or misleading. As explained previously, the 2013 Form 10-K failed to disclose that Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Accordingly, Defendant Skarpelos' attestation to the accuracy of the 2013 Form 10-K was false and/or materially misleading.

**<u>February 14, 2014 – Quarterly Report</u>**

86. Anavex filed a quarterly report (Form 10-Q) with the SEC on February 12, 2014 (the "1Q14 Form 10-Q"). Defendant Missling signed the quarterly report on behalf of Anavex.

87. The financial statements within the 1Q14 Form 10-Q provided the following information about the Company:

- Anavex had 37,640,098 shares of common stock outstanding as of February 14, 2014;
- Anavex's consolidated balance sheet indicated that, as of December 31, 2013, the Company had $95,927 of cash compared to $1,620,777 of accounts payable and accrued liabilities;
- Anavex's operating loss before other income/expenses was ($358,637) for the quarter ended December 31, 2013 (due strictly to a $683,000 gain in fair value of derivative liability);

- For the three-month period ended December 31, 2013, Anavex paid $26,991 for investor relations. From January 23, 2004 to December 31, 2013, Anavex paid $987,273 for investor relations; and

- For the three-month period ended December 31, 2013, Anavex paid $51,000 for consulting fees. From January 23, 2004 to December 31, 2013, Anavex paid $12,066,989 for consulting fees.

88. The notes to the financial statements in the 1Q14 Form 10-Q indicated that Anavex had "an accumulated deficit of $40,846,335 . . . , had a working capital deficit of $1,672,389 and expect[ed] to incur further losses in the development of its business, all of which cast[ed] substantial doubt about the Company's ability to continue as a going concern."

89. Anavex's 1Q14 Form 10-Q incorporated risk warnings from the Company's most recent annual report (Form 10-K) for fiscal 2013 filed on December 31, 2013. With respect to the volatile conditions in the stock and financial markets, Anavex's annual report for fiscal 2013 stated, in pertinent part, as follows:

> *A decline in the price of our common stock could affect our ability to raise further working capital and adversely impact our operations and would severely dilute existing or future investors if we were to raise funds at lower prices.*
>
> A prolonged decline in the price of our common stock could result in a reduction in our ability to raise capital. Because our operations have been financed through the sale of equity securities, a decline in the price of our common stock could be especially detrimental to our continued operations. Any reduction in our ability to raise equity capital in the future would force us to reallocate funds from other planned uses and would have a significant negative effect on our business plans and operations, including our ability to develop new products and continue our current operations. If our stock price declines, there can be no assurance that we can raise additional capital or generate funds from operations sufficient to meet our obligations. We believe the following factors could cause the market price of our common stock to continue to fluctuate widely and could cause our common stock to trade at a price below the price at which you purchase your shares of common stock:
>
> - actual or anticipated variations in our quarterly operating results;
>
> - announcements of new services, products, acquisitions or strategic relationships by us or our competitors;

- changes in accounting treatments or principles;
- changes in earnings estimates by securities analysts and in analyst recommendations; and
- general political, economic, regulatory and market conditions.

The market price for our common stock may also be affected by our ability to meet or exceed expectations of analysts or investors. Any failure to meet these expectations, even if minor, could materially adversely affect the market price of our common stock.

90. The above statements in paragraphs 89 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

91. Similarly, Anavex stated further in the 2013 Form 10-K that:

***Trading of our common stock may be volatile and sporadic****, which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.*

There is currently a limited market for our common stock and **the volume of our common stock traded on any day may vary significantly from one period to another**. Our common stock is quoted on OTC Market's OTCOB. **Trading in stock quoted on OTC Market's OTCOB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects**. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance. Moreover, OTC Market's OTCOB is not a stock exchange, and trading of securities quoted on OTC Market's OTCOB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ. There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(emphasis added)

92. The omissions described in paragraph 89 above and the bold statements identified in bold-faced font in paragraph 91 (to the extent they were incorporated in the 1Q14 Form 10-Q) were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

93. In conjunction with the 1Q14 Form 10-Q, Defendant Missling also filed Sarbanes-Oxley Act certifications. The certifications attested to the accuracy and completeness of the 1Q14 Form 10-Q. The certifications stated as follows:

> I, Christopher Missling, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q for the three months ended December 31, 2013 of Anavex Life Sciences Corp. (the "registrant");
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its

> consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(emphasis added)

94. The above statements identified in bold-faced font in paragraphs 93 were materially false and/or misleading. As explained previously, the 1Q14 Form 10-Q failed to disclose that Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Accordingly, Defendant Missling's attestation to the accuracy of the 1Q14 Form 10-Q was false and/or materially misleading.

**May 14, 2014 – Quarterly Report**

95. Anavex filed a quarterly report (Form 10-Q) with the SEC on May 14, 2014 (the "2Q14 Form 10-Q"). Defendant Missling signed the quarterly report on behalf of Anavex.

96. The financial statements within the 2Q14 Form 10-Q provided the following information about the Company:

- Anavex had 38,260,097 shares of common stock outstanding as of May 14, 2014;

- Anavex's consolidated balance sheet indicated that, as of March 31, 2014, the Company had $9,193,558 of cash compared to $1,689,605 of accounts payable and accrued liabilities. The increase in Anavex's assets was due strictly to the receipt of $8,848,484 from the sale of senior convertible debentures. Anavex did not generate any revenue;

- Anavex's operating loss before other income/expenses was ($2,307) for the quarter ended March 31, 2014;

- Anavex did not provide investors with its investor relations expenses for the three- and six-month periods ended March 31, 2014. Instead, Anavex stated in a note to its financial statements that the Company's operating expenses for the three-month period ended March 31, 2014 was $1,021,167, which represented an increase of $894,056, or 703.4%, compared to $127,111 for the three-month period ended March 31, 2013. Anavex identified "an increase in investor relations expense" as being partially responsible for the increase in expenses; and

- Anavex did not provide investors with its consulting fees expenses for the three- and six-month periods ended March 31, 2014. Instead, Anavex stated in a note to its financial statements that the "Company was charged consulting fees totaling $Nil and $Nil, respectively . . . by directors, officers of the Company."

97. Anavex's accumulated deficit as of March 31, 2014 was $41,865,195. According to the 2Q14 Form 10-Q, Anavex had not generated any revenue since inception on January 23, 2004.

98. Anavex's 2Q14 Form 10-Q incorporated risk warnings from the Company's most recent annual report (Form 10-K) for fiscal 2013 filed on December 31, 2013. With respect to the

volatile conditions in the stock and financial markets, Anavex's annual report for fiscal 2013 stated, in pertinent part, as follows:

> *A decline in the price of our common stock could affect our ability to raise further working capital and adversely impact our operations and would severely dilute existing or future investors if we were to raise funds at lower prices.*
>
> A prolonged decline in the price of our common stock could result in a reduction in our ability to raise capital. Because our operations have been financed through the sale of equity securities, a decline in the price of our common stock could be especially detrimental to our continued operations. Any reduction in our ability to raise equity capital in the future would force us to reallocate funds from other planned uses and would have a significant negative effect on our business plans and operations, including our ability to develop new products and continue our current operations. If our stock price declines, there can be no assurance that we can raise additional capital or generate funds from operations sufficient to meet our obligations. We believe the following factors could cause the market price of our common stock to continue to fluctuate widely and could cause our common stock to trade at a price below the price at which you purchase your shares of common stock:
>
> - actual or anticipated variations in our quarterly operating results;
> - announcements of new services, products, acquisitions or strategic relationships by us or our competitors;
> - changes in accounting treatments or principles;
> - changes in earnings estimates by securities analysts and in analyst recommendations; and
> - general political, economic, regulatory and market conditions.
>
> The market price for our common stock may also be affected by our ability to meet or exceed expectations of analysts or investors. Any failure to meet these expectations, even if minor, could materially adversely affect the market price of our common stock.

99. The above statements in paragraphs 98 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme

to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

100. Similarly, Anavex stated further in the 2013 Form 10-K that:

> ***Trading of our common stock may be volatile and sporadic****, which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.*
>
> There is currently a limited market for our common stock and **the volume of our common stock traded on any day may vary significantly from one period to another**. Our common stock is quoted on OTC Market's OTCOB. **Trading in stock quoted on OTC Market's OTCOB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects**. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance. Moreover, OTC Market's OTCOB is not a stock exchange, and trading of securities quoted on OTC Market's OTCOB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ. There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(emphasis added)

101. The omissions described in paragraph 98 above and the bold statements identified in bold-faced font in paragraph 100 (to the extent they were incorporated in the 2Q14 Form 10-Q) were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

102. In conjunction with the 2Q14 Form 10-Q, Defendant Missling also filed Sarbanes-Oxley Act certifications. The certifications attested to the accuracy and completeness of the 2Q14 Form 10-Q. The certifications stated as follows:

> I, Christopher Missling, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q for the three months ended March 31, 2014 of Anavex Life Sciences Corp. (the "registrant");
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

> 5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> > (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
> >
> > (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(emphasis added)

103. The above statements identified in bold-faced font in paragraphs 102 were materially false and/or misleading. As explained previously, the 2Q14 Form 10-Q failed to disclose that Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Accordingly, Defendant Missling's attestation to the accuracy of the 2Q14 Form 10-Q was false and/or materially misleading.

**<u>August 13, 2014 – Quarterly Report</u>**

104. Anavex filed a quarterly report (Form 10-Q) with the SEC on August 13, 2014 (the "3Q14 Form 10-Q"). Defendant Missling signed the quarterly report on behalf of Anavex.

105. The financial statements within the 3Q14 Form 10-Q provided the following information about the Company:

- Anavex had 38,260,098 shares of common stock outstanding as of August 12, 2014;
- Anavex's consolidated balance sheet indicated that, as of June 30, 2014, the Company had $8,179,681 of cash compared to $1,703,307 of accounts payable and accrued liabilities;
- Anavex's operating loss before other income/expenses was $10,257 for the quarter ended June 30, 2014;

- Anavex did not provide investors with its investor relations expenses for the three- and nine-month periods ended June 30, 2014. Instead, Anavex stated in a note to its financial statements that the Company's operating expenses for the nine-month period ended June 30, 2014 was $2,329,608, which represented an increase of $1,660,648 compared to $668,960 for the nine-month period ended June 30, 2013. Anavex identified "an increase in investor relations expenses" as being partially responsible for the increase in expenses; and

- Anavex did not provide investors with its consulting fees expenses for the three- and six-month periods ended June 30, 2014.

106. Anavex's accumulated deficit as of June 30, 2014 was $42,874,285. According to the 3Q14 Form 10-Q, Anavex had not generated any revenue since inception on January 23, 2004.

107. Anavex's 3Q14 Form 10-Q incorporated risk warnings from the Company's most recent annual report (Form 10-K) for fiscal 2013 filed on December 31, 2013. With respect to the volatile conditions in the stock and financial markets, Anavex's annual report for fiscal 2013 stated, in pertinent part, as follows:

> *A decline in the price of our common stock could affect our ability to raise further working capital and adversely impact our operations and would severely dilute existing or future investors if we were to raise funds at lower prices.*
>
> A prolonged decline in the price of our common stock could result in a reduction in our ability to raise capital. Because our operations have been financed through the sale of equity securities, a decline in the price of our common stock could be especially detrimental to our continued operations. Any reduction in our ability to raise equity capital in the future would force us to reallocate funds from other planned uses and would have a significant negative effect on our business plans and operations, including our ability to develop new products and continue our current operations. If our stock price declines, there can be no assurance that we can raise additional capital or generate funds from operations sufficient to meet our obligations. We believe the following factors could cause the market price of our common stock to continue to fluctuate widely and could cause our common stock to trade at a price below the price at which you purchase your shares of common stock:
>
> - actual or anticipated variations in our quarterly operating results;
>
> - announcements of new services, products, acquisitions or strategic relationships by us or our competitors;

- changes in accounting treatments or principles;
- changes in earnings estimates by securities analysts and in analyst recommendations; and
- general political, economic, regulatory and market conditions.

> The market price for our common stock may also be affected by our ability to meet or exceed expectations of analysts or investors. Any failure to meet these expectations, even if minor, could materially adversely affect the market price of our common stock.

108. The above statements in paragraphs 107 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

109. Similarly, Anavex stated further in the 2013 Form 10-K that:

> ***Trading of our common stock may be volatile and sporadic****, which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.*
>
> There is currently a limited market for our common stock and **the volume of our common stock traded on any day may vary significantly from one period to another**. Our common stock is quoted on OTC Market's OTCOB. **Trading in stock quoted on OTC Market's OTCOB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects**. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance. Moreover, OTC Market's OTCOB is not a stock exchange, and trading of securities quoted on OTC Market's OTCOB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ. There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(emphasis added)

110. The omissions described in paragraph 107 above and the bold statements identified in bold-faced font in paragraph 109 (to the extent they were incorporated in the 3Q14 Form 10-Q) were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

111. In conjunction with the 3Q14 Form 10-Q, Defendant Missling also filed Sarbanes-Oxley Act certifications. The certifications attested to the accuracy and completeness of the 3Q14 Form 10-Q. The certifications stated as follows:

> I, Christopher Missling, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q for the three months ended June 30, 2014 of Anavex Life Sciences Corp. (the "registrant");
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its

> consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(emphasis added)

112. The above statements identified in bold-faced font in paragraphs 111 were materially false and/or misleading. As explained previously, the 3Q14 Form 10-Q failed to disclose that Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Accordingly, Defendant Missling's attestation to the accuracy of the 3Q14 Form 10-Q was false and/or materially misleading.

## December 29, 2014 – Annual Report

113. Anavex filed an annual report (Form 10-K) with the SEC on December 29, 2014 (the "2014 Form 10-K"). Defendant Missling signed the annual report on behalf of Anavex.

114. The financial statements within the 2014 Form 10-K provided the following information about the Company:

- Anavex had 54,684,905 shares of common stock outstanding as of December 15, 2014;
- Anavex's consolidated balance sheet indicated that, as of September 30, 2014, the Company had $7,262,138 of cash compared to $1,249,084 of accounts payable and accrued liabilities;
- Anavex's operating loss before other income/expenses was ($2,968,675) for the year ended September 30, 2014;
- Anavex did not provide investors with its investor relations expenses for the year ended September 30, 2014. Instead, Anavex stated that the Company's operating expenses for the year ended September 30, 2014 was $2,968,975, which represented an increase of $831,608 compared to $2,137,367 for the year ended September 30, 2013. Anavex identified "an increase in investor relations expenses" as being partially responsible for the increase in expenses; and
- Anavex did not provide investors with its consulting fees expenses for the three- and six-month periods ended June 30, 2014.

115. The notes to the financial statements in the 2014 Form 10-K indicated that Anavex had "an accumulated deficit of $52,573,325" and, to date, had "not generated any revenues from our operations." As a result of this, Anavex stated that it had a "substantial doubt about our ability to continue as a going concern."

116. The 2014 Form 10-K discussed risks related to Anavex's common stock, including volatility in the price as well as the impact of the price on the Company's ability to obtain future financing. The 2014 Form 10-K stated, in pertinent part, as follows:

> *A decline in the price of our common stock could affect our ability to raise further working capital and adversely impact our operations and would severely dilute existing or future investors if we were to raise funds at lower prices.*

> A prolonged decline in the price of our common stock could result in a reduction in our ability to raise capital. Because our operations have been financed through the sale of equity securities, a decline in the price of our common stock could be especially detrimental to our continued operations. Any reduction in our ability to raise equity capital in the future would force us to reallocate funds from other planned uses and would have a significant negative effect on our business plans and operations, including our ability to develop new products and continue our current operations. If our stock price declines, there can be no assurance that we can raise additional capital or generate funds from operations sufficient to meet our obligations. We believe the following factors could cause the market price of our common stock to continue to fluctuate widely and could cause our common stock to trade at a price below the price at which you purchase your shares of common stock:
>
> - actual or anticipated variations in our quarterly operating results;
> - announcements of new services, products, acquisitions or strategic relationships by us or our competitors;
> - changes in accounting treatments or principles;
> - changes in earnings estimates by securities analysts and in analyst recommendations; and
> - general political, economic, regulatory and market conditions.
>
> The market price for our common stock may also be affected by our ability to meet or exceed expectations of analysts or investors. Any failure to meet these expectations, even if minor, could materially adversely affect the market price of our common stock.

117. The above statements in paragraphs 116 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex’s stock price artificially through paid promotions. Having disclosed these risks concerning the Company’s common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

118. Similarly, Anavex stated further in the 2014 Form 10-K that:

> ***Trading of our common stock may be volatile and sporadic****, which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.*
>
> There is currently a limited market for our common stock and **the volume of our common stock traded on any day may vary significantly from one period to another**. Our common stock is quoted on OTC Market's OTCOB. **Trading in stock quoted on OTC Market's OTCOB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects**. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance. Moreover, OTC Market's OTCOB is not a stock exchange, and trading of securities quoted on OTC Market's OTCOB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ. There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(emphasis added)

119. The above statements identified in bold-faced font in paragraph 118 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

120. In conjunction with the 2014 Form 10-K, Defendant Missling also filed Sarbanes-Oxley Act certifications. The certifications attested to the accuracy and completeness of the 2013 Form 10-K. The certifications stated as follows:

> I, Christopher Missling, certify that:
>
> 1. I have reviewed this quarterly report on Form 10-K of Anavex Life Sciences Corp. (the "registrant");

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

> (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(emphasis added)

121. The above statements identified in bold-faced font in paragraph 120 were materially false and/or misleading. As explained previously, the 2014 Form 10-K failed to disclose that Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Accordingly, Defendant Skarpelos' attestation to the accuracy of the 2014 Form 10-K was false and/or materially misleading.

**<u>February 17, 2015 – Quarterly Report</u>**

122. Anavex filed a quarterly report (Form 10-Q) with the SEC on February 17, 2015 (the "1Q15 Form 10-Q"). Defendant Missling signed the quarterly report on behalf of Anavex.

123. The financial statements within the 1Q15 Form 10-Q provided the following information about the Company:

- Anavex had 56,441,000 shares of common stock outstanding as of February 13, 2014;
- Anavex's consolidated balance sheet indicated that, as of December 31, 2014, the Company had $6,980,924 of cash compared to $1,319,840 of accounts payable and accrued liabilities;
- Anavex's operating loss before other income/expenses was $770,678 for the quarter ended December 31, 2014;
- Anavex did not provide investors with its investor relations expenses for the three-month periods ended December 31, 2014. Instead, Anavex stated in a note to its financial statements that the Company's operating expenses for the three-month period ended December 31, 2014 was $770,678, which represented an increase of $461,070 compared to $309,608 for the three-month period ended December 31, 2013. The increase was due to increased research and development expenses of $313,445 related to the Company's clinical trial in Australia; and

- Anavex did not provide investors with its consulting fees expenses for the three-month periods ended December 31, 2014.

124. Anavex's accumulated deficit as of December 31, 2014 was $53,360,043. According to the 1Q15 Form 10-Q, Anavex had not generated any revenue since inception on January 23, 2004.

125. Anavex's 1Q15 Form 10-Q incorporated risk warnings from the Company's most recent annual report (Form 10-K) for fiscal 2014 filed on December 29, 2014. With respect to the volatile conditions in the stock and financial markets, Anavex's annual report for fiscal 2014 stated, in pertinent part, as follows:

> *A decline in the price of our common stock could affect our ability to raise further working capital and adversely impact our operations and would severely dilute existing or future investors if we were to raise funds at lower prices.*
>
> A prolonged decline in the price of our common stock could result in a reduction in our ability to raise capital. Because our operations have been financed through the sale of equity securities, a decline in the price of our common stock could be especially detrimental to our continued operations. Any reduction in our ability to raise equity capital in the future would force us to reallocate funds from other planned uses and would have a significant negative effect on our business plans and operations, including our ability to develop new products and continue our current operations. If our stock price declines, there can be no assurance that we can raise additional capital or generate funds from operations sufficient to meet our obligations. We believe the following factors could cause the market price of our common stock to continue to fluctuate widely and could cause our common stock to trade at a price below the price at which you purchase your shares of common stock:
>
> - actual or anticipated variations in our quarterly operating results;
> - announcements of new services, products, acquisitions or strategic relationships by us or our competitors;
> - changes in accounting treatments or principles;
> - changes in earnings estimates by securities analysts and in analyst recommendations; and
> - general political, economic, regulatory and market conditions.

> The market price for our common stock may also be affected by our ability to meet or exceed expectations of analysts or investors. Any failure to meet these expectations, even if minor, could materially adversely affect the market price of our common stock.

126. The above statements in paragraphs 125 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

127. Similarly, Anavex stated further in the 2014 Form 10-K that:

> ***Trading of our common stock may be volatile and sporadic***, *which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.*
>
> There is currently a limited market for our common stock and **the volume of our common stock traded on any day may vary significantly from one period to another**. Our common stock is quoted on OTC Market's OTCOB. **Trading in stock quoted on OTC Market's OTCOB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects**. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance. Moreover, OTC Market's OTCOB is not a stock exchange, and trading of securities quoted on OTC Market's OTCOB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ. There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(emphasis added)

128. The omissions described in paragraph 125 above and the bold statements identified in bold-faced font in paragraph 127 (to the extent they were incorporated in the 1Q15 Form 10-Q) were materially false and/or misleading because they omitted to disclose to investors that Anavex

was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

129. In conjunction with the 1Q15 Form 10-Q, Defendant Missling also filed Sarbanes-Oxley Act certifications. The certifications attested to the accuracy and completeness of the 1Q15 Form 10-Q. The certifications stated as follows:

> I, Christopher Missling, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q for the three months ended December 31, 2014 of Anavex Life Sciences Corp. (the "registrant");
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(emphasis added)

130. The above statements identified in bold-faced font in paragraphs 129 were materially false and/or misleading. As explained previously, the 1Q15 Form 10-Q failed to disclose that Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Accordingly, Defendant Missling's attestation to the accuracy of the 1Q15 Form 10-Q was false and/or materially misleading.

**<u>May 14, 2015 – Quarterly Report</u>**

131. Anavex filed a quarterly report (Form 10-Q) with the SEC on May 14, 2015 (the "2Q15 Form 10-Q"). Defendant Missling signed the quarterly report on behalf of Anavex.

132. The financial statements within the 1Q15 Form 10-Q provided the following information about the Company:

- Anavex had 77,243,580 shares of common stock outstanding as of May 14, 2015;

- Anavex's consolidated balance sheet indicated that, as of March 31, 2015, the Company had $6,310,643 of cash compared to $1,437,939 of accounts payable and accrued liabilities;

- Anavex's operating loss before other income/expenses was $858,339 for the quarter ended March 31, 2015;

- Anavex did not provide investors with its investor relations expenses for the three-month periods ended December 31, 2014; and

- Anavex did not provide investors with its consulting fees expenses for the three-month periods ended December 31, 2014.

133. Anavex's accumulated deficit as of March 31, 2015 was $55,084,902. According to the 2Q15 Form 10-Q, Anavex had not generated any revenue since inception on January 23, 2004.

134. Anavex's 2Q15 Form 10-Q incorporated risk warnings from the Company's most recent annual report (Form 10-K) for fiscal 2014 filed on December 29, 2014. With respect to the volatile conditions in the stock and financial markets, Anavex's annual report for fiscal 2014 stated, in pertinent part, as follows:

> *A decline in the price of our common stock could affect our ability to raise further working capital and adversely impact our operations and would severely dilute existing or future investors if we were to raise funds at lower prices.*
>
> A prolonged decline in the price of our common stock could result in a reduction in our ability to raise capital. Because our operations have been financed through the sale of equity securities, a decline in the price of our common stock could be especially detrimental to our continued operations. Any reduction in our ability to raise equity capital in the future would force us to reallocate funds from other planned uses and would have a significant negative effect on our business plans and operations, including our ability to develop new products and continue our current operations. If our stock price declines, there can be no assurance that we can raise additional capital or generate funds from operations sufficient to meet our obligations. We believe the following factors could cause the market price of our common stock to continue to fluctuate widely and could cause our common stock to trade at a price below the price at which you purchase your shares of common stock:

- actual or anticipated variations in our quarterly operating results;
- announcements of new services, products, acquisitions or strategic relationships by us or our competitors;
- changes in accounting treatments or principles;
- changes in earnings estimates by securities analysts and in analyst recommendations; and
- general political, economic, regulatory and market conditions.

> The market price for our common stock may also be affected by our ability to meet or exceed expectations of analysts or investors. Any failure to meet these expectations, even if minor, could materially adversely affect the market price of our common stock.

135. The above statements in paragraphs 134 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

136. Similarly, Anavex stated further in the 2014 Form 10-K that:

> ***Trading of our common stock may be volatile and sporadic***, *which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.*
>
> There is currently a limited market for our common stock and **the volume of our common stock traded on any day may vary significantly from one period to another**. Our common stock is quoted on OTC Market's OTCOB. **Trading in stock quoted on OTC Market's OTCOB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects**. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance. Moreover, OTC Market's OTCOB

> is not a stock exchange, and trading of securities quoted on OTC Market's OTCOB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ. There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(emphasis added)

137. The omissions described in paragraph 134 above and the bold statements identified in bold-faced font in paragraph 136 (to the extent they were incorporated in the 2Q15 Form 10-Q) were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

138. In conjunction with the 2Q15 Form 10-Q, Defendant Missling also filed Sarbanes-Oxley Act certifications. The certifications attested to the accuracy and completeness of the 2Q15 Form 10-Q. The certifications stated as follows:

> I, Christopher Missling, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q for the three months ended March 31, 2015 of Anavex Life Sciences Corp. (the "registrant");
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules

> 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> > (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
> >
> > (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(emphasis added)

139. The above statements identified in bold-faced font in paragraphs 138 were materially false and/or misleading. As explained previously, the 2Q15 Form 10-Q failed to disclose that Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions.

Accordingly, Defendant Missling's attestation to the accuracy of the 2Q15 Form 10-Q was false and/or materially misleading.

**August 14, 2015 – Quarterly Report**

140. Anavex filed a quarterly report (Form 10-Q) with the SEC on August 14, 2015 (the "3Q15 Form 10-Q"). Defendant Missling signed the quarterly report on behalf of Anavex.

141. The financial statements within the 3Q15 Form 10-Q provided the following information about the Company:

- Anavex had 120,446,116 shares of common stock outstanding as of August 14, 2015;
- Anavex's consolidated balance sheet indicated that, as of June 30, 2015, the Company had $7,961,331 of cash compared to $1,259,051 of accounts payable and accrued liabilities. The increase in Anavex's cash position was due to the exercise of outstanding warrants;
- Anavex's operating loss before other income/expenses was $1,512,960 for the quarter ended June 30, 2015;
- Anavex did not provide investors with its investor relations expenses for the three-month periods ended December 31, 2014; and
- Anavex did not provide investors with its consulting fees expenses for the three-month periods ended December 31, 2014.

142. Anavex's 3Q15 Form 10-Q incorporated risk warnings from the Company's most recent annual report (Form 10-K) for fiscal 2014 filed on December 29, 2014. With respect to the volatile conditions in the stock and financial markets, Anavex's annual report for fiscal 2014 stated, in pertinent part, as follows:

> *A decline in the price of our common stock could affect our ability to raise further working capital and adversely impact our operations and would severely dilute existing or future investors if we were to raise funds at lower prices.*
>
> A prolonged decline in the price of our common stock could result in a reduction in our ability to raise capital. Because our operations have been financed through the sale of equity securities, a decline in the price of our common stock could be especially detrimental to our continued operations. Any reduction in our ability to

> raise equity capital in the future would force us to reallocate funds from other planned uses and would have a significant negative effect on our business plans and operations, including our ability to develop new products and continue our current operations. If our stock price declines, there can be no assurance that we can raise additional capital or generate funds from operations sufficient to meet our obligations. We believe the following factors could cause the market price of our common stock to continue to fluctuate widely and could cause our common stock to trade at a price below the price at which you purchase your shares of common stock:
>
> - actual or anticipated variations in our quarterly operating results;
> - announcements of new services, products, acquisitions or strategic relationships by us or our competitors;
> - changes in accounting treatments or principles;
> - changes in earnings estimates by securities analysts and in analyst recommendations; and
> - general political, economic, regulatory and market conditions.
>
> The market price for our common stock may also be affected by our ability to meet or exceed expectations of analysts or investors. Any failure to meet these expectations, even if minor, could materially adversely affect the market price of our common stock.

143. The above statements in paragraphs 142 were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

144. Similarly, Anavex stated further in the 2014 Form 10-K that:

> ***Trading of our common stock may be volatile and sporadic****, which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.*

> There is currently a limited market for our common stock and **the volume of our common stock traded on any day may vary significantly from one period to another**. Our common stock is quoted on OTC Market's OTCOB. **Trading in stock quoted on OTC Market's OTCOB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects**. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance. Moreover, OTC Market's OTCOB is not a stock exchange, and trading of securities quoted on OTC Market's OTCOB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ. There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(emphasis added)

145. The omissions described in paragraph 142 above and the bold statements identified in bold-faced font in paragraph 144 (to the extent they were incorporated in the 3Q15 Form 10-Q) were materially false and/or misleading because they omitted to disclose to investors that Anavex was substantively responsible for the volatility of its common stock price due to an ongoing stock promotion campaign. Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were obligated to disclose the risk to its common stock relating to the paid-promotions scheme.

146. In conjunction with the 3Q15 Form 10-Q, Defendant Missling also filed Sarbanes-Oxley Act certifications. The certifications attested to the accuracy and completeness of the 3Q15 Form 10-Q. The certifications stated as follows:

> I, Christopher Missling, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q for the three months ended June 30, 2015 of Anavex Life Sciences Corp. (the "registrant");
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>>
>> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>>
>> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
>> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>>
>> (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(emphasis added)

147. The above statements identified in bold-faced font in paragraphs 146 were materially false and/or misleading. As explained previously, the 3Q15 Form 10-Q failed to disclose that Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Anavex's stock price artificially through paid promotions. Accordingly, Defendant Missling's attestation to the accuracy of the 3Q15 Form 10-Q was false and/or materially misleading.

**ANAVEX'S STOCK PROMOTION SCHEME IS REVEALED**

**October 6, 2015**

148. The truth about Anavex's stock promotion scheme was partially revealed on October 6, 2015. In an article titled "Anavex Life Sciences: Biotech Pump Goes On And On And…," Sonya Colberg, Senior Editor for the popular investor news outlet *The Street Sweeper*, discussed the suspicious trading patterns around Anavex stock (the "Colberg Article I").

149. The Colberg Article I juxtaposed the fact that Anavex had "a $230 million-plus market valuation" with the Company's longstanding lack of operations and immense accumulated deficit. The article noted that the Company was initially a "digital-to-photo-print business" that changed its operations into a biopharmaceutical company overnight through a "reverse merger" in 2007, and that since then Anavex has "lost $61.8 million" and has been "living on the ragged edge of survival."

150. The Colberg Article I concluded that Anavex's incredible market valuation was due to an undisclosed stock promotion campaign. For support, the article referenced Anavex promotional pieces featured on a websites such as Wide World of Stocks and Stock News Now. The Colberg Article I also questioned whether Missling was responsible for the promotion, given

the fact that his compensation equaled or surpassed the total amount of money Anavex spent on research and development.

151. *The Street Sweeper* published the Colberg Article I during the morning of October 6, 2015. On October 6, 2015, Anavex's common stock price opened at $7.74 per share. During the course of the day, the price dropped to $5.48 per share, ultimately closing at $5.80 per share on unusually heavy volume. The Colberg Article I resulted in a decline of approximately 25% in the span of just one trading day.

**<u>October 14, 2015</u>**

152. On October 14, 2015, Ms. Colberg from *The Street Sweeper* published a second article about Anavex titled "Anavex Life Sciences: Biotech Pump Goes On … II" (the "Colberg Article II").

153. The Colberg Article II elaborated on the claims made in the Colberg Article I. Ms. Colberg focused on a then-recent Anavex promotion featured in an e-mail news alert sent by "Stockpalooza.com." The promotional piece told investors to "Put [Anavex] on your radar! [Anavex] have been stabilizing right around $9 dollars with a nice volume to boot!" The piece went on to state that "Results from pre-clinical studies indicate that ANAVEX 2-73 demonstrates anti-amnesic and neuroprotective properties." In fine print below the tout, "Stockpalooza.com" disclosed that "StockPalooza.com.com [sic] expect to be compensated Two Hundred Thousand Dollars Cash via Bank Wire Transfer by a third party for a 1 Day Marketing Program regarding [Anavex]."

154. In response to the promotion, Ms. Colberg spoke with Defendant Missling during an interview on October 13, 2015. During the interview, Ms. Colberg asked Missling whether he or the Company was responsible for the promotional piece. Missling responded, stating that

"Absolutely not by us. That's crazy! . . . We do very ethical work. Let me tell you this. We really don't want any association with anything like that. It's absolutely inappropriate." Missling further claimed during the interview that "We are not by any means highly promotional. . . . We would never, ever consider paying even $1 for what you mentioned."

155. The Colberg Article II concluded with a list of no less than seven "red flags" indicating the likelihood of an ongoing, underhanded stock promotion campaign, including the close temporal proximity between the promotions and the Company's uplisting to trading on the NASDAQ. "After more digging into Anavex – previously traded under the stock symbol AVXL, but temporarily trading under AVXLD – we remain convinced the stock is excessively hyped and continues to pose a significant investment risk."

156. The Colberg Article II was released mid-day on October 14, 2015. On October 14, 2015, Anavex's common stock opened at $8.875 per share, reaching a high of $8.88 per share before declining to $7.91 per share and ultimately closing at $8.49 per share on heavy trading. Anavex's stock price continued to decline the following day on October 15, 2015, closing at $8.40. The decline in Anavex's stock price between October 14 and 15, 2015 was caused by the Colberg Article II.

**<u>November 9, 2015</u>**

157. The truth about Anavex's stock promotion scheme was partially revealed on November 9, 2015. In an article titled "The Secret to Making 2000% in Stocks Overnight, the Anavex Story," analyst Jean Fonteneau discussed at length the volatility in Anavex's stock price (the "Fonteneau Article"). The Fonteneau Article stated, in pertinent part, as follows:

- "During the week of November 2nd, 2015, a promotional 'newsletter', run by a site claiming to sell stock 'research' and investment advice named Agora Financial, was sent around urging investors to jump on a little known stock, trading for about $9, that was about to, with almost complete certainty, rocket overnight to $200, or

a gain of 2150%, and even further hinting that the stock could be worth as much as $900 or a 10000% gain."

- "According to Agora Financial author the value of AVXL was about to rise overnight to $6.5 billion, if not $30 billion (!), a staggering amount for such a small entity that has never generated any revenues, has virtually no assets, and was trading for $0.65 per share (worth about $20 million in total) in early 2015."

- "A number of the people involved with Anavex Life Sciences at the time (2006-2011), namely the CEO, CFO, COO, have now been linked to numerous penny stock operations that were used as the vehicle of 'pump and dump' schemes listed on various exchanges, mainly in Canada."

- "This small company stock, unknown to probably 99% of the investing public. . . can only be the result of active promotion and spam. . . . To conclude, Anavex Life Sciences (AVXL), appears to be somewhat of a phenomenon in the world of stock promotion schemes for its longevity, sophistication and scale."

158. The Fonteneau Article led to a significant decline in Anavex's stock price. On November 9, 2015, Anavex's stock price declined from $9.20 per share in the morning when the Fonteneau Article was first released to $6.05 per share afterwards. Anavex's stock price closed at $6.20 per share on November 9, 2015, a total loss of over 32%.

159. Anavex's stock price continued to decline the following day as the market absorbed the information in the Fonteneau Article. From a closing price of $6.20 per share on November 9, 2015, Anavex's stock price continued to decline to an intraday trading low of $3.60 per share on November 10, 2015, ultimately closing at $5.44 per share. In the span of just two days, Anavex's stock price declined over 40% in response to the Fonteneau Article. The declines in Anavex's stock price occurred on unusually heavy trading volume.

**November 11, 2015**

160. On November 11, 2015, popular investor website SeekingAlpha.com re-released the Fonteneau Article (under the title "Anavex Life Sciences: A Promotional Company With Too Many Red Flags"). The Fonteneau Article immediately caused further declines in Anavex's stock

price. From a closing price of $5.44 per share on November 10, 2015, Anavex's stock price declined to $3.24 per share over the course of the next five trading days ending November 17, 2015. The declines in Anavex's stock price occurred on unusually heavy trading volume.

**December 29, 2015**

161. Several weeks later, on December 29, 2015, pre-market, Anavex filed an annual report (Form 10-K) with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended September 30, 2015. For the quarter, the Company reported a net loss of $5.36 million, or $0.20 per diluted share, on zero revenue, compared to a net loss of $9.70 million, or $0.88 per diluted share, on zero revenue for the same period in the prior year. For fiscal year 2015, the Company reported a net loss of $12.11 million, or $0.65 per diluted share, on zero revenue, compared to a net loss of $11.37 million, or $1.16 per diluted share, on zero revenue for fiscal year 2014.

162. Anavex also disclosed in the annual report that it had received a subpoena from the SEC on December 22, 2015. Anavex stated: "On December 22, 2015, the Company received a subpoena from the Securities and Exchange Commission (SEC) which indicates that the agency is conducting a formal investigation. The Company believes the subpoena and investigation relate to the recent unusual activity in the market for the Company's shares. The Company is fully cooperating with the SEC in this investigation and is unable to predict when this matter will be resolved or what further action, if any, the SEC may take in connection with it."

163. As a result of this news, Anavex stock fell $0.75 per share, or 10%, to close at $6.28 per share on December 29, 2015 from $7.03 per share on December 28, 2015. The declines in Anavex's stock price occurred on unusually heavy trading volume.

**December 30, 2015**

164. The next day, on December 30, 2015, pre-market, investor website SeekingAlpha.com published a report by Melissa Davis entitled "Anavex: A Regulatory Target Damaged By Incriminating Evidence" (the "Davis Report"). Elaborating on the subject of the SEC's subpoenas, the Davis Report stated, in pertinent part, as follows:

> Since its early days as a young penny-stock company, for example, Anavex has relied on The Primoris Group for publicity in spite of the firm's crowded roster of dubious microcap companies and its suspected involvement in pump-and-dump schemes.
>
> By the time that Anavex hired the firm almost a decade ago—using 50,000 stock options to help cover the bill—Primoris had already developed a reputation for touting the very sort of sleazy microcap stocks responsible for giving the industry such a horrible name . . . .
>
> With Primoris in charge of its publicity, Anavex has managed to generate some rather powerful hype of its own.
>
> Anavex owes at least some of its newfound popularity to the glowing review published by Kanak Kanti De, a so-called "doctor" who has developed a strong following on financial websites like Seeking Alpha and The Motley Fool (where he ranks as a senior healthcare contributor) by portraying himself "as a retired medical practitioner" with an impressive "M.D." behind his name. Unless De rushed to pursue a second career in medicine after serving as the chairman of IndoGenic Consultancy—a paid content provider that caters to clients seeking favorable stock coverage—however, his credentials look somewhat inflated, to say the very least. In the official bio that appeared on its website less than five years ago, IndoGenic described De as "a veteran college principal (retired) with a Ph.D. in English"—not a medical doctor—when the firm openly showcased his role as chairman of its board.

165. The Davis Report elaborated on the past releases concerning Anavex's stock promotion scheme, discussing Dr. Kanak Kanti De in particular. Investors reacted promptly to the Davis Report. On this news, Anavex's stock price fell $0.78 per share, or 12%, to close at $5.50 on December 30, 2015 from $6.28 per share on December 29, 2015. The declines in Anavex's stock price occurred on unusually heavy trading volume.

166. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

167. Anavex has been a company with virtually no significant operations since its inception. It has never generated revenue and has never had more than four full-time employees. The Company's drug pipeline is largely filled with pre-clinical studies, except for ANAVEX 2-73 which is and has been in a Phase IIa study in Australia for the past year and a half (December 2014) with no sign of completion any time soon.

168. Anavex has suffered from immense deficits as a result of its lack of progress. The Company's accumulated deficit as of December 31, 2015 was $67,235,964. At the same time, Anavex was spending millions of dollars per year in operating activities—$3.7 million in fiscal 2013, $9.9 million in fiscal 2014, and $12.1 million in fiscal 2015. Throughout the Class Period, Anavex consistently disclosed that it had substantial doubts about the Company's ability to continue as a going concern.

169. Anavex resorted primarily to equity financing in order to fund operations. In fiscal 2013, 2014, and 2015, Anavex raised $1.1 million, $9.5 million, and $12.2 million, respectively, from selling shares of its common stock, entering into promissory notes, and selling convertible debentures.

170. Furthermore, Anavex, through its stock price, was able to generate significant sums of cash from its arrangements with Lincoln Park Capital. Between 2013 and 2015, Anavex entered into at least three financing agreements with Lincoln Park Capital. Two of these agreements, dated July 5, 2013 and October 21, 2015, essentially operated as "put" contracts whereby Anavex could

force Lincoln Park Capital to buy millions of shares of its common stock at the prevailing market price. The 2013 agreement provided Anavex with the ability to sell Lincoln Park Capital up to $10 million worth of Anavex stock while the 2015 agreement provided Anavex with the ability to sell up to $50 million. Anavex's ability to sell stock to Lincoln Park Capital was absolute, provided Anavex's stock price remain above a certain threshold level ($2.00 per share under the 2013 agreement and $3 per share under the 2015 agreement). Anavex also entered into a purchase agreement with Lincoln Park Capital on October 22, 2014 for an equity investment of $500,000 along with an issuance of 4 million stock purchase warrants (exercisable at $0.30 per share and $0.42 per share, pre-split).

171. The price of the Company's common stock was of critical importance, as it dictated whether or not the Company would be able to generate additional revenue. Anavex admitted as much in its quarterly and annual disclosure filings with the SEC, *e.g.*, the 2014 Form 10-K stated, "A decline in the price of our common stock could affect our ability to raise further working capital and adversely impact our operations and would severely dilute existing or future investors if we were to raise funds at lower prices." Given the importance of the price of Anavex's common stock to Anavex's ability to remain a going concern, Defendants were aware of the fluctuations in its stock price caused by the promotional advertisements described above.

172. Evidence also shows that Defendants were responsible and/or caused the promotional advertisements behind the stock price fluctuations. **First**, Anavex paid materially significant sums of money for "investor relations" services. For fiscal 2013, Anavex paid $128,575 for investor relations, an increase of almost 20% from the prior fiscal year. For fiscal 2014, Anavex's total operating expenses increased to $2.9 million, which according to the 2014

Form 10-K was "mainly attributable" to "an increase in investor relations expenses" as well as a one-time compensation charge and increased research and development.

173. Sneakily, after the first quarter of fiscal 2014, Anavex stopped reporting "investor relations" fees as a line item amount in its expense tables and, for fiscal 2015, provided no information at all about "investor relations" fees. Either Anavex decided to withhold this information from investors and regulators (so as to avoid suspicion) or, alternatively, Anavex hid the information within its "consulting fees" expense item which included fees for "business development" among other things. Similar to Anavex's decision to omit its "investor relations" expenses, Anavex conspicuously omits its "consulting fees" expenses paid to non-directors/officers after the first quarter of fiscal 2014.

174. **Second**, Anavex retained Primoris in 2007. In a press release dated November 2, 2007, Anavex announced that it engaged Primoris to "implement a communications program to support Anavex's corporate growth strategy." Under the terms of the Company's agreement with Primoris, Anavex would pay Primoris $5,000 per month. Anavex also granted Primoris an option to purchase 50,000 shares of Anavex's common stock at an exercise price of $3.75 per share.

175. Primoris' client roster, as featured on their website, includes a number of Canadian mining companies traded over-the-counter. Primoris' clients include Goldsource Mining (CAD$0.40/share), Argentex Mining Corporation (CAD$0.10/share), Carmax Mining (CAD$0.03/share), Eagle Mountain Gold Corp. ($1.56/share), Entrée Gold Corp. (CAD$0.43/share), and NWT Uranium Corporation (CAD$0.05/share). With the exception of Eagle Mountain Gold Corp., Primoris' client's stock trades well under $1. Primoris' clients are all penny-stock companies and all exhibit the indicia of being involved in pump-and-dump stock promotion schemes.

176. Primoris also provided investor relations for a company named HiEnergy Technologies, Inc. ("HiEnergy"). HiEnergy was accused of fraud by the SEC and was subsequently delisted in 2011 and revoked by the SEC in 2013. Primoris was at the center of HiEnergy's legal trouble. HiEnergy's retention of Primoris began with a grant of stock options in HiEnergy, just as Anavex's retention of Primoris began here.

177. That Anavex retained Primoris is not a coincidence. Harvey Lalach was the Company's President and Secretary when Anavex retained Primoris. This is significant given Lalach's history with stock promotion schemes. Initially, Lalach did not have any background or experience in biotechnology. Rather, he was a longtime individual investor. When Anavex transformed into a biotechnology company, Lalach became a "consultant" to the Company in exchange for $90,000 per year. Lalach continued to serve Anavex in various executive and non-executive positions until resigning in June 2012. Lalach's other past employment positions consist of director and executive positions in a slew of apparently non-operational reverse-merger companies, including: ACL International LTD, a Canadian firm acquiring Indonesian oil and gas assets; Savary Gold Corp., a Canadian gold-exploration company with a stock price that declined 70% during Lalach's tenure; and First Cypress Technologies, Inc., a diamond mining company that approved Lalach's appointment as CFO but later indicated that Lalach declined the appointment. Lalach's history demonstrates a pattern of involvement in less-than-reputable companies involved in stock manipulation schemes.

178. **Third**, the opportune timing of the Anavex promotions strongly implicates Defendants as being responsible for the promotions themselves. As mentioned above, Anavex retained the Primoris Group in 2007. From that point forward, Anavex has enjoyed promotional campaigns at key points in time. For example, following the Company's initial listing on over-

the-counter trading in 2006, an Anavex stock promotion campaign commenced in early-2007 as the Company was touting "its strategic vision for growth by discovering and developing cutting-edge drugs against neurological diseases" and "its strategic vision for growth by discovering and developing cutting-edge drugs against solid tumors."

179. Another promotional campaign commenced in 2009 and 2010. While Anavex was publicly introducing a supposed diversified pipeline of drugs under development capable of generating $60 billion of yearly revenues, a number of other promotional pieces were issued and released that created a favorable environment for Anavex to obtain key financing deals based upon its then-current stock price.

180. In the spring of 2013, another promotion campaign commenced. Shortly thereafter, in July 2013, Anavex secured a financing agreement with Lincoln Park Capital for funding up to $10 million. Anavex ultimately received the full $10 million under the terms of this agreement by selling over 2 million shares of Anavex stock to Lincoln Park Capital during mid- to late-2015 at or around the time of the Company's "uplisting" to the NASDAQ.

181. The following year, in late-2014, Anavex announced that it would be commencing its first-ever clinical trial. This was the start of a steep year-long run in Anavex's stock price, climbing from $0.65 per share in late-2014 to more than $14 per share on November 2, 2015. During this time period, Anavex successfully "uplisted" itself from over-the-counter trading to the NASDAQ. Immediately before being "uplisted," Anaved profited by executing a new financing arrangement with Lincoln Park Capital in October 2015. The new financing arrangement provided for financing up to $50 million. While Anavex has yet to receive money under the terms of this new deal, it provided the Company with a lifeline for future operations which was of critical importance. The increase in Anavex's stock price at or around the time of both financing

agreements with Lincoln Park Capital is not a coincidence, but rather intentional on the part of Defendants.

182. Anavex also profited from a string of public offerings during various stock promotion campaigns. Anavex conducted public offerings on October 18, 2013, July 24, 2013, and March 25, 2015. While most of these offerings consisted of "selling stockholders" selling shares to the public, Anavex profited by receiving cash from the exercise of warrants underlying the shares sold in these offerings. For example, in connection with the offering on October 18, 2013, Anavex received $4.8 million from the exercise of warrants; in connection with the offering on July 24, 2014, Anavex received $9.2 million from the sale of debentures related to the common stock registered in the offering; and in connection with the offering on March 25, 2015, Anavex received $9.2 million from the issuance of warrants underlying the shares at issue in the offering. These offerings, including the financing received from Lincoln Park Capital, would not have occurred if Anavex's stock price had not been artificially inflated by Defendants' manipulation and promotion.

183. Defendants' stock promotion scheme has been immensely valuable to the Company. When Anavex stock was at $14 per share, the Company was valued at approximately $470 million (based on approximately 33,789,938 outstanding shares). The stock promotion scheme was the only way for Anavex to demonstrate this amount of value to obtain its financing arrangements—the Company itself has traditionally had less than 10 employees, never generated any revenue, never obtained any partnership development deals, and has never had any material assets other than the cash provided by Lincoln Park Capital, which has been used largely for the Individual Defendants' personal profit in the form of exorbitant salaries and consulting fees. For example, between fiscal 2013 and 2014, Defendant Missling received over $3.2 million in

compensation while Anavex's "consultants" have received millions of dollars since the Company's inception. Considering the fact that Anavex employees only a handful of people, Defendant Missling has rewarded himself handsomely.

184. **Fourth**, the British Columbia Securities Commission previously cited Anavex for involvement in a stock promotion scheme. On June 4, 2013, the British Columbia Securities Commission issued a "Halt Trade Order" which suspended trading of Anavex's stock. The order stated that "[t]he Executive Director consider[ed] that circumstances exist[ed] that could result in other than an orderly trading of Anavex's securities" and halted trading until June 26, 2013. The "Halt Trade Order" was later revoked on June 20, 2013 following a press release from Anavex addressing "the recent promotion of its shares by third parties that appeared to have a significant effect on Anavex's share price and trading volume." Anavex's press release, referenced in the revocation order, was dated June 12, 2013 and purported to deny responsibility for the promotional campaign perpetrated by K Street Financial and/or Wyatt Investment Research.

185. More recently, the SEC has commenced a formal investigation into Anavex's stock manipulation. As disclosed by the Company in its most recent annual report (Form 10-K), Anavex received a subpoena from the SEC. Anavex stated in the annual report that "[t]he Company believes the subpoena and investigation relate to the recent unusual activity in the market for the Company's shares."

186. Anavex's "unusual activity in the market" extends back far more than recent times. The chart below illustrates Anavex's stock performance during the Class Period relative to the performance of stocks belonging to several other companies identified by Anavex as its "competition" in its filings with the SEC:




187. As is evident from the chart, Anavex's stock price (orange) bears no resemblance to the relatively stable prices exhibited by Anavex's competitors which include Axovant Sciences Ltd. (purple), Merck & Co. Inc. (green), Pfizer Inc. (blue), Roche Holding AG (red), and Novartis AG (yellow). Anavex has no substantive operations, does not generate revenue, employs less than five full-time employees, and has been in the same clinical Phase IIa trial for almost one and a half years—there only explanation for Anavex's erratic stock price is Defendants' ongoing promotion and manipulation.

* * *

188. Collectively, the above allegations demonstrate with sufficient particularity that Defendants acted with scienter in connection with the wrongs alleged herein.

## CLASS ACTION ALLEGATIONS

189. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Anavex securities during the Class Period (the "Class"); and were damaged upon the

revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

190. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Anavex securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Anavex or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

191. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

192. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

193. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by defendants' acts as alleged herein;

b. whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Anavex;

c. whether the Individual Defendants caused Anavex to issue false and misleading financial statements during the Class Period;

d. whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of Anavex securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

194. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

195. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Anavex securities are traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiff and members of the Class purchased, acquired and/or sold Anavex securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

196. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

197. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Against All Defendants for Violations of Section 10(b) and Rule 10b-5(b)**
**False and/or Misleading Statements**

198. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

199. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

200. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members,

as alleged herein; (ii) artificially inflate and maintain the market price of Anavex securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Anavex securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

201. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Anavex securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Anavex's finances and business prospects.

202. By virtue of their positions at Anavex, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

203. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Anavex securities from their personal portfolios.

204. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Anavex, the Individual Defendants had knowledge of the details of Anavex's internal affairs.

205. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Anavex. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Anavex's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Anavex securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Anavex's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Anavex securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

206. During the Class Period, Anavex securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Anavex securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were

paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Anavex securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Anavex securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

207. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

208. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against All Defendants for Violations of Section 10(b) and Rule 10b-5(a) and (c) Market Manipulation

209. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

210. During the Class Period, Defendants violated Rules 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Anavex publicly traded common stock during the Class Period as alleged herein. Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to

purchase Anavex's common stock at artificially inflated prices. In furtherance of these unlawful schemes, plans and courses of conduct, Defendants, and each of them, took the actions set forth herein.

211. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock to maintain artificially high market prices for Anavex's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

212. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct, including causing the publication of undisclosed, paid promotions. By paying for, approving, creating and/or publishing paid promotional materials without disclosing that Anavex or its agents paid for the creation and dissemination of those materials, Defendants employed devices, schemes and artifices to defraud, engaged in acts, practices, and a course of conduct designed artificially to inflate the price of Anavex common stock and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Anavex common stock during the Class Period.

213. Defendants knew of the devices, schemes, and artifices to defraud or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of supporting the artificially inflated price of Anavex's securities.

214. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Anavex publicly traded securities. Plaintiffs and the Class would not have purchased Anavex publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for Anavex's common stock had been artificially inflated by Defendants' devices, schemes, and artifices to defraud.

## COUNT III

### Violations of Section 20(a) Against the Individual Defendants
### Control Person Liability

215. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

216. During the Class Period, the Individual Defendants participated in the operation and management of Anavex, and conducted and participated, directly and indirectly, in the conduct of Anavex's business affairs. Because of their senior positions, they knew the adverse non-public information about Anavex's misstatement of income and expenses and false financial statements.

217. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Anavex's financial condition and results of operations, and to correct promptly any public statements issued by Anavex which had become materially false or misleading.

218. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Anavex disseminated in the marketplace during the Class Period concerning Anavex's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Anavex to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Anavex within the meaning of

Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Anavex securities.

219. Each of the Individual Defendants, therefore, acted as a controlling person of Anavex. By reason of their senior management positions and/or being directors of Anavex, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Anavex to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Anavex and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

220. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Anavex.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: May 13, 2016

Respectfully submitted,

LEVI & KORSINSKY LLP

/s/ Adam M. Apton
Nicholas I. Porritt
Adam M. Apton
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: nporritt@zlk.com
Email: aapton@zlk.com

*Counsel for Lead Plaintiff Lam Truong*
*and Lead Counsel for the Class*