**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| KEVIN CORTINA, Individually and On Behalf of All Others Similarly Situated, | ) | Case No. 15-cv-10162 |
| | ) | |
| | ) | Hon. Jesse M. Furman |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANAVEX LIFE SCIENCES CORP., CHRISTOPHER U. MISSLING, SANDRA BOENISCH, and ATHANASIOS SKARPELOS, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

ARGUMENT ............................................................................................................. 7

I.   PLAINTIFFS CANNOT STATE A CLAIM UNDER SECTION 10(b) AGAINST
     DEFENDANTS BASED ON STATEMENTS AND ACTIONS BY THIRD
     PARTIES ........................................................................................................... 9

     A.   Plaintiffs Cannot State A Claim Under Rule 10b-5(b) Because Defendants
          Did Not "Make" Any Of The Statements In The Supposed Promotion
          Scheme .................................................................................................... 9

     B.   Plaintiffs Cannot State A Claim Under Rule 10b-5(a) or (c) Because They
          Cannot Allege That They Relied On Allegedly Deceptive Acts By
          Defendants. ............................................................................................. 11

II.  PLAINTIFFS CANNOT STATE 10b-5 CLAIMS BASED ON FAILURE TO
     DISCLOSE ALLEGED PROMOTION SCHEME. .......................................... 13

III. PLAINTIFFS DO NOT PLEAD FACTS SUPPORTING A STRONG
     INFERENCE OF SCIENTER. ......................................................................... 15

     A.   Plaintiffs Must Plead a Strong Inference of Scienter. ......................... 16

     B.   Plaintiffs Have Not Pleaded Motive and Opportunity to Defraud. ...... 18

     C.   Plaintiffs Have Not Pleaded Strong Circumstantial Allegations of Intent to
          Defraud. .................................................................................................. 19

     D.   Inference of Scienter Is Not As Strong As Non-Fraudulent Inference. ..... 23

     E.   Plaintiffs Cannot Rely on Group Pleading to Establish Scienter. ........ 24

IV.  PLAINTIFFS FAILS TO PLEAD CONTROL-PERSON LIABILITY ............ 25

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................7

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...........................................................................8, 9, 24

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) .........................................................................19

*In re C.D.T.S. v. UBS AG*,
  2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ....................................................25

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994).........................................................................................9, 20

*Chill v. General Elec. Co.*,
  101 F. 3d 263 (2d Cir. 1996).................................................................................23

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F. 3d 187 (2d Cir. 2009)........................................................................... *passim*

*Fezzani v. Bear, Stearns & Co., Inc.*,
  716 F.3d 18 (2d Cir. 2013)...............................................................9, 10, 11, 12

*Fort Worth Employers' Retirement Fund v. Biovail Corp.*,
  615 F. Supp. 2d 218 (S.D.N.Y. 2009)...................................................................23

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
  -- F. Supp. 3d, 2015 WL 964724, *3 (N.D. Ga., Dec. 30, 2015)...........................14

*Garvey v. Arkoosh*,
  345 F. Supp. 2d 73 (D. Mass 2005) ......................................................................14

*In re GeoPharma, Inc. Sec. Litig.*,
  411 F. Supp. 2d 434 (S.D.N.Y. 2006)....................................................................17

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................20

*Hensley v. IEC Elec. Corp.*,
  No. 13-CV-4507 JMF, 2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) ............20, 21

*Janus Cap. Group, Inc. v. First Deriv. Traders,*
    564 U.S. 135 (2011) ........................................................................ 10, 11, 24

*Kalnit v. Eichler,*
    264 F.3d 131 (2d Cir. 2001) ............................................................ 8, 18, 19

*Kleinman v. Elan Corp.,*
    706 F.3d 145 (2d Cir. 2013) .......................................................................... 25

*Lipow v. Net1 UEPS Techs., Inc.,*
    131 F. Supp. 3d 144, 157 (S.D.N.Y. 2015) ...................................... *passim*

*Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.,*
    724 F. Supp. 2d 447 (S.D.N.Y. 2010) ............................................... 16, 23

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
    513 F.3d 702 (7th Cir. 2008) ...................................................................... 21

*In re Molycorp, Inc. Sec. Litig.,*
    2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ......................................... 21

*New Orleans Employees Ret. Sys. v. Celestica, Inc.,*
    445 Fed. Appx. 10 (2d Cir. 2011) .............................................................. 20

*Nielsen v. Rabin,*
    746 F.3d 58 (2d Cir. 2014) ............................................................................ 7

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ................................................................. 16, 17

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP,*
    603 F.3d 144 (2d Cir. 2010) ........................................................... 10, 12, 13

*In re Pfizer Inc. Sec. Litig.,*
    2016 U.S. App. LEXIS 6622, 2016 WL 1426211 .................................... 11

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*
    *Commerce,*
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ...................................................... 20

*In re PXRE Group, Ltd., Sec. Litig.,*
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ...................................................... 22

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) .......................................................................... 8

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510, 526 (S.D.N.Y. 2015), *aff'd, Tongue v. Sanofi*, Nos. 15-
  588-cv, 15-623-cv, 2016 WL 851797 (2d Cir. Mar. 4, 2016) ....................................8

*Santa Fe Ind., Inc. v. Green*,
  430 U.S. 462 (1977)........................................................................................................9

*In re Sec. Cap. Assurance, Ltd. Sec. Litig.*,
  729 F. Supp. 2d 569 (S.D.N.Y. 2010)..............................................................22, 23

*Silsby v. Icahn*,
  17 F. Supp. 3d 348, 365 (S.D.N.Y. 2014) *aff'd sub nom. Lucas v. Icahn*, 616
  F. App'x 448 (2d Cir. 2015) ........................................................................................18

*Steinberg v. Ericsson LM Tel. Co.*,
  No. 07 CV 9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008).............................23

*Stoneridge Investment P'ners LLC v. Scientific-Atlanta*,
  522 U.S. 148, 160 (2008)............................................................................................11

*Teamsters Allied Benefit Funds v. McGraw*,
  No. 09 CIV. 140 (PGG), 2010 WL 882883 (S.D.N.Y. Mar. 11, 2010)..................20

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008)........................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................ *passim*

*Turner v. MagicJack VocalTec, Ltd.*,
  No. 13 CIV. 0448, 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014), *appeal
  dismissed* (April 1, 2014)...........................................................................................18

*In re UBS AG Sec. Litig*,
  2012 WL 4471265, *10 (S.D.N.Y. Sept. 28, 2012)................................................24

*Vining v. Oppenheimer Holdings Inc.*,
  No. 08 Civ. 4435 (LAP), 2010 WL 3825722 (S.D.N.Y. Sept. 29, 2010)...............21

*Zagami v. Cellceutix Corp.*,
  2016 U.S. Dist. LEXIS 74638 15 Civ. 7194 (S.D.N.Y. June 8, 2016)...................11

## Statutes

15 U.S.C. § 77q(b) ............................................................................................................13

15 U.S.C. § 78t(a) .............................................................................................................25

15 U.S.C. § 78u-4(b)(2) ......................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 9(b) .....................................................................................................................8, 9

Defendants Christopher U. Missling, PhD, Sandra Boenisch, CPA, CGA, and Athanasios Skarpelos ("Individual Defendants") and Anavex Life Sciences Corp. ("Anavex" or the "Company") (collectively, "Defendants") submit this Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint (the "Complaint") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA").[1]

## PRELIMINARY STATEMENT

Plaintiffs are former Anavex shareholders who have sued Defendants under §10(b) and 20(a) of the Securities Exchange Act to recover monetary losses they claim to have suffered when the price of Anavex stock declined after revelation on a third-party investor website of a supposed scheme to artificially inflate the price of Anavex stock, which was allegedly perpetrated through more than 30 internet articles, blog posts and interviews written by other third parties over the course of almost five years.  Yet in their 85-page, 220-paragraph Complaint, Plaintiffs do not plead a single fact showing that any Defendant wrote, requested, paid for or was otherwise in any way legally responsible for any of the articles that made up the supposed scheme.  Instead, Plaintiffs' Complaint is an extended smear campaign in which they set out in exhaustive detail things said and done by people other than Defendants and then use carefully-crafted allegations to infer – but never to actually *say* – that Defendants were responsible for saying or doing those things.  But the federal securities laws do not allow such pleading by proxy.  Plaintiffs must provide the details of the allegedly false and misleading statements and/or fraudulent scheme and Defendants' alleged roles in that scheme.  Since Plaintiffs cannot do so, their claims should be dismissed in their entirety, with prejudice.

---

[1] Accompanying this memorandum is the Declaration of David H. Kistenbroker, the exhibits to which are cited as "Ex. __."  The Amended Complaint is cited in the form "Compl. ¶ __."

## FACTUAL BACKGROUND

In the Complaint, Plaintiffs purport to state claims under §§ 10(b) and 20(a) of the Exchange Act.  Compl. ¶¶ 198-214.  Plaintiffs claim Defendants were at the center of a stock promotion scheme in which third parties wrote and distributed more than 30 positive Internet articles about Anavex over the course of 5 years and that these positive articles caused the price of Anavex's stock to become artificially inflated.  *See* Compl. ¶¶ 1-9, 26-60.  Plaintiffs claim that when this supposed scheme was "revealed" by other third parties in another series of Internet articles, the price of Anavex's stock declined, causing them damage.  *See* Compl. ¶¶ 148-166. Importantly, while Plaintiffs go to great lengths in the Complaint to infer that Defendants orchestrated this scheme, they do not allege a single fact demonstrating that any Defendant wrote, paid for or disseminated these Internet articles.  Instead, they cite and quote extensively from the articles, *see* Compl. ¶¶ 1-9, 26-60, reference an investor services company hired by Anavex years before the class period, Compl. ¶ 174, and cite two separate government investigations, separated by more than two years, into unusual trading in Anavex stock, *see* Compl. ¶¶ 5, 32, 162.  The rest of the Complaint is comprised of excerpts of the same sections of every Anavex public filing from the two-and-a-half year class period, all of which Plaintiffs insist were false and misleading because they failed to disclose that Anavex "set in motion", "fueled" or was "substantively responsible" for the stock promotion scheme.  Compl. ¶¶ 61-147.  Plaintiffs' own allegations and the documents from which they are drawn, though, tell a different story.

At the heart of Plaintiffs' claims is the preposterous notion that Anavex is somehow not a *real* company.  Compl. ¶ 167 ("virtually no significant operations since its inception"); 187 ("has no substantive operations, does not generate revenue, employs less than five full-time employees and has been in the same clinical Phase IIa trial for almost one and a half years").  But it is significant to note that Plaintiffs' allegations about the supposed shortcomings of Anavex and its

2

employees and the alleged promotion scheme come exclusively from the very source Plaintiffs decry as the vehicle by which the stock promotion scheme was perpetrated – the Internet.  In fact, the central themes of the Complaint appear to have been lifted nearly verbatim from articles written by so-called journalist Sonya Colberg of TheStreetSweeper.org.  Compl. ¶¶ 148-156.  What Plaintiffs fail to state in the Complaint, though, is that at the time Ms. Colberg wrote those articles, TheStreetSweeper.org held a short position in Anavex and disclosed that it stood "to profit on any future declines in the stock price."  Ex 1.[2]

In contrast to Ms. Colberg's cynical and self-serving articles, Anavex clearly and consistently disclosed in its public filings that it is a *development-phase* biopharmaceutical company aiming to develop drug candidates to treat central nervous system diseases, including Alzheimer's disease.  Compl. ¶ 23, Ex. 2, 12/29/15 Form10-K at 1.  Plaintiffs' own allegations confirm that Anavex always disclosed that its drugs are still in the developmental stage and that the Company has not yet generated any revenue.  Compl. ¶¶ 22-23.

Also disclosed in Anavex's public filings were the impeccable credentials of Anavex's management, board of directors and advisors.  Dr. Missling earned his MS and PhD from the University of Munich and an MBA from Northwestern University Kellogg School of Management and WHU Otto Beisheim School of Management.  Ex. 3, 4/1/16 Proxy at 6.  He has over 20 years of healthcare industry experience in the pharmaceutical, biotech and investment banking industries, including as chief financial officer of successful biotech companies Curis Inc. and ImmunoGen, Inc.  *Id.*  Board member Bernd Metzner, PhD, was chief administration officer and a member of the Board of Management of Bayer Schering Pharma AG, the pharmaceutical division

---

[2] This Court may take judicial notice of documents "reference[d]" in the Complaint," as well as "public disclosure documents that must be filed with the Securities and Exchange Commission."  *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 157 (S.D.N.Y. 2015).

of $100+ billion market cap company Bayer AG. *Id.* Board member Dr. Elliot Favus, MD, is board-certified in internal medicine, was an instructor in medicine at Mount Sinai School of Medicine in New York and worked on human genetics projects at Harvard Medical School, the University of Chicago and the University of Pittsburgh. *Id.* at 7. And board member Steffen Thomas, PhD, is an experienced European patent attorney with masters and doctoral degrees in chemistry from the University of Munich who worked at Japan-based pharmaceutical giant Takeda Pharmaceutical and Nycomed Pharma. *Id.*

Also disclosed in Anavex's public filings but largely ignored in the Complaint is the fact that the experience and expertise of Anavex's leadership has begun to pay off. While Anavex always discloses that its "compounds are in the pre-clinical and clinical testing stages of development" and warns that "there is no guarantee that the activity demonstrated in pre-clinical models will be shown in human testing," *see* e.g., Ex 4, 5/11/16 Form 10-Q at 24, results disclosed during the class period were quite promising. In December 2014, the Company initiated a Phase IIa clinical trial to explore the efficacy and safety of its two leading drug compounds, ANAVEX 2-73 and ANAVEX PLUS, to treat patients with mild to moderate Alzheimer's disease. Ex. 2, 12/29/15 Form10-K at 1-2. These and other compounds also have potential application for depression, epilepsy, neuropathic pain, malignant melanoma, prostate cancer, and pancreatic cancer. *Id.* at 3-4. Significantly, Plaintiffs do not challenge Anavex's positive Phase IIa study results. And developments after the end of the class period confirm that Anavex is a real company, developing real products and making real progress. Most notably,

4

- With regard to ANAVEX 2-73:

  o In January, 2016, the Company reported that a positive dose-response relationship had been observed in Alzheimer's patients given ANAVEX 2-73 for treatment of mild to moderate Alzheimer's disease; Ex 4, 5/11/16 Form 10-Q at 25;

  o In February, 2016, the Company announced positive preclinical data in an exploratory study of Rett syndrome; *id*;

  o In March, 2016, the Company received approval from the Ethics Committee of Australia to extend the ongoing Phase IIa trial of ANAVEX 2-73; *id.*

- And with regard to ANAVEX 3-71:

  o In April, 2016, the U.S. FDA granted Orphan Drug Designation to ANAVEX 3-71 for the treatment of Frontotemporal dementia; Ex 4, 5/11/16 Form 10-Q at 26;

  o In March 2016, the Company announced positive preclinical data showing a statistically significant reduction in the rate of cognitive deficit, amyloid beta pathology and inflammation in animal models. *Id.*

Admittedly, these developments occurred after Plaintiffs filed the Complaint. But even before the first complaint was filed in this case, Anavex's public filings demonstrated definitively that Anavex was doing what hundreds of other development-phase pharmaceutical companies are doing every day – the hard, expensive and sometimes frustratingly slow business of developing the drugs of tomorrow. Plaintiffs omit, minimize or mischaracterize such positive aspects of Anavex's story, though, because they undermine Plaintiffs' efforts to insinuate that Defendants orchestrated a promotional campaign to artificially inflate the price of Anavex stock. But Plaintiffs' efforts to attack the accomplishments and integrity of Anavex and its employees fail for other reasons, too.

5

First, Plaintiffs do not allege that any Defendant wrote, requested or paid for any of the more than 30 Internet articles referenced and/or excerpted in the Complaint.  *See* Compl. ¶¶ 1-9, 26-60.  Plaintiffs use language in the Complaint intended to infer as much, primarily by creating the impression that all of the articles were paid for by *someone*, and that someone had to be Anavex.  Compl. ¶¶ 6, 27, 28, 31 (calling some articles "advertisements") and ¶¶ 33, 42, 50 (noting where authors disclosed that they had been, or expected to be, compensated).  But a careful reading of the Complaint confirms the absence of any allegation that Defendants—or anyone hired by Defendants—requested, wrote, paid for or disseminated the articles cited in the Complaint.  *See* Compl. ¶¶ 1-9, 26-60.  And tellingly, in the two instances referenced in the Complaint in which Defendants emphatically deny any role in articles or a supposed promotion scheme, ***Plaintiffs do not claim the denials were false***.  *See* Compl. ¶¶ 32, 154.

Second, Plaintiffs attempt to tie Defendants to Primoris, an investor relations services company which they claim has a history of inappropriate stock promotion.  Compl. ¶¶ 164, 174-76.  But other than pleading that Avanex retained Primoris in 2007 (Compl. ¶ 174), Plaintiffs plead absolutely nothing about what, if anything, Primoris actually did for Anavex at any time.  Instead, Plaintiffs merely quote extensively from other third-party articles in which Primoris is attacked for their work with *other* clients.  Compl.  ¶¶ 164, 175-177.

Third, Plaintiffs mischaracterize the nature of the inquiries by the British Columbia Securities Commission ("BCSC") in 2013 and the Securities Exchange Commission ("SEC") in 2015.  Insinuating that Anavex is the *target* of two governmental investigations, Plaintiffs allege that "the British Columbia Securities Commission previously cited Anavex for involvement in a stock promotion scheme," Compl. ¶ 184, and that the SEC is currently investigating "[t]he questions surrounding Anavex" and "Anavex's stock manipulation."  Compl. ¶ 8, 185.  The

documents cited in the Complaint, however, do not support such allegations.  Rather than blaming Anavex for the unusual market activity, the BCSC's Halt Trade Order merely states, "The Executive Director considers that circumstances exist that could result in other than orderly trading of Anavex's securities."  Compl. ¶ 184, Ex. 5, 6/5/2013 Halt Trade Order.  Less than one week later, Anavex issued a press release stating that it "did not pay for, authorize, permit, or otherwise participate in" the advertising initiative giving rise to the Halt Trade Order, and further warned that some of the statements in the advertisements were "***exaggerated and/or inaccurate and may be misleading***."  Ex. 6, 6/12/2013 Anavex Press Release (emphasis added).  This occurred not even one month after the class period began, and in response, the BCSC revoked the Halt Trade Order.  *See* Compl. ¶ 184; Ex. 7, 6/20/2013 Revocation of Halt Trade Order.  Likewise, Plaintiffs plead no facts to support their assertion that the SEC is currently investigating the Company's conduct; Anavex merely disclosed that the SEC was investigating "the recent unusual activity in the market for the Company's shares," in its annual report.  Compl. ¶ 162.

## ARGUMENT

When ruling on a motion to dismiss, this Court must accept all well-pleaded factual allegations as true, but it need not credit "conclusory statements" or "threadbare recitals of the elements of a cause of action."  *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 156 (S.D.N.Y. 2015) (citing *Ashcroft v. Igbal*, 556 U.S. 662, 678 (2009)).  To survive a motion to dismiss, a complaint "must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."  *Id*. (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678 (citing *Twombly* at 556).  To satisfy this standard, a plaintiff must show more "than a sheer possibility that a defendant has acted unlawfully."  *Id*. (citing *Ashcroft*, 556 U.S. at 678).

Securities fraud claims are also subject to the heightened pleading requirements of the PSLRA, which requires Plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004). Federal Rule 9(b) also applies and requires Plaintiffs to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *In re Sanofi Sec. Litig*., 87 F. Supp. 3d 510, 526 (S.D.N.Y. 2015), *aff'd*, *Tongue v. Sanofi*, Nos. 15-588-cv, 15-623-cv, 2016 WL 851797 (2d Cir. Mar. 4, 2016). Conclusory and unsupported allegations are insufficient and must be disregarded. *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA also requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter, taking into account plausible opposing inferences. 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). The Complaint here fails to satisfy these demanding requirements and must be dismissed.

Plaintiffs attempt to state two claims under § 10(b) of the Exchange Act: one for misstatements or omissions under Rule 10b-5(b), and one for market manipulation (also referred to as scheme liability) under Rule 10b-5(a) and (c). To state a claim for an actionable misstatement or omission under Rule 10b-5(b), a "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). A valid market manipulation claim must allege "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of

securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Fezzani v. Bear, Stearns & Co., Inc.*, 716 F.3d 18, 22 (2d Cir. 2013). The market manipulation claim thus has the same elements as an ordinary 10(b) action but also includes the elements of a "manipulative act" and "a misplaced belief in the price of the security as being set by arms-length, *bona fide* trading." *Id.* at 22-23.

The term "manipulative act" is a term of art. *ATSI*, 493 F.3d at 99-100. It "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities," *id.* at 100, and it "refers generally to practices, such as wash sales, matched orders, or rigged prices that are intended to mislead investors by artificially affecting market activity.'" *Id.* (citing *Santa Fe Indus. V.* Green, 430 U.S. 462, 476-477 (1977)). The Second Circuit requires "a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security," leading investors into believing "that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand." *Id.* Further, to satisfy Rule 9(b), a claim of manipulation must plead with particularity "the roles of the defendants," and "[g]eneral allegations not tied to the defendants or resting upon speculation are insufficient." *Id.* at 102. Finally, a market manipulation claim cannot be based solely on alleged omissions; rather, "[t]here must be some market activity, such as 'wash sales, matched orders, or rigged prices.'" *Id.* at 101 (citing *Santa Fe Ind., Inc. v. Green*, 430 U.S. 462, 476 (1977)).

**I.      PLAINTIFFS CANNOT STATE A CLAIM UNDER SECTION 10(b) AGAINST DEFENDANTS BASED ON STATEMENTS AND ACTIONS BY THIRD PARTIES.**

**A.      Plaintiffs Cannot State A Claim Under Rule 10b-5(b) Because Defendants Did Not "Make" Any Of The Statements In The Supposed Promotion Scheme.**

The law is clear that only those who actually "make" a statement can be held liable as primary violators of §10(b). *Janus Cap. Group, Inc. v. First Deriv. Traders*, 564 U.S. 135, 143-44 (2011). Importantly, the term "make" is not synonymous with "create." *Id*. at 145. Rather, the maker of the statement is one with "ultimate authority over the statement, including its content and whether and how to communicate it." *Id*. at 143-44. Ordinarily, attribution of a statement is "strong evidence that the statement was made by—***and only by***—the party to whom it is attributed." *Id*. (emphasis added). Even "knowingly participating," "facilitating," or being "indispensable" to the fraud is insufficient. *Fezzani*, 716 F.3d at 24-25. Likewise, the allegation that the public understood that a defendant "'is at work behind the scenes'" is insufficient. *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 155 (2d Cir. 2010). Rather, to be cognizable, defendants must actually "make" the statements at issue. *Janus Cap. Group, Inc.*, 564 U.S. at 143-44.

The Supreme Court's decision in *Janus* is controlling. In that case, plaintiffs sought to hold an investment advisor liable under Rule 10b-5 because it "played a role in preparing or approving the content" of false statements made in its client mutual funds' prospectuses. *Id*. at 138-141. The Supreme Court held that the investment advisor did not "make" the statements at issue because only the mutual fund had "ultimate authority over the statement." *Id*. at 143-44, 147-48. By way of example, the Court explained that while a speechwriter may suggest what another should say, only the speaker can be deemed to "make" the statement, since the speaker has ultimate control over whether and what to say. *Id*. at 143-44. Thus, even though the investment advisor "was significantly involved in preparing the prospectuses" and "exercise[d] significant influence" over the fund, these allegations were not sufficient to create liability. *Id*. at 145-47.

10

Rather, at most, the advisor's participation in the preparation of the statements amounted aiding and abetting, which is not actionable in a private cause of action. *Id*. at 143-44, 145-47.[3]

Just as in *Janus*, the Plaintiff here does not allege facts demonstrating that Defendants "made" the statements published by promotors or analysts. As demonstrated above, while Plaintiffs attempt to infer that Defendants paid promotors or analysts during the class period, they do not actually allege these facts. Nor do Plaintiffs allege that Defendants drafted or adopted these statements. Plaintiffs have thus not alleged that Defendants had ***any*** control—let alone "ultimate control"—over the statements of third parties. *Id*. at 143. This is fatal to Plaintiffs' claim under Rule 10b-5. *Id.* at 158.

**B.    Plaintiffs Cannot State A Claim Under Rule 10b-5(a) or (c) Because They Cannot Allege That They Relied On Allegedly Deceptive Acts By Defendants.**

Just as Plaintiffs must show that statements were actually made by defendants in order to establish liability under Rule 10b-5(b), Plaintiffs must similarly plead that they relied on defendants' "own deceptive conduct"—not the conduct of others—in order to plead a manipulative act under Rule 10b-5(a) and (c). *Fezzani*, 716 F.3d at 28 (citing *Stoneridge Investment P'ners LLC v. Scientific-Atlanta*, 522 U.S. 148, 160 (2008)). Where, as here, plaintiffs allege that they were unaware of Defendants' alleged manipulative acts when they purchased their securities and that

---

[3] The case of *Zagami v. Cellceutix Corp.*, decided by the Honorable Katherine Polk Failla just a few days before this memorandum was filed, provides a factually analogous application of the *Janus* "ultimate authority" rule. 2016 U.S. Dist. LEXIS 74638 15 Civ. 7194 (S.D.N.Y. June 8, 2016). There, Plaintiffs sued Cellceutix Corporation, a clinical stage biotechnology company, and two of its officers, for alleged violations of Section 10(b) of the Exchange Act. *Id.* at *7-8. Plaintiffs claimed statements about the company in an internet article published by a third party were false and misleading and argued that direct quotes from one of the defendants in the article rendered the entire article "attributable to" that defendant. *Id.* at *17-18. Judge Failla rejected that argument, noting that plaintiffs had not alleged any particular relationship with or control over the publisher and had not suggested that the defendant had "ultimate authority" over the publication of the article in question, "such that he dictated 'whether and how to communicate' the content." *Id.* at *19, citing *In re Pfizer Inc. Sec. Litig.*, 2016 U.S. App. LEXIS 6622, 2016 WL 1426211 at *12. Here, too, Plaintiffs plead absolutely nothing to suggest that any Defendant had "ultimate authority" over any of the 30-plus articles that made up the supposed promotion scheme. As such, the articles cannot be attributed to any Defendant for purposes of establishing liability under Rule 10b-5(b).

plaintiffs would not have purchased the securities had they known of the allegedly deceptive acts, the claim must be dismissed because plaintiffs cannot prove "the essential element of reliance." *Pac. Inv. Mgmt. Co. LLC*, 603 F.3d at 158-59.  This remains true even if defendants' conduct was indisputably deceptive, and even if defendants enabled another individual's manipulative acts.  *Id*. Here, of course, Plaintiffs don't allege Defendants did anything, let alone something "indisputably deceptive."

The Second Circuit's opinion in *Pacific Investment Management Company LLC* is instructive.  603 F.3d 144 (2d Cir. 2010).  In that case, a law firm drafted documents allegedly containing misrepresentations or omissions.  *Id.* at 149-50.  The plaintiffs brought a claim for manipulative acts under Rule 10b-5(a) and (c).  *Id.* at 151.  The Second Circuit held that the law firm could not be held liable.  *Id.* at 161.  Although the firm allegedly "facilitated sham transactions" that enabled another party to commit fraud, the plaintiffs "were not aware of those transactions and, in fact, plaintiffs explicitly disclaim[ed] any knowledge of defendants' involvement" in their complaint.  *Id.* at 159.  For these reasons, the plaintiffs did not adequately plead reliance on the misstatements or omissions under Rule 10b-5(b) or the manipulative acts under Rule 10b-5(a) and (c).  *Id.* at 158-59.  The Court thus dismissed the complaint.  *Id.* at 161; *see also Fezzani*, 716 F.3d at 23 (dismissing market manipulation claim even though defendant had "particular knowledge" of the fraud and participated and "actively facilitated" the fraud).

Just as in *Pacific Investment Management*, Plaintiffs admit that they were "ignoran[t]" of Defendants' "concealed" acts at the time they purchased their securities and "would not have purchased" their securities had they been aware of Defendants' alleged manipulative acts.  Compl. ¶¶ 205, 206, 214.  Because they "were not aware" of these alleged manipulative acts, they cannot establish reliance upon them, even if this Court accepts that Defendants "facilitated" the fraud.

12

*Pacific Inv. Mgmt. Co. LLC*, 603 F.3d at 159.  For this reason, Plaintiffs' claim under Rule 10b-5(a) and (c) must also be dismissed.

## II.   PLAINTIFFS CANNOT STATE 10b-5 CLAIMS BASED ON FAILURE TO DISCLOSE ALLEGED PROMOTION SCHEME.

While Plaintiffs conclusively assert in both Counts I and II that Defendants "made various untrue statements of material fact and omitted to state material facts," Plaintiffs do not challenge the veracity of a single statement in the Complaint.  Compl. ¶¶ 200, 211.  In fact, Plaintiffs do not even claim the statements published on the Internet by third parties were false or misleading in any way.  Rather, Plaintiffs contend that each and every one of Anavex's quarterly and yearly public filings issued during the class period are "false and/or misleading" because they "failed to disclose" that Anavex "set in motion", "fueled" or was "substantively responsible" for the alleged stock promotion scheme.  *See,* e.g. Compl. ¶¶ 66, 68, 74.  As demonstrated above, though, Plaintiffs provide absolutely no facts to support these conclusory allegations.  They don't allege that Defendants "made" any of the statements or played any role whatsoever in the alleged promotional scheme.  But even if they could somehow tie any Defendant to the string of Internet articles that make up the "scheme", Defendants still couldn't be held liable under §10(b) or Rule 10b-5(b) for failing to disclose such a connection.

Silence, absent a duty to disclose, is not misleading.  *Lipow*, 131 F. Supp. 3d at 168. Plaintiffs have pleaded no such duty here.  Section 17(b) of the Exchange Act explicitly allows companies to pay for stock promotion, requiring only that the promotor disclose that it received compensation in exchange for promoting the company's securities.  15 U.S.C. § 77q(b).  This securities laws thus place the burden of disclosure on the paid promotor who actually makes the statement, not the entity who paid the promotor.  In an effort to avoid the devastating impact of this statute, Plaintiffs appear to be asking the Court to require the companies who hire promoters

to disclose paid promotion.  The Court should decline Plaintiffs' invitation to ignore the express language of § 17(b) and/or create a conflict with § 10(b).  If Plaintiffs want to rewrite the securities laws, they should raise the issue with Congress or the SEC, not this Court.

The Northern District of Georgia was presented with this exact same issue just months ago. In *In re Galectin Therapeutics, Inc. Sec. Litig.*, the plaintiff alleged that a biotechnology corporation failed to disclose that it paid stock promotors, in violation of § 10(b). – F. Supp.3d – , 2015 WL 9647524, *3 (N.D. Ga., Dec. 30, 2015).  The court noted that it "may seem odd to the uninitiated, but nothing in the securities laws bars the issuer of a regulated security from paying an analyst for a stock promotion." *Id*. at *5 (citing *Garvey v. Arkoosh*, 345 F. Supp. 2d 73, 83 (D. Mass 2005).  The court granted the motion to dismiss with prejudice, holding that "based on the language of [§ 17(b) of the Exchange Act] the duty to disclose rests on the stock promoters, not Defendants." *Id*.  It reasoned that it could not "impose a duty to disclose on Defendants" because such a ruling "would encroach on the drafter's decision to create a duty to disclose on analysts, such as stock promoters, rather than the issuer of a regulated security." *Id*.  The court further held that "[t]he purpose of stock promotors is to promote a company and its stock, thereby increasing the value or price of the stock" and "[b]ecause it is permissible to use stock promoters, Defendants did not impermissibly manipulate the company's stock price." *Id*.  Thus, where a plaintiff "merely alleges that [defendant] used stock promoters to increase the price of its stock and Defendants did not disclose this arrangement to investors," the allegations "are insufficient to support a claim under Rule 10b-5(b)." *Id*.  Although this case is not controlling, its well-reasoned holding is grounded in the interpretation of the same statutes at issue here, and Defendants respectfully submit that this Court should use the decision as a roadmap for considering the issue here.

Finally, even if § 10(b) provides a cause of action for conduct that complies with § 17(b), Plaintiffs have not pleaded a duty to disclose.  It is well-established that disclosure is not required merely because information is material, relevant, or would be of interest to a reasonable investor. *Lipow*, 131 F. Supp. 3d at 168.  Nor are defendants required to accuse themselves of wrongdoing or disclose information that is "equally available, widely reported, or 'so basic that any investor could be expected to know it.'"  *Id.* at 168-69.  Rather, a duty to disclose arises where the omitted information renders public statements materially misleading.  *Id*.  No such duty is alleged here because Plaintiffs have not alleged particularized facts showing that Defendants orchestrated a scheme to manipulate the stock price.  For example, Plaintiffs admit that promotors repeatedly disclosed that they were paid by third parties to promote Anavex stock, see Compl. ¶¶ 4, 33, 50, and never once do Plaintiffs allege that a promotor or analyst—including Dr. De or any other analyst—accepted payment from Anavex, let alone that they did so without disclosing receipt of such compensation.  Nor do Plaintiffs challenge the veracity of any statements made by promotors during the class period.  Thus, even if a duty to disclose could exist under § 10(b) despite the language of § 17(b), Plaintiffs have plead no factual allegations that could give rise to a duty here.[4]

## III.    PLAINTIFFS DO NOT PLEAD FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER.

Based on the foregoing discussion, the Court need not proceed further and can dismiss the Complaint in its entirety, with prejudice.  Plaintiffs simply do not plead facts demonstrating that any Defendant made or was otherwise legally responsible for any false or misleading statement or engaged in any manipulative act of any kind, at any time.   But if the Court harbors any doubts

---

[4] Plaintiffs allege that Defendants failed to disclose Lincoln Park Capital was only obligated to purchase shares if the price remained above $2 per share ($.50 per share pre-split).  Compl. ¶ 72.  This is not correct.  This information was disclosed in the agreement with Lincoln Park Capital, which was attached to the Company's 7/8/2013 Form 8-K.  See Ex. 8.

about the patent insufficiency of Plaintiffs' claims, those doubts should be put to rest by Plaintiffs' inability to plead facts supporting the "strong inference" of scienter required under the PSLRA.

Plaintiffs contend that Defendants knew or should have known of an illicit scheme to promote Anavex stock, but they offer no motive for this alleged fraud and do not plead circumstantial allegations giving rise to *any* inference of scienter, let alone an inference that is as "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F. 3d 187, 198 (2d Cir. 2009). (citing *Tellabs*, 127 U.S. at 314). Further, Plaintiffs makes no attempt to plead scienter for each Individual Defendant. For these reasons, Plaintiffs have failed to plead that Defendants acted with the requisite scienter, and the entire Complaint must be dismissed.

### A.    Plaintiffs Must Plead a Strong Inference of Scienter.

To state a claim for actionable misstatements/omissions or market manipulation under § 10(b), "a plaintiff must plead 'with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F. 3d at 198. The "requisite state of mind" is "an intent 'to deceive, manipulate, or defraud,'" referred to as scienter. *Id.* (citing *Tellabs*, 551 U.S. at 313). Although, recklessness is "a sufficiently culpable mental state," recklessness is defined as "an extreme departure from the standards of ordinary care," such that the danger "was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). Thus, in this context, "[r]eckless disregard means 'conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 459 (S.D.N.Y. 2010); *Lipow*, 131 F. Supp. 3d at 162 (recklessness is not "merely enhanced negligence"). Where, as here, the claim rests on the theory that the statements are misleading

16

because they omitted material information—rather than a claim that the statements are literally false—"it is especially important to rigorously apply the standard for pleading intent, because defendants should not be required to incur litigation expenses every time an aggrieved investor claims that an accurate statement was rendered misleading based on the absence of additional information." *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 437 (S.D.N.Y. 2006).

To establish a "strong inference" of scienter, the inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F. 3d at 198 (citing *Tellabs*, 127 U.S. at 314). This inquiry is "inherently comparative," requiring the court to consider "both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *Id.*; *Tellabs*, 127 U.S. at 323. A complaint survives only if "a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F. 3d at 198 (citing *Tellabs*, 127 U.S. at 326).

A plaintiff can establish scienter in one of two ways: (1) showing that defendants "had the motive and opportunity" to commit the alleged fraud, or (2) showing "strong circumstantial evidence of conscious misbehavior or recklessness." *Id*. To allege scienter through motive and opportunity, a plaintiff must plead that defendants "benefitted in some concrete and personal way from the purported fraud." *Id*. (citing *Novak*, 216 F.3d 307-08). However, motives that are "common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high" do not constitute an adequate motive. *Id*. Instead, the motive requirement is generally met where the plaintiff alleges that defendants engaged in the fraud in order to sell their shares at a profit. *Id*. If a plaintiff cannot establish motive and opportunity, it

may raise a strong inference of scienter under the "strong circumstantial evidence" prong. *Id.* However, where there is no motive, "the strength of the circumstantial allegations must be correspondingly greater." *Id.* (citing *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

### B.   Plaintiffs Have Not Pleaded Motive and Opportunity to Defraud.

To be well-pled, motive allegations must demonstrate that the defendants benefited in some "***concrete and personal***" way from the purported fraud. *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198 (emphasis added); *see also Silsby v. Icahn*, 17 F. Supp. 3d 348, 365 (S.D.N.Y. 2014) *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015); *Kalnit*, 264 F.3d at 139. To determine whether defendants benefited personally, courts look to whether they sold any shares during the class period. Where defendants did not sell any stock during the class period, or where they actually increased their stock holdings, any inference of scienter is undermined because they did not personally benefit from the alleged fraud. *See Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (acquisition of stock by three defendants, and lack of sales by fourth, did not support finding of scienter); *Turner v. MagicJack VocalTec, Ltd.,* No. 13 CIV. 0448, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014), *appeal dismissed* (April 1, 2014) (finding lack of sales by three of four defendants and purchases by two "rebuts an inference of scienter").

Here, the Complaint contains no particularized facts suggesting that an Individual Defendant possessed a personal and concrete motive to commit fraud. As demonstrated in the Statements of Changes in Beneficial Ownership of Securities ("Form 4s") filed with the SEC, the Individual Defendants sold ***none*** of their shares during the class period, and in fact Dr. Missling obtained additional shares. *See* Ex. 9. The Individual Defendants thus gained no personal benefit from the alleged artificial inflation of the Company's stock price, undermining any inference of scienter.

18

**C.      Plaintiffs Have Not Pleaded Strong Circumstantial Allegations of Intent to Defraud.**

Because Plaintiffs offer no motive to commit fraud, "the strength of the circumstantial allegations must be correspondingly greater."  *Id*.  *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198 (citing *Kalnit*, 264 F.3d at 142).  Plaintiffs fail to meet this heightened standard.

Plaintiffs attempt to establish the requisite strong inference of scienter by alleging: (1) the Individual Defendants must have been aware of the alleged fraud, given their positions at Anavex, Compl. ¶ 202; (2) Defendants were aware of the fluctuations in its stock price caused by the promotions because the stock price was "importan[t]" to Anavex's ability to remain a going concern, Compl. ¶ 171; (3) Anavex was responsible for or caused the promotional advertisements to be published because they paid "materially significant sums of money for 'investor relations' services," Compl. ¶ 172; (4) Anavex's retention of Primoris in 2007, Compl. ¶¶ 174-76; (5) Anavex's retention of Harvey Lalach, who was allegedly involved in "less-than-reputable companies" but resigned before the class period begins, Compl. ¶ 177; (6) that promotional campaigns occurred at "key points in time," Compl. ¶¶ 178-82; (7) Dr. Missling received over $3.2 million in compensation between fiscal years 2013 and 2014, Compl. ¶ 183, (8) the BCSC issued a Halt Trade Order in June, 2013 that was later revoked, and in December, 2015, the SEC issued a subpoena to the Company, Compl. ¶¶ 184-85; and (9) Anavex's stock price "bears no resemblance" to the stock price of its competitors, Compl. ¶ 187.  Whether considered individually or as a whole, Plaintiffs' circumstantial allegations are insufficient to raise a strong inference of scienter.

***First***, an Individual Defendant's position cannot establish that he knew or should have known of the alleged fraud.  *See Lipow*, 131 F. Supp. 3d at 163.  As such, Plaintiffs' argument

that the Individual Defendants' positions rendered them "aware" of the fraud must be rejected. *Id.* (allegations founded on corporate positions "are entitled to no weight"); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) ("accusations founded on nothing more than a defendant's corporate position are entitled to no weight."); *accord Teamsters Allied Benefit Funds v. McGraw,* No. 09 CIV. 140 (PGG), 2010 WL 882883, at *11 (S.D.N.Y. Mar. 11, 2010).

*Second*, although Plaintiffs allege that the Individual Defendants should have known of the alleged fraud because high stock prices were important to ensure funding and because the Company paid material sums for investor relations, these allegations amount to no more than an assertion that the Individual Defendants "knew or should have known" that their statements were misleading because they concerned "the core operations" of the Company.  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011).  Even if the core operations doctrine survived the enactment of the PSLRA—which the Second Circuit has yet to determine—Plaintiffs cannot establish scienter through the use of the core operations doctrine because this theory "at most constitutes *supplemental* support for alleging scienter" but it "cannot support an inference of scienter where none [otherwise] exists." *Lipow*, 131 F. Supp. 3d at 163, 167 (citing *New Orleans Employees Ret. Sys. v. Celestica, Inc.*, 445 Fed. Appx. 10, 14 n.3 (2d Cir. 2011)); *see also Glaser*, 772 F. Supp. 2d at 596 & n.17.  Further, courts applying this doctrine generally require "that the operation in question constitute nearly all of a company's business before finding scienter," which is not alleged here.  *See Hensley v. IEC Elec. Corp.*, No. 13-CV-4507 JMF, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014).  For this reason, even if stock prices and investor relation expenses were core operations, they do not establish an inference of scienter.

**Third**, Plaintiffs attempt to plead circumstantial allegations of scienter by relying on events that occurred before the class period even began, including (i) the hiring of Primoris in 2007, (ii) the hiring and resignation of Lalach, who was supposedly involved in unscrupulous affairs while working at other companies, and (iii) the timing of certain promotional activity before 2013.  All of these events occurred both before Anavex hired any of the Individual Defendants and before the class period begins.  *See* Ex 10 at 10; Ex. 2 at 20; Ex. 11, 12/29/2014 Form 10-K, at 32.  Because these events occurred before the Individual Defendants even worked at the Company, the allegations cannot support an inference scienter.  *See Hensley v. IEC Elecs. Corp.*, No. 13-CV-4507 JMF, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014).[5]   To the contrary, such allegations "actually cut[] against a finding of scienter."  *Id.*  (timing of alleged fraud "actually cuts against a finding of scienter" because it occurred before the defendant became CFO).

**Fourth**, the fact that the promotional events occurred during the class period at "key points in time" does not support a strong inference of scienter.  As explained in further detail above, the securities laws explicitly permit companies to pay analysts for stock promotion.  Further, at most, this allegation amounts than an assertion that Defendants were motivated to keep stock prices high in order to raise capital.  This is a motivation shared by all corporate executives and thus cannot support an inference of scienter.  *See Lipow*, 131 F. Supp. 3d at 160

---

[5] Nor are these allegations sufficient to establish "corporate" scienter.  To plead corporate scienter, Plaintiff must identify a statement that is so "dramatic that it 'would have been approved by corporate official as sufficiently knowledgeable about the company to know that the announcement was false."  *Vining v. Oppenheimer Holdings Inc.*, No. 08 Civ. 4435 (LAP), 2010 WL 3825722, *13 (S.D.N.Y. Sept. 29, 2010) (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (providing example of corporate scienter where General Motors announced it sold one million cars, but actually sold zero); *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190 (2d Cir. 2008) (plaintiff failed to plead corporate scienter because it did not identify specific reports that demonstrated the falsity of the statements and the desire to maintain an appearance of profitably is common to all executives and thus insufficient to establish motive); *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, *15 (S.D.N.Y. Mar. 12, 2015) (dismissing claims where no corporate scienter).

("general motives common to most corporate officers do not constitute 'motive' for the purpose of establishing scienter"); *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) (motivation to raise capital cannot support an inference of scienter, even if a drop in stock price "would allegedly threaten the 'survival' of a company").   Likewise, allegations concerning Dr. Missling's level of compensation are insufficient as a matter of law because the "desire . . . to keep stock prices high to increase officer compensation" is a motive that is "common to most corporate officers."   *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198.

*Fifth*, the existence of the SEC investigation in late 2015 and the Halt Trade Order issued by the BCSC in 2013 do not give rise to a strong inference of scienter.   Plaintiffs do not plead facts demonstrating that those agencies were investigating Defendants and, instead, mischaracterize the very documents from which the allegations are drawn.   But even if Plaintiffs could allege that the agencies were investigating Defendants, the existence of an investigation cannot alone "give rise to a requisite cogent and compelling inference of scienter."   *Lipow*, 131 F. Supp. 3d at 164, 167.   Rather, it can merely support an already existing inference of scienter, *see id.*, which does not exist here.   *Id.* at 167 ("government investigations cannot bolster allegations of scienter that do not exist").

*Finally*, the allegation that Anavex's stock increase "bears no resemblance" to the stock increases of Anavex's competitors is woefully insufficient.   No case stands for the proposition that a company's stock price compared to its competitors' stock prices can establish scienter. Such a holding defies logic, as stock prices rise and fall for innumerable reasons.[6]

---

[6] *See In re Sec. Cap. Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569 (S.D.N.Y. 2010) ("Any allegation that Defendants' statements and omissions were made recklessly because Defendants were aware of the housing market crisis fails because '[k]nowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate or defraud.'"); *Local No. 38 Intern. Broth. Of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp.

Whatever minimal support such allegations might have provided to Plaintiffs' efforts to plead a strong inference of scienter is eliminated here because Plaintiffs chose to compare only the stable, slow-moving stock prices of Anavex's well-established, billion-dollar competitors (Merck, Pfizer, Roche Holding and Novartis) while ignoring the stock performance of other competitors identified by Anavex (Prana Biotechnology Limited, Perrigo Company and Actavis), which are much more similar to Anavex in size, history, capitalization and stock performance than the behemoths referenced in the Complaint.  *See* Compl. ¶ 187, Ex. 11, 12/29/2014 Form 10-K, at 4.  Plaintiffs' decision to deliberately mislead the Court by cherry-picking Anavex's competitors to manufacture a stock chart that better supports its claims essentially eliminates any inference of scienter that might be drawn from Plaintiffs' selective, self-serving stock chart.  Therefore, since Plaintiffs have not provided "independent basis" from which a strong inference of scienter can be drawn, the claims must be dismissed.  *Lipow*, 131 F. Supp. 3d at 167.

## D.     Inference of Scienter Is Not As Strong As Non-Fraudulent Inference.

To determine whether Plaintiffs have pleaded facts sufficient to create an inference of scienter strong enough to satisfy the PSLA's heightened pleading standards, the Court must weigh the inference Plaintiffs ask it to draw against the "competing inferences rationally drawn from all the facts alleged, taken collectively."  *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553

---

2d 447, 463 (S.D.N.Y. 2010) ("That AMEX's losses were higher than those of its competitors does not alone support the inference that Defendants acted with intent or reckless disregard" because "the size of the fraud alone does not create an inference of scienter."); *Fort Worth Employers' Retirement Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 226 (S.D.N.Y. 2009) ("The Second Circuit has held that the alleged motives to maintain a company's stock price or 'sustain [] the appearance of corporate profitability' do not constitute sufficient evidence of motive to support a securities fraud claim." (citing *Chill v. General Elec. Co.*, 101 F. 3d 263, 268 (2d Cir. 1996)) (alterations in original)); *Steinberg v. Ericsson LM Tel. Co.*, No. 07 CV 9615, 2008 WL 5170640, *15 (S.D.N.Y. Dec. 10, 2008) ("there is little basis to assume that a decline in projected revenue for [defendant's] competitors would necessarily lead to a decline in [defendant's] projected revenues as well.").

F. 3d at 198 (citing *Tellabs*, 127 U.S. at 323).  A complaint survives only if "a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* (citing *Tellabs*, 127 U.S. at 326).

Weighing the allegations in the Complaint and the documents from which they are drawn against all of the foregoing arguments, there can be no doubt that Plaintiffs' proffered inference of fraud is not nearly as strong as the inference the much more reasonable, common-sense inference that Anavex was – and is – a real company making real progress in the fight to cure Alzheimer's and that when it came to Anavex's stock price, Defendants were interested bystanders, generally watching from the sidelines as Anavex's stock was driven up and down by good or bad news issued by the Company and by the articles, blog posts and reports issued by investors, bloggers and so-called journalists with positions driven by whoever was paying them or whether they held a long or short position in the stock.  There are simply no facts to support Plaintiffs' claims that Defendants committed fraud and the facts in the Complaint and judicially-noticeable documents compel the opposite conclusion.  As such, Plaintiffs' claims should be dismissed, in their entirety, for failure to establish the required strong inference of scienter.  *See ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F. 3d at 198; *ATSI*, 493 F.3d at 99-100 ("A strong inference of scienter is not raised by alleging that a legitimate investment vehicle . . . creates an opportunity for profit through manipulation").

### E.   Plaintiffs Cannot Rely on Group Pleading to Establish Scienter.

Although the Second Circuit has not yet addressed the viability of the group pleading doctrine, for the reasons set forth in *In re UBS AG Sec. Litig*, the group pleading doctrine is inconsistent with the PSLRA and the Supreme Court's decision and *Janus*.  2012 WL 4471265, *10 (S.D.N.Y. Sept. 28, 2012).  In fact, it has already been abandoned by multiple circuits.  *Id*. Yet even if the group pleading doctrine is still viable, it is well-established that group pleading

cannot be used to plead scienter.  *Id*. at *11.  Rather, scienter "must be separately pled and individually supportable as to each defendant."  *In re C.D.T.S. v. UBS AG*, 2013 WL 6576031, *6 (S.D.N.Y. Dec. 13, 2013).  Here, Plaintiffs make no attempt to allege scienter for each Individual Defendant, and the claims against them should be dismissed for this reason alone.

## IV.   PLAINTIFFS FAILS TO PLEAD CONTROL-PERSON LIABILITY

To state a claim under § 20 of the Exchange Act, Plaintiffs must first establish a primary violation of § 10(b).  15 U.S.C. § 78t(a).  Where, as here, Plaintiff fails to establish an actionable claim under § 10(b), his § 20(a) claims must also be dismissed.  *Kleinman v. Elan Corp.*, 706 F.3d 145, 156 n.14 (2d Cir. 2013) (affirming dismissal of § 20(a) claims for failure to plead predicate violation of § 10(b)).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiff's Corrected Amended Complaint with prejudice.


Dated:    June 13, 2016                              Respectfully Submitted,
                                                     /s/ David H. Kistenbroker
                                                     David H. Kistenbroker, Admitted Pro Hac Vice
                                                     Carl E. Volz, Admitted Pro Hac Vice
                                                     Melanie C. MacKay, Admitted Pro Hac Vice
                                                     DECHERT LLP
                                                     35 W. Wacker Drive,  Suite 3400
                                                     Chicago, Illinois 60601
                                                     Telephone: 312-646-5800
                                                     Facsimile: 312-646-5858
                                                     david.kistenbroker@dechert.com
                                                     carl.volz@dechert.com
                                                     melanie.mackay@dechert.com

                                                     *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2016 the above document was filed through the ECF system for electronic serve to the registered participants.

/s/ Carl. E. Volz
Carl E. Volz
DECHERT LLP
35 W. Wacker Drive, Suite 3400
Chicago, Illinois 60601
Telephone: 312-646-5800
Facsimile: 312-646-5858
carl.volz@dechert.com

*Counsel for Defendants*