UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN CORTINA, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:15-cv-10162-JMF |
| Plaintiff, | |
| v. | |
| ANAVEX LIFE SCIENCES CORP., CHRISTOPHER U. MISSLING, SANDRA BOENISCH, and ATHANASIOS SKARPELOS, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 2

    Anavex Is a Company with Limited Operations and an Immense Deficit ............................. 2

    Promotions Featured Anavex as a Burgeoning Biopharmaceutical Company ....................... 4

    Analysts Reveal the Company's Stock Promotion Campaign ................................................. 6

STANDARD OF REVIEW ....................................................................................................... 7

ARGUMENT ............................................................................................................................. 7

    A.    DEFENDANTS VIOLATED SEC RULE 10B-5(A) AND (C) BY ENGAGING IN A
            FRAUDULENT SCHEME TO INFLATE THE PRICE OF ANAVEX SECURITIES
            FOR THEIR PERSONAL GAIN ................................................................................... 7

            1.    Legal Standard ...................................................................................................... 7

            2.    Defendants Manipulated Anavex's Stock Price through an Undisclosed Stock
                 Promotion Scheme ............................................................................................... 8

    B.    DEFENDANTS VIOLATED SEC RULE 10B-5(B) BY INTENTIONALLY OR
            RECKLESSLY WITHHOLDING THE FACT THAT THEY WERE CREATING
            INCREASED VOLATILITY IN ANAVEX SECURITIES AS A RESULT OF THE
            COMPANY'S STOCK PROMOTION SCHEME ....................................................... 12

            1.    Legal Standard .................................................................................................... 12

            2.    Anavex's Filings with the SEC Omitted the Existence of the Company's Stock
                 Promotion Scheme ............................................................................................. 12

    C.    DEFENDANTS ACTED WITH SCIENTER BY CONSCIOUSLY OR RECKLESSLY
            ENGAGING IN A STOCK PROMOTION SCHEME AND FAILING TO DISCLOSE
            IT ............................................................................................................................. 16

            1.    Legal Standard .................................................................................................... 16

            2.    Defendants Profited from the Undisclosed Promotional Campaign ..................... 17

            3.    Scienter Is Evident from the Fact that Defendants Participated in the
                 Promotions ......................................................................................................... 19

            4.    Plaintiffs' Theory of Scienter Outweighs Defendants' Excuse of Non-Culpable
                 Conduct ............................................................................................................. 21

    D.    THE INDIVIDUAL DEFENDANTS ARE LIABLE UNDER SECTION 20(A) FOR
            ANAVEX'S PRIMARY VIOLATION OF SECTION 10(B) ..................................... 22

CONCLUSION ....................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
  615 Fed. Appx. 44 (2d Cir. 2015) ............................................................................. 17

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972) ................................................................................................... 11

*Ansell v. Laikin*,
  No. CV 10-9292 PA (AGRx), 2011 U.S. Dist. LEXIS 85695 (C.D. Cal. Aug. 1, 2011).. 13, 14,
  15, 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................... 7

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ....................................................................... 19

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................... 12

*In re Bear Stearns Mortgage Pass-Through Certificates Litigation*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) ....................................................................... 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................................... 7

*In re BioScrip, Inc. Secs. Litig.*,
  No. 13-cv-6922 (AJN), 2015 U.S. Dist. LEXIS 46763 (S.D.N.Y. Mar. 31, 2015) ................. 13

*In re Blech Sec. Litig.*,
  961 F. Supp. 569 (S.D.N.Y. 1997) ............................................................................... 8

*City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) ......................................................................... 7

*In re CytRx Corp. Sec. Litig.*,
  No. CV 14-1956-GHK (PJWx), 2015 U.S. Dist. LEXIS 91447 (C.D. Cal. July 13, 2015)
  ............................................................................................................................. passim

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ......................................................................... 17, 18, 20

*In re Enron Corp. Secs.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) ......................................................................... 8

*Foman v. Davis*,
  371 U.S. 178 (1962) ................................................................................................... 23

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014) ................................................................... 22

*Freedman v. Weatherford Int'l Ltd.*,
   No. 12 Civ. 2121 (LAK), 2013 U.S. Dist. LEXIS 135149 (S.D.N.Y. Sept. 19, 2013) ........... 21

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
   No. 15-CV-29-SCJ, 2015 U.S. Dist. LEXIS 173767 (N.D. Ga. Dec. 30, 2015) ........... 9, 15, 16

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) ....................................................... passim

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000).................................................................. 12

*Garvey v. Arkoosh*,
   345 F. Supp. 2d 73 (D. Mass. 2005) ........................................................ 16

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) ....................................................... 18

*In re Global Crossing, Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004)......................................................... 8

*In re Harman Intern. Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) ............................................................... 13

*Haw. Ironworkers Annuity Trust Fund v. Cole*,
   No. 3:10CV371, 2011 U.S. Dist. LEXIS 98760 (N.D. Ohio Sept. 1, 2011) ........................ 10

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)............................................................. 12, 18

*In re Initial Public Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)......................................................... 8

*Institutional Investors Group v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009).............................................................. 20

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)...................................................................... 10

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ............................................................. 15

*In re MBIA, Inc. Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010)........................................................ 22

*New Mexico State Investment Council v. Ernst & Young LLP*,
   641 F.3d 1089, 1095 (9th Cir. 2011) ....................................................... 21

iii

*In re NovaGold Res. Inc. Sec. Litig.*,
   629 F. Supp. 2d 272 (S.D.N.Y. 2009)...............................................................22

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).........................................................................16, 17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015)...................................................................................14

*Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*,
   No. 5:13-CV-746 (MAD) (ATB), 2014 U.S. Dist. LEXIS 130677 (N.D.N.Y. Sept. 18, 2014)
   .......................................................................................................................18

*Pacific Investment Management Company LLC v. Mayer Brown LLP*,
   603 F.3d 144 (2d Cir. 2010)...........................................................................11

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005)...............................................................11

*In re Prudential Secs. Inc. P'ships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996)......................................................................13

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)...........................................................................13

*SEC v. Curshen*,
   888 F. Supp. 2d 1299 (S.D. Fla. 2012) ........................................................8, 9, 18

*SEC v. Farmer*,
   No. 4:14-CV-2345, 2015 U.S. Dist. LEXIS 136702 (S.D. Tex. Oct. 7, 2015) .....................8, 9

*SEC v. Gabelli*,
   653 F.3d 49 (2d Cir. 2011)..............................................................................15

*SEC v. Monterosso*,
   756 F.3d 1326 (11th Cir. 2014) .......................................................................10

*SEC v. Pentagon Capital Mgmt. PLC*,
   844 F. Supp. 2d 377 (S.D.N.Y. 2012)...............................................................10

*SEC v. Strebinger*,
   114 F. Supp. 3d 1321 (N.D. Ga. 2015).............................................................8, 9

*South Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ..........................................................................20

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008)........................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)....................................................................................16, 21

iv

*U.S. v. Laurienti,*
   611 F.3d 530 (9th Cir. 2010) ........................................................................ 14

*Van Dongen v. CNinsure Inc.,*
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ........................................................... 18

*In re Virtus Inv. Partners, Inc.,*
   No. 15cv1249 (WHP), 2016 U.S. Dist. LEXIS 86149 (S.D.N.Y. July 1, 2016) ...................... 15

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.,*
   57 F. Supp. 3d 950 (D. Minn. 2014) .............................................................. 11

**Statutes**

15 U.S.C. §78u-4(b) ........................................................................... 14

17 C.F.R. § 250.10b-5 ................................................................... passim

**Rules**

FED. R. CIV. P. 9(b) ......................................................................... 14

## PRELIMINARY STATEMENT

Defendants engaged in a fraudulent and manipulative scheme to inflate the price of Anavex's common stock.[1] Defendants perpetrated their scheme through despicable promotional materials designed to prey on naïve investors with families affected by Alzheimer's Disease. By promoting the Company's "clinical trial" as the cure to Alzeimer's Disease, Defendants were able to benefit significantly at the expense of Plaintiffs and the investors they represent in this lawsuit.

Anavex began trading on the NASDAQ Stock Market ("NASDAQ") on October 28, 2015. Prior to that point, the Company traded through over-the-counter ("OTC") exchanges. In the months and weeks leading up to Anavex's "uplisting" to the NASDAQ, Defendants engaged in an illicit, undisclosed stock promotion campaign. The advertisements were shameless, sharing stories of individuals suffering from Alzheimer's Disease while at the same time identifying Anavex as the answer both medically and financially. Defendants' promotions boasted potential overnight-returns of 2,150%. One promoter, above all others, was especially merciless in terms of his undue praise and baseless optimism—"Dr. Kanak Kanti De". Dr. De alone posted no less than sixteen (16) articles in the weeks preceding Anavex's "uplisting," sometimes multiple articles within the span of just 24 hours. Dr. De was given front-row access to Anavex's operations too, including but not limited to one-on-one interviews with Missling himself (Anavex's CEO). Anavex's promotional campaign prompted a meteoric rise in the Company's stock price, climbing from $0.65 per share in 2014 to more than $14.00 per share in November 2015.

Defendants profited as a direct result of the promotional campaign. As a small company with less than four full-time employees, no operational revenue, no marketing partnerships, and only one drug candidate past the pre-clinical stage, Anavex was entirely dependent upon equity financing to fund operations. By issuing shares of its common stock and selling warrants, Anavex was able to raise nearly $35 million in cash to pay exorbitant salaries, bonuses, and consulting

---

[1] "Defendants" refers to Anavex Life Sciences Corp. ("Anavex" or the "Company"), Christopher U. Missling (current CEO), Sandra Boenisch (current CFO), and Athanasios Skarpelos (former CEO).

fees. Anavex would not have been able to generate this capital without the promotional campaign that allowed its stock to be "uplisted" to the NASDAQ.

Anavex's scheme was finally exposed after a number of analysts started questioning the effusive praise Anavex had been receiving. These analysts also questioned Anavex's past dealings with nefarious stock promoters as well as the Company's previous trouble with the British Columbia Securities Commission for unusual trading activity. Investors also learned that Dr. De was a charlatan with no credentials other than a forged medical doctor degree from the University of Calcutta. On this news, Anavex's stock price declined precipitously, falling from an intra-class period high of over $14.00 per share to close at $5.50 per share on December 30, 2015. Anavex is currently under investigation by the SEC for its stock promotion activities.

Plaintiffs bring claims under SEC Rule 10b-5(a) and (c) (scheme liability) as well as SEC Rule 10b-5(b) (material omission). Plaintiffs adequately plead each of their claims under the governing pleading standards. For the reasons below, Defendants' motion to dismiss should be denied in it entirety.

## FACTUAL BACKGROUND

### *Anavex Is a Company with Limited Operations and an Immense Deficit*

Anavex is a small company with no history of revenue. ¶22.[2] In 2007, it changed virtually overnight from an online photofinishing company to a biopharmaceutical company. ¶22. Since its metamorphosis, the Company has generated nothing in terms of revenue and has failed to advance the majority of its drug candidates past pre-clinical stages. ¶23. In fact, only one drug candidate in Anavex's pipeline has advanced into clinical trials—ANAVEX 2-73. ¶23. ANAVEX 2-73 is a developmental drug designed to treat Alzheimer's Disease. ¶23. The drug has been in a Phase IIa trial in Australia since December 2014 with no sign of completion any time soon. ¶¶23, 167.

Anavex has suffered from immense deficits as a result of its lack of progress. The Company's accumulated deficit as of December 31, 2015 was $67,235,964. ¶168. At the same

---

[2] Citations to "¶__" and "¶¶__" refer to Plaintiff's Complaint.

time, Anavex has spent millions of dollars per year in operating activities—$3.7 million in fiscal 2013, $9.9 million in fiscal 2014, and $12.1 million in fiscal 2015. ¶168. Throughout the Class Period, Anavex consistently disclosed that it had substantial doubts about the Company's ability to continue as a going concern. ¶168.

Anavex has managed to survive through unusual equity financing arrangements, each uniquely premised upon the price of Anavex's common stock. ¶24. In fiscal 2013, 2014, and 2015, Anavex raised $1.1 million, $9.5 million, and $12.2 million, respectively, from selling shares of its common stock, entering into promissory notes, and selling convertible debentures. ¶169. Anavex's most frequent financing partner has been Lincoln Park Capital. Between 2013 and 2015, Anavex entered into at least three financing agreements with Lincoln Park Capital. ¶170. Two of these agreements, dated July 5, 2013 and October 21, 2015, essentially operated as "put" contracts whereby Anavex could force Lincoln Park Capital to buy millions of shares of its common stock at the then-prevailing market price. ¶170. Anavex's ability to sell stock to Lincoln Park Capital was absolute, provided Anavex's stock price remain above a certain threshold level ($2.00 per share under the 2013 agreement and $3.00 per share under the 2015 agreement). ¶170. In total, Anavex's agreements with Lincoln Park Capital provided Anavex with access to over $60.5 million in capital. ¶170.[3]

Anavex's stock price has been of critical importance to the Company, far more so than ordinary companies with publicly traded stock. ¶¶24, 170. In light of the fact that Anavex was generating zero revenue from operations, Anavex needed to maintain its ability to access the capital available under its agreements with Lincoln Park Capital. ¶¶168, 169. To do so, Anavex was required to ensure that its stock price remained above a certain price. ¶168. Anavex admitted it its filings with the SEC that the Company's stock price was key to Anavex's "ability to rais[ing] further working capital." ¶171.

---

[3] The 2013 agreement provided Anavex with the ability to sell Lincoln Park Capital up to $10 million worth of Anavex stock while the 2015 agreement provided Anavex with the ability to sell up to $50 million. ¶170. Anavex also entered into a purchase agreement with Lincoln Park Capital on October 22, 2014 for an equity investment of $500,000 along with an issuance of 4 million stock purchase warrants. ¶170.

*Promotions Featured Anavex as a Burgeoning Biopharmaceutical Company*

Second to its overnight change to a biopharmaceutical company, Anavex's most important moment in corporate history was its "uplisting" from trading OTC to trading on the NASDAQ. Anavex's "uplisting" occurred on October 28, 2015. Anavex Annual Report (Form 10-K), Declaration of David H. Kistenbroker ("Kistenbroker Decl."), Ex. 2 at 17 (Dkt. No. 63-2). By "uplisting" to the NASDAQ, Anavex's shares of common stock became instantly more liquid and, in turn, more valuable. *Id.* Anavex profited as a result too, as it was at this point in time that the Company decided to access the capital available under its agreements with Lincoln Park Capital. *Id.* at 22. Within weeks of "uplisting" to the NASDAQ, Anavex sold Lincoln Park Capital $9.9 million worth of Anavex common stock in addition to inking the 2015 agreement with Lincoln Park Capital (worth $50 million in capital). *Id.* at 22-23; ¶¶180-81. Anavex also profited through a series of public offerings whereby Anavex received nearly $25 million in cash from the exercise of warrants by selling stockholders. ¶182.[4]

Anavex's ability to profit was not a coincidence, but rather the end objective of an intense stock promotion campaign. ¶181. Beginning in June 2013, an outfit called "K Street Financial" published a bulletin promoting Anavex's future operations and share price valuation. ¶32. The "K Street Financial" triggered an inquiry by the British Columbia Securities Commission, which resulted in the suspension of trading of Anavex's stock. ¶32. In August 2013, "K Street Financial" issued another bulletin describing ANAVEX 2-73 as the "best hope against" Alzheimer's Disease. ¶33. The bulleting disclosed that "K Street Financial" had been compensated by "$25,500 by Investor Media Service to build awareness for AVXL [Anavex]." ¶33. Several days later, the "K Street Financial" bulletin was re-released through "The Stock Junction" and "Champlain Media" for additional compensation in the amount of $115,000. ¶33. "Ultimate Penny Stock" also re-released the bulletin, but without any disclosure concerning compensation. ¶33.

---

[4] The offerings occurred on October 18, 2013, July 24, 2014, and March 25, 2015. ¶182. While the offerings largely consisted of "selling stockholders" selling shares to the public, Anavex received millions of dollars through the exercise of warrants underlying the shares sold in the offerings. ¶182.

In late-2014, just as Anavex announced that it would be commencing its Phase IIa trial of ANAVEX 2-73, Anavex's promotion reignited. ¶181. On November 17, 2014, Anavex was the subject of a promotional video on "Wide World of Stocks." ¶34. The promotional video was followed by the release of a "Transformation Technology Alert" in December 2014 by "Mauldin Economics," claiming that Anavex could "Give Millions New Hope" in the fight against Alzheimer's Disease. ¶35. On March 23, 2015, Anavex was featured in a promotional video by "CEO LIVE Insider Report." ¶36. On July 19, 2015, "King Penny Stocks" issued a "Biotech Breakout Special Report" promoting Anavex's ongoing clinical Phase IIa trial. ¶37. The following day, on July 20, 2015, the "King Penny Stocks" report was re-released on "StockPromoters.com." ¶37. On July 28, 2015, Missling provided a six-minute interview on "Stock News Now" about the progress of Anavex's ongoing Phase IIa clinical trial. ¶41. On July 30 and 31, 2015, "MantleMedia LLC" issued a "Biotech Breakout" report promoting Anavex's rising stock price. ¶42. The report was released through two websites owned by "MantleMedia LLC"—KingPennyStocks.com and StockRunway.com. ¶42. (The report indicated in fine print that while "MantleMedia LLC" is at times compensated for promotional reports, it had not been compensated for the "Biotech Breakout" about Anavex. ¶42.) In October 2015, "Agora Financial" released a newsletter telling investors that Anavex and its forthcoming clinical trial data could yield returns to investors of "as much as 2,150% or more" as the Company "rockets from under $9.00 to $200 and beyond." ¶49. "Stockpalooza.com" sent a similar email to investors promoting preliminary results of Anavex's clinical trial at the same time. ¶50. (In fine print, the email disclosed that "Stockpalooza.com" was to be compensated $250,000 for a "1 Day Marketing Program." ¶50.) Immediately before Anavex's announcement of clinical data on November 9, 2015, Anavex was the subject of more internet discussion than any other company—HedgeChatter[5] logged 1,146 messages over social media outlets about Anavex on November 8, 2015, far more than the number of messages about companies likes Apple, Valeant, and MannKind. ¶53.

---

[5] A service that uses data mining algorithms to detect unusual activity or manipulation on stocks across all social medial channels. ¶53.

One promoter, above all others, may in fact be the most responsible for the well-timed, massive upswing in Anavex's stock price. "Dr. Kanak Kanti De," a professed medical doctor graduate from the University of Calcutta, India, singlehandedly published at least sixteen (16) reports promoting Anavex and its ability to return mind-boggling profits to investors. Dr. De's reports began on July 23, 2015 and continued through to November 16, 2015, increasing in frequency and intensity within days before and after Anavex's "uplisting" to the NASDAQ. ¶¶38 (July 23), 39 (July 24), 40 (July 25), 43 (August 6), 44 (August 17), 45 (September 4), 46 (September 29), 47 (October 7), 48 (October 14), 51 (October 23), 52 (October 28), 55 (November 9), 56 (November 10), 57 (November 12), 58 (November 16), 59 (November 16). Dr. De's reports featured: interviews with Missling, Anavex's clinical "trial investigator," and a professor from Montpellier University (¶¶39, 56, 59); claims of returns of 200% in less than a month (¶43); calls for investors to see past the Company's volatility (¶44); explanations of the benefits of "uplisting" (¶¶47, 48, 52); and rebuttals to numerous claims of fraud against Anavex (¶¶51, 56, 57, 58).

### _Analysts Reveal the Company's Stock Promotion Campaign_

These promotions, including Dr. De's articles in particular, resulted in a meteoric rise in Anavex's stock price, climbing from $0.65 per share in late-2014 to more than $14.00 per share on November 2, 2015. ¶181. Investors, however, soon discovered that the hype around Anavex was the result of an undisclosed paid-for promotion. On October 9, October 14, November 9, and November 11 of 2015, market analysts released reports revealing Anavex's stock promotion scheme, noting the outrageous claims being made by outfits like "Stockpalooza.com" and "Agora Financial" about Anavex's potential return on investment. ¶¶148-50, 153-55, 157, 160. On December 29, 2015, Anavex disclosed to investors that the SEC had commenced a formal investigation into Anavex's potential stock manipulation and that Anavex had received a subpoena. ¶¶161-62. Finally, on December 30, 2015, Melissa Davis (former journalist for _The Street Sweeper_) released an article revealing Dr. Kanak Kanti De (by far, Anavex's heaviest promoter) as a charlatan. ¶164. As disclosed in the article, Ms. Davis' investigation revealed that

Dr. De's medical credentials had been forged and that, in fact, Dr. De was not a medical doctor offering independent unbiased analysis about Anavex. ¶165.

Collectively, the revelations about Anavex's stock promotion scheme resulted in significant declines in the price of Anavex's common stock. In the span of just three months, Anavex's stock declined approximately 30%. ¶¶151, 165. In response to each disclosure, Anavex's stock dropped precipitously on unusually heavy volume. ¶¶151, 156, 159, 160, 163, 165. As a result, investors in Anavex stock of lost millions of dollars.

## STANDARD OF REVIEW

In order "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007)). On a motion to dismiss, the Court is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 401 (S.D.N.Y. 2011). In fact, a "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts in improbable." *Twombly,* 550 U.S. at 556.

## ARGUMENT

**A.    DEFENDANTS VIOLATED SEC RULE 10B-5(A) AND (C) BY ENGAGING IN A FRAUDULENT SCHEME TO INFLATE THE PRICE OF ANAVEX SECURITIES FOR THEIR PERSONAL GAIN**

1.    Legal Standard

SEC Rule 10b-5(a) and (c) prohibit the use of "any device, scheme, or artifice to defraud" or the participation "in any act, practice, or course of business" resulting in fraudulent conduct. "In order for such a claim to survive a motion to dismiss, plaintiffs must allege that '(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for

securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter.'" *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 329 (S.D.N.Y. 2004) (quoting *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 385 (S.D.N.Y. 2003)). "Market manipulation" encompasses "illegal *trading* activity" as well as "*any* device, scheme or artifice" or "*any* act, practice, or course of business" used to perpetrate a fraud. *Id.* at 336 (citing 17 C.F.R. §240.10b-5(a), (c)). "In cases where it is not a statement or omission that is alleged, but rather, a fraudulent scheme to affect the price of stocks, it is sufficient to specify 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *Id.* at 329-30 (quoting *In re Blech Sec. Litig.*, 961 F. Supp. 569, 580 (S.D.N.Y. 1997)). "Because 'the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation.'" *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015) (quoting *In re Enron Corp. Secs.*, 235 F. Supp. 2d 549, 580 (S.D. Tex. 2002)).

> 2.     Defendants Manipulated Anavex's Stock Price through an Undisclosed Stock Promotion Scheme

Plaintiffs' allegations more than satisfy the pleading rules for scheme liability claims under SEC Rule 10b-5(a) and (c). Plaintiffs allege that Defendants perpetrated a series of undisclosed promotions that caused Anavex's stock price to increase materially at key opportune times relative to corporate events (*e.g.*, Anavex's "uplisting"). ¶¶32-60. Courts addressing claims with similar facts have routinely held these allegations to be sufficient when stating a claim at the pleading stage. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d at 1195-96; *In re CytRx Corp. Sec. Litig.*, No. CV 14-1956-GHK (PJWx), 2015 U.S. Dist. LEXIS 91447, at *42-46 (C.D. Cal. July 13, 2015); *SEC v. Strebinger*, 114 F. Supp. 3d 1321, 1329-30 (N.D. Ga. 2015); *SEC v. Farmer*, No. 4:14-CV-2345, 2015 U.S. Dist. LEXIS 136702, at *43-44 (S.D. Tex. Oct. 7, 2015); *SEC v. Curshen*, 888 F. Supp. 2d 1299, 1308 (S.D. Fla. 2012).

*Galena* and *CytRx* in particular, are just two instances of where courts have upheld scheme liability claims based upon undisclosed stock promotional campaigns similar to the one at hand. In *Galena* and *CytRx*, the defendants retained third-parties to publish promotional articles about their companies. *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d at 1193-94; *In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *41-42. The court in each case held that the defendants' conduct in retaining the third-parties and authorizing them to promote their respective companies without disclosing their involvement was violative of SEC Rule 10b-5(a) and (c). *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d at 1194; *In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *42-43. This is the precise situation here—Defendants "caused, directed and authorized" the numerous promotional pieces listed in the Complaint between 2014 and 2015 in anticipation of the Company's "uplisting" to the NASDAQ. ¶60. Indeed, similar to the defendants in *Galena* and *CytRx* who edited the promotional articles before release, Missling here provided Dr. De with a slew of information through interviews with himself as well as the Company's clinical "trial investigator." ¶¶39, 56. Given the similarity between the allegations here and those in *Galena* and *CytRx*, Plaintiffs' "scheme liability" allegations should be upheld. *See also SEC v. Strebinger*, 114 F. Supp. 3d at 1329-30 (denying motion to dismiss where defendant retained third-party to promote stock in advance of merger); *SEC v. Farmer*, 2015 U.S. Dist. LEXIS 136702, at *43-44 ("market awareness" campaign coordinated by defendant constituted "deceptive practice supporting scheme liability"); *SEC v. Curshen*, 888 F. Supp. 2d at 1308 (upholding "scheme liability" claims where defendant "orchestrated the false media campaign . . . includ[ing] posting of a false website" touting "cutting-edge technological developments").[6]

---

[6] In reply, Defendants may attempt to distinguish *Galena* and *CytRx* by relying on *In re Galectin Therapeutics, Inc. Sec. Litig.*, No. 15-CV-29-SCJ, 2015 U.S. Dist. LEXIS 173767 (N.D. Ga. Dec. 30, 2015). Any such reliance on that case would be misplaced. Unlike the defendants in *Galectin* who "merely . . . used stock promoters to increase the price of [their] stock" (*id*. at *20), Defendants here "caused, directed and authorized" the promotional pieces while also assisting the promoters by providing them with promotional information during interviews (¶¶39, 56, 59, 60). The facts at hand are far more similar to *Galena* and *CytRx* which denied the defendants' motions to dismiss. Further to the point, while *Galectin* held that "working with stock promoters" was not prohibited, the case does not stand for the premise that stock promotion schemes are per se shielded from liability. *In re Galectin Therapeutics, Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 173767, at *22.

Defendants claim that Plaintiffs' "scheme liability" claims should be dismissed for two reasons only, neither of which are persuasive. First, Defendants claim that they cannot be held liable for the statements made in the promotional pieces. Defs. Br. at 9-11. Regardless of whether or not Defendants can be considered "makers" of these statements under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), Plaintiffs do not seek to hold Defendants liable for the contents of the statements. To be certain, Plaintiffs' "scheme liability" claims against Defendants are premised upon their "caus[ing], direct[ing], and authoriz[ing]" of the promotional articles. ¶60. This is separate and apart from the contents of the articles themselves. *See SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d 377, 421 (S.D.N.Y. 2012) ("Accordingly, while Defendants were certainly aware of the misstatements made at their direction and behest by TW & Co. personnel, the allegations here hinge on Defendants' deceptive conduct"). In any event, the holding in *Janus* concerning liability for the "maker" of a statement does not apply to claims under Rule 10b-5(a) and (c). *See*, *e.g.*, *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) ("*Janus* only discussed what it means to 'make' a statement for purposes of Rule 10b-5(b), and did not concern . . . Rule 10b-5(a) or (c)."); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d at 1196-97 ("Scheme liability is not contingent upon the defendant making a specific misrepresentation . . . ."); *In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *43 ("the Rule 10b-5(b) 'maker' limitation described in *Janus* is inapplicable to scheme liability claims"); *Haw. Ironworkers Annuity Trust Fund v. Cole*, No. 3:10CV371, 2011 U.S. Dist. LEXIS 98760, at *17-20 (N.D. Ohio Sept. 1, 2011) (attribution not required for SEC Rule 10b-5(a) and (c)).[7]

Defendants' second argument in support of dismissing the "scheme liability" claims is also unsupported by the law. Defendants claim that Plaintiffs failed to plead that they "relied" on Defendants' deceptive conduct. Defs. Br. at 11-13. Defendants' argument ignores the well-settled principles concerning the presumption of reliance in Section 10(b) claims. *See In re Galena*

---

[7] Defendants' reliance on *Zagami v. Cellceutix Corp.*, No. 15 Civ. 7194 (KPF), 2016 U.S. Dist. LEXIS 74638 (S.D.N.Y. June 8, 2016), is misplaced. The plaintiff in that case did not even allege "scheme liability" under SEC Rule 10b-5(a) and (c). Accordingly, the court's application of *Janus* is irrelevant.

*Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d at 1199 (applying "fraud-on-the-market theory of reliance" to scheme liability claims); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 981 (D. Minn. 2014) (approving "fraud on the market theory" where deceptive conduct resulted in public statements). Specifically, where the alleged deceptive conduct results in public statements that effect the price of a stock in an efficient market, a plaintiff will be able to take advantage of the "fraud-on-the-market" presumption in pleading claims under SEC Rule 10b-5(a) and (c). *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d at 1198-99; *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 508-509 (S.D.N.Y. 2005) (applying "fraud-on-the-market doctrine" in denying motion to dismiss claims under SEC Rule 10b-5(a) and (c)). Plaintiffs here pleaded that Anavex shares traded in an efficient market and, therefore, Plaintiffs' claims are entitled to a presumption of reliance. ¶¶195-97.

Defendants' reliance on *Pacific Investment Management Company LLC v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010), does not change the outcome on this issue. In that case, the Second Circuit applied an exception to the general rule concerning reliance at the pleading stage. *Id.* at 158-59. The exception that the Second Circuit applied came from the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), a case in which the Supreme Court held that reliance could not be presumed because the deceptive conduct on the part of a secondary defendant was never made public. 552 U.S. at 161. In both cases, the alleged deceptive conduct involved actions by secondary defendants that were never directly communicated to the public, but rather reflected indirectly through the companies' respective financial statements. Unlike the alleged deceptive conduct in *Pacific Investment Management Company LLC* and *Stoneridge Investment Partners, LLC*, the deceptive conduct here was undertaken by Defendants and consisted of public promotions that directly impacted Anavex's stock price. ¶¶181, 183, 186. The facts in this case trigger a presumption of reliance. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152-54 (1972) (presuming reliance where defendants

perpetrated a "course of business" or a "device, scheme, or artifice" to defraud the plaintiffs); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d at 1198.[8]

**B.     DEFENDANTS VIOLATED SEC RULE 10B-5(B) BY INTENTIONALLY OR RECKLESSLY WITHHOLDING THE FACT THAT THEY WERE CREATING INCREASED VOLATILITY IN ANAVEX SECURITIES AS A RESULT OF THE COMPANY'S STOCK PROMOTION SCHEME**

1.     Legal Standard

SEC Rule 10b-5(b), promulgated under Section 10(b) of the Exchange Act, prohibits any person from "mak[ing] any untrue statement of a material fact or omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security." 17 C.F.R. § 250.10b-5(b). To adequately state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) (internal quotations omitted). "[A] plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (*citing Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). Materiality is a fact-intensive inquiry that is usually not suitable for determination at the pleading stage. *Id*. at 162.

2.     Anavex's Filings with the SEC Omitted the Existence of the Company's Stock Promotion Scheme

The Complaint adequately alleges that Defendants' statements about the volatility of the Company's stock price were materially false and misleading. An issuer's warning of stock price volatility that omits the existence of a paid promotional campaign on the issuer's behalf is

---

[8] Plaintiffs' allegations in Paragraphs 205, 206 and 214 of the Complaint do not preclude Plaintiffs from enjoying a presumption of reliance, as Defendants argue. Defs. Br. at 12. These allegations do not change the fact that Defendants' deceptive conduct was communicated to the public and, therefore, does not fall within the exception of *Stoneridge Investment Partners, LLC*. ¶¶32-60, 195-97.

materially false and actionable under Rule 10b-5. *See In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *33-36 (denying motion to dismiss, holding that risk warnings were materially misleading for omitting existence of paid promotions); *In re Galena Biopharma, Inc. Secs. Litig.*, 117 F. Supp. 3d at 1180-81 (denying motion to dismiss, holding that disclosures regarding volatility were misleading where company omitted information about paid stock promotion); *Ansell v. Laikin*, No. CV 10-9292 PA (AGRx), 2011 U.S. Dist. LEXIS 85695, at *9 (C.D. Cal. Aug. 1, 2011) (denying motion to dismiss, holding omission actionable where risk factors failed to disclose manipulation of stock price).

The Complaint adequately alleges that Defendants' disclosure of "risks related to the Company's common stock" was materially false. While the false and misleading statements are risk disclosures, the PSLRA offers these statements no safe harbor protection.  The Complaint pleads that throughout the Class Period, as Defendants disclosed trading price volatility risk to investors in filings with the SEC, they had already set in motion the paid promotional campaign. *See, e.g.*, ¶¶66, 74, 81, 83, 90, 92, 99, 101, 108, 110, 117, 119, 126, 128, 135, 137, 143, 145. To caution of risk is prudent, but to caution of risk when an adverse circumstance has already occurred is deceit. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).[9] For example, on August 14, 2015, the Company filed with the SEC a quarterly report on Form 10-Q signed by Missling. ¶140. The Company's risk disclosure about its stock price fluctuations stated that factors related and unrelated to Company performance may cause volatility. ¶¶142, 144. Absent from the list of factors provided to investors was any indication that Defendants were in the midst of orchestrating an undisclosed stock promotion campaign in anticipation of Anavex's "uplisting" to the NASDAQ. ¶¶143, 145. The Complaint, therefore, adequately alleges who made the offending statements, what the statements were, and when and where Defendants made them—which is all that is required to allege a material

---

[9] *See also In re Harman Intern. Indus., Inc. Sec. Litig.*, 791 F.3d 90, 104-05 (D.C. Cir. 2015) (reversing dismissal, holding that general warning of product obsolescence that omitted historical facts that could have affected the analysis was misleading); *In re BioScrip, Inc. Secs. Litig.*, No. 13-cv-6922 (AJN), 2015 U.S. Dist. LEXIS 46763, at *52-53 (S.D.N.Y. Mar. 31, 2015) (cautionary language did not shield defendants from liability because "severe downturn in revenue" had already occurred at time of statement).

misrepresentation and/or omission at the pleading stage. Fed. R. Civ. P. 9(b); 15 U.S.C. §78u-4(b)(1), (2).

Galena and CytRx are especially applicable on this issue as well. In Galena, the plaintiffs alleged that the defendants misled investors by failing to identify a "promotional campaign" as a factor that could lead to "volatil[ity]" or "price fluctuations" in the company's stock. 117 F. Supp. 3d at 1180. The court paid special attention to the fact that the defendants' disclosures purported to provide investors with reasons why the stock could be "volatile" or "fluctuate" (*i.e.*, increase *and* decrease not just simply "decline"). *Id.* at 1180-81. Given the fact that the defendants' promotional campaign was capable of causing the price of stock to both increase and decrease, the court held that it should have been disclosed along with the other factors listed. *Id.* at 1181. The court based its decision on the well-settled principle that, "[r]egardless of whether Galena had an independent duty to disclose the paid promotional campaign in its SEC filings, Rule 10b-5(b) 'prohibits the telling of material half-truths, where the speaker omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting *U.S. v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (quoting Rule 10b-5(b))). Like the defendants in *Galena*, "[a]fter [Defendants] chose to disclose a lengthy list of reasons why [Anavex's] stock price might fluctuate, [they] needed to include in that list the alleged scheme that [Anavex] was manipulating the stock price with the help of [Dr. Kanak Kanti De and others]." *Id.*; *see also In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *35-36 ("Once management started making announcements about investment risks, stock value, and the public offerings, it is misleading to omit a full explanation regarding how and why the Company's stock price was so dramatically increasing."); *Ansell*, 2011 U.S. Dist. LEXIS 85695, at *9-10 (failure to disclose "stock manipulation" in offering materials "misled investors into believing that [defendant] had disclosed all known risks of investing in the [c]ompany").

The law is clear on this issue: "[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1331 (2015). To avoid

14

the implications of this rule, Defendants attempt to focus the Court's attention on the non-controversial precept that "[s]ilence, absent a duty to disclose, is not misleading." Defs. Br. at 13-14. Defendants' argument misinterprets Plaintiffs' allegations—liability under SEC Rule 10b-5(b) exists not because Defendants engaged in a stock promotion campaign, but rather because they did so while misleading investors "into believing that [defendant] had disclosed all known risks of investing in the Company." *Ansell*, 2011 U.S. Dist. LEXIS 85695, at *9-10. Defendants' statements about the "volatil[ity]" and "fluctuat[ions]" in Anavex's stock price amounted to "half-truths" rendered misleading by Defendants decision to not disclose the ongoing stock promotion campaign in advance of the Company's "uplisting." *E.g.*, ¶¶143, 145.[10]

Defendants' reliance on *In re Galectin Therapeutics, Inc. Sec. Litig.*, No. 15-CV-29-SCJ, 2015 U.S. Dist. LEXIS 173767 (N.D. Ga. Dec. 30, 2015), does not save them from liability. Defs. Br. at 14. In *Galectin*, the plaintiff attempted to hold the defendants liable for a lone statement made in an agreement with an entity operating as the company's agent in an "at-the-market" offering. *In re Galectin Therapeutics, Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 173767, at *7-8. The statement, which was made public by virtue of the agreement being attached to a current report (Form 8-K) filed with the SEC on the first day of the class period, was a boilerplate representation warranting that the company would not take any action that would result in the "manipulation" of the price of its common stock. *Id*. at *7-8. According to the plaintiff, this statement was false because the defendants had in fact retained third-parties to promote the stock. *Id*. at *8-9. While the court ultimately held in favor of the defendants, it did so on the basis that a duty to disclose had not been triggered. *Id*. at *17-18. The court also noted that the plaintiff had not alleged that the defendants participated in the promotion scheme. *Id*. at *18-19. These facts are markedly different than those here and, ultimately, determinative. Whereas the defendants' alleged misrepresentation in *Galectin* may have been a one-off statement gleaned from an agreement

---

[10] *See also SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) (warning concerning "market timing" was "half-truth" and therefore materially misleading); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009) ("a duty to speak the full truth arises when a defendant undertakes a duty to say anything"); *In re Virtus Inv. Partners, Inc.*, No. 15cv1249 (WHP), 2016 U.S. Dist. LEXIS 86149, *12-13 (S.D.N.Y. July 1, 2016) (motion to dismiss denied in part where statement was "half-truth" in light of fact that it omitted "misleading performance history").

between the company and one of its agents, Defendants here repeatedly communicated "half-truths" to their investors in their quarterly and annual disclosure reports (Form 10-Q and 10-K) that a stock promotion campaign was not underway. *E.g.*, ¶¶142, 144. Further, while the court in *Galectin* declined to follow *Galena* and *CytRx*, its reason for doing so is the exact reason why the two decisions apply so aptly here. *In re Galectin Therapeutics, Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 173767, at *19-20. Unlike the defendants in *Galectin* who were only alleged to have "retained" stock promoters, Defendants (Missling in particular) actually participated in at least two promotional interviews during the Class Period as well as "caused, directed, and authorized" the promotions. ¶¶39, 41, 60.[11]

In sum, the facts at hand are far more similar to those presented in *Galena*, *CytRx*, and *Ansell*. For that reason, Defendants' motion to dismiss the SEC Rule 10b-5(b) claims should be denied.

## C.   DEFENDANTS ACTED WITH SCIENTER BY CONSCIOUSLY OR RECKLESSLY ENGAGING IN A STOCK PROMOTION SCHEME AND FAILING TO DISCLOSE IT

### 1.   Legal Standard

Plaintiff must plead scienter when stating claims under Subsections (a), (b), and (c) of Rule 10b-5. To plead scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000). To make this determination, a court must "accept all factual allegations in the complaint as true" and consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10 (2007). The "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun'

---

[11] Further to the point, *Galectin* was decided by the U.S. District Court for the Northern District of Georgia in 2015. The case has not been cited as authority by any court since. Moreover, the one case *Galectin* relies upon in its decision—*Garvey v. Arkoosh*, 345 F. Supp. 2d 73, 83 (D. Mass. 2005)—has never been followed. It has been cited a total of three times for its discussion on SEC Rule 10b-5. The two cases citing *Garvey* in addition to Galectin are *Galena* and *CytRx*, both of which explicitly rejected *Galectin*. *Galectin* is currently on appeal before the U.S. Court of Appeals for the Eleventh Circuit. *Hotz v. Gelectin Therapeutics, Inc., et al.*, No. 16-10324-EE (11th Cir.).

genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. A complaint will survive if the inference of scienter is "cogent and at least as compelling as any opposing inference . . . ." *Id.* at 323-24. A plaintiff adequately alleges a strong inference of scienter "where the complaint alleges facts showing either: 1) a motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quotations omitted). Here, Plaintiff adequately alleges both.

> 2.   Defendants Profited from the Undisclosed Promotional Campaign

Plaintiffs raise a cogent, strong, and compelling inference of scienter through motive and opportunity allegations. "[T]o raise a strong inference of scienter through motive and opportunity to defraud, [a plaintiff] must allege that [a defendant] or its officers benefitted in some concrete and personal way from the purported fraud." *Acticon AG v. China North East Petroleum Holdings Ltd.*, 615 Fed. Appx. 44, 45 (2d Cir. 2015) (internal quotations omitted). "This requirement [is] generally met when corporate insiders [are] alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *Novak*, 216 F.3d at 308. This is exactly what Plaintiffs allege here.

From 2014 through 2015, Defendants orchestrated the promotion of Anavex's stock for the purpose of profiting through public offerings, the sale of stock to Lincoln Park Capital, and the Company's "uplisting" to the NASDAQ. ¶¶60, 178-83. Within weeks of "uplisting" to the NASDAQ, Anavex sold Lincoln Park Capital $9.9 million worth of Anavex common stock in addition to securing $50 million of future capital under the 2015 agreement with Lincoln Park Capital. ¶¶180-81. Anavex also profited through a series of public offerings whereby Anavex received nearly $25 million in cash from the exercise of warrants by selling stockholders. ¶182. This influx of capital allowed Missling in particular to pay himself over $3.2 million in compensation in fiscal 2013 and 2014 alone while the Company generated zero revenue from operations. ¶183. The fact that Defendants' deceptive conduct resulted in material financial

benefits to Anavex and Missling supports a strong inference of scienter. *See Blanford*, 794 F.3d at 308-309 (2d Cir. 2015) (scienter inferred in part from stock sales occurring close in time to misleading investor conference calls); *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 786 (E.D. Va. 2015) (finding scienter where debt offering made the day after the alleged material misstatement and multi-million dollar bonuses paid on the basis of the misstatements); *Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*, No. 5:13-CV-746 (MAD) (ATB), 2014 U.S. Dist. LEXIS 130677, at *36-37 (N.D.N.Y. Sept. 18, 2014) (finding corporate scienter based on motive to issue indentures specifically in order to delay insolvency and thereby continue receiving management fees); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474-75 (S.D.N.Y. 2013) (holding that misstatements that artificially inflate a stock price in advance of a public offering are sufficient to support scienter on a motion to dismiss).

Defendants attempt to avoid liability by relying on the fact that Missling did not sell shares of Anavex stock during the Class Period, but rather acquired shares. Defs. Br. at 18. Missling's conduct in this regard actually furthers Plaintiffs' theory of scienter, as the entire objective in a "pump-and-dump" scheme is to acquire shares cheaply and then sell once the price of the stock is artificially inflated. *See Curshen*, 888 F. Supp. 2d at 1307 (noting that a "pump-and-dump stock scheme is a classic violation" of Rules 10b-5(a) and (c)). Indeed, Missling did not begin purchasing stock until just June 30, 2015, just several weeks before giving interviews to Dr. Kanak Kanti De and Shelly Craft.[12] That Missling did not ultimately have the opportunity to sell the shares at inflated prices is beside the point, as such an "argument confuses expected with realized benefits." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d at 97 (internal quotations omitted).

---

[12] Missling's acquisitions consisted of 14 purchases between June 8, 2015 and July 14, 2015 for a total of 14,000 shares at prices between $0.352 per share and $0.5295 per share. Kistenbroker Decl., Ex. 9. These are Missling's only purchases of Anavex stock, which is suspicious in and of itself considering the timing of the purchases relative to Missling's interviews. Regardless, courts have routinely held that "this possibility [acquisition of stock during Class Period] alone cannot counteract the circumstantial evidence of fraudulent intent described above; such a rule would create incentive for corporate officers to insulate themselves from liability by purchasing stock merely to negate an inference of fraud." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013).

3.      Scienter Is Evident from the Fact that Defendants Participated in the Promotions

Plaintiffs' theory of scienter is also supported heavily by allegations establishing that Defendant "knew facts or had access to information" evidencing that a stock promotion scheme was in place. *Novak*, 216 F.3d at 311.

First, Missling himself, CEO of Anavex, participated in at least two of the promotional pieces during the Class Period. On July 24, 2015, Missling gave an interview to Dr. De which was then printed for publication. ¶39. Four days later, on July 28, 2015, Missling gave a video interview to an individual named Shelly Craft on who purportedly worked for an outfit named "Stock News Now." ¶41. During the interview, Missling described "revolutionary" events that had occurred at the Company within the last quarter. ¶41. The fact that Missling agreed to give interviews to these two individuals (one of which, Dr. De, was later revealed to be a fraud) strongly supports the conclusion that Defendants (Missling in particular) was aware of and intentionally furthered the stock promotional campaign. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d at 1164-68 (participation in drafting promotional articles was sufficient to support inference of scienter); *In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *36-40 (reviewing promotional articles raised inference of scienter).

Second, the price of Anavex's stock was of critical importance to the Company, more so than any normal company traded on a public exchange. ¶171. This was because Anavex, a small company with not more than four full-time employees and no revenue-generating operations, was completely dependent upon equity financing to generate capital. ¶¶167-70. Indeed, Anavex admitted as much in its filings with the SEC, stating that a "decline in the price of [the Company's] common stock" would impact Anavex's "ability to raise further working capital." ¶171. The importance of the Company's stock price to Defendants suggests strongly that Defendants were aware of the stock's volatility due to the ongoing promotional campaign. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant

knew or should have known the statements were false when made."); *In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *38 (company with only 17 employees charged with scienter where it was likely that executives knew of stock promotion).

    Third, Anavex paid millions of dollars for "investor relations" and "consultant" services. In 2013, Anavex paid $128,575 for "investor relations" services. ¶172. The next year, in 2014, Anavex's total operating expenses increased to $2.9 million, which was "mainly attributable" to "an increase in investor relations expenses." ¶172. Anavex appears to have increased its "investor relations" budget even further in fiscal 2015 given the erratic volatility experienced by the Company's stock relative to Anavex's peers. ¶186. In light of the fact that Anavex had no more than four full-time employees without any revenue-generating operations, the vast amount of money spent on investor relation services is extremely suspect. *South Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (Courts "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective."). Moreover, during an analyst interview when Anavex first started being investigated for promotions, Missling emphatically denied anything of the sort—"Absolutely not by us. That's crazy! . . . We really don't want any association with anything like that. It's absolutely inappropriate." ¶154. Missling's denial raises a strong inference of scienter given the clear evidence that such a scheme was ongoing and that he in fact had already directly participated in it by giving two interviews in July 2015. *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (denial of scheme in response to direct question from analyst supported inference of scienter). Finally, the fact that Anavex stopped reporting its investor relations expenses supports the conclusion that Defendants were trying to hide this information from investors so as to avoid suspicion. ¶173. Defendants' efforts to conceal their scheme furthers the inference of scienter. *See Blanford*, 794 F.3d at 308 (efforts to deceive supported inference of scienter).

    Fourth, Defendants' knowledge of the promotion scheme is also supported by the fact that Anavex had already been involved in stock promotion schemes prior to and earlier during the Class Period. Anavex began its promotional practices with the retention of The Primoris Group in 2007.

¶174. The Primoris Group is notorious for stock promotion schemes, as evidenced by the fact that their clients consist of nefarious Canadian penny-stock mining companies that, at least in one case (HiEnergy Technologies, Inc.), have been investigated by the SEC for illegal stock promotion conduct. ¶175-76. Moreover, Anavex's former president, Harvey Lalach, who initially retained The Primoris Group, had previously been involved with less-than-reputable companies involved in stock manipulation schemes. ¶177. Proof of Anavex's and The Primoris Group's previous stock promotion violations is evident in the fact that the British Columbia Securities Commission cited Anavex for suspicious promotional activity and halted the trading of Anavex's stock in June 2013. ¶184. Given Anavex's continued involvement with The Primoris Group, the SEC decision to commence an investigation into Anavex's promotional activities is completely warranted. ¶185. In light of Anavex's continued involvement with The Primoris Group and previous violation from the British Columbia Securities Commission, Anavex's recent subpoena from the SEC relating to additional stock promotion activity furthers Plaintiffs' inference of scienter. *See Freedman v. Weatherford Int'l Ltd.*, No. 12 Civ. 2121 (LAK), 2013 U.S. Dist. LEXIS 135149, at *14-16 (S.D.N.Y. Sept. 19, 2013) (repeat violation of accounting rule after previous restatement supported inference of scienter).

4.   Plaintiffs' Theory of Scienter Outweighs Defendants' Excuse of Non-Culpable Conduct

For Plaintiffs' scienter allegations to withstand Defendants' motion to dismiss, they must be at least as likely as Defendants' competing non-culpable explanation. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007) ("A plaintiff alleging fraud in a § 10(b) action, we hold today, must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference."); *see also New Mexico State Investment Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) ("a tie goes to the Plaintiff in terms of competing inferences of scienter").

Plaintiff's theory of the case is compelling and cogent—Defendants engaged in an undisclosed stock promotion scheme for the purpose of increasing Anavex's stock price in order

to profit through equity financing. ¶60. The timing of Anavex's promotions relative to key corporate events—specifically, Anavex's "uplisting"—dramatically furthers Plaintiffs' inference of scienter. ¶¶178-83. Cementing the conclusion that Defendants knew of and were responsible for the ongoing promotional scheme is the fact that Missling himself participated in the promotions and that the Company's stock price was of critical importance to Anavex, as it was the Company's only means to obtaining revenue through its equity financing deals with Lincoln Park Capital. ¶¶167-71.

In response, Defendants simply claim that they were "interested bystanders" with no say or responsibility in what was occurring. Defs. Br. at 24. Defendants' explanation fails to outweigh the strong, cogent, and compelling inference of scienter pleaded by Plaintiffs in the Complaint. *See In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 594 (S.D.N.Y. 2010) (denying motion in part where inference of recklessness was at least as plausible as acting in good faith); *MF Glob. Holdings*, 982 F. Supp. 2d at 320 (motion denied where defendants had a "genuine belief" that the company would succeed); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) ("good faith error" undermined by fact that defendants were "sophisticated scientists running a regulated, publicly traded corporation").

## D. THE INDIVIDUAL DEFENDANTS ARE LIABLE UNDER SECTION 20(A) FOR ANAVEX'S PRIMARY VIOLATION OF SECTION 10(B)

The Individual Defendants are liable for Section 20(a) because the Complaint adequately alleges primary liability under Section 10(b). *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 304 (S.D.N.Y. 2009). While the Second Circuit has reserved decision on the issue of whether a showing of "culpable participation" is required, the "majority" of judges in the Southern District has held that "such an allegation is not required." *In re Bear Stearns Mortgage Pass-Through Certificates Litigation*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (collecting cases). Regardless, as the senior executives responsible for making the statements alleged to be false herein, the Individual Defendants are responsible for the actions of the Company and therefore liable under Section 20(a). *See In re Barrick Gold Secs. Litig.*, 2015 U.S. Dist. LEXIS 43053, at *51-54.

## CONCLUSION

For the reasons set forth herein, Defendants' motion to dismiss should be denied.[13]


Dated:  July 13, 2016                          Respectfully submitted,

                                               LEVI & KORSINSKY LLP


                                               /s/ Adam M. Apton
                                               Nicholas I. Porritt
                                               Adam M. Apton
                                               30 Broad Street, 24th Floor
                                               New York, New York 10004
                                               Tel: (212) 363-7500
                                               Fax: (212) 363-7171
                                               Email: nporritt@zlk.com
                                               Email: aapton@zlk.com

                                               *Counsel for Lead Plaintiff Lam Truong,*
                                               *Plaintiffs Arina Davliatshina and Michael Yu,*
                                               *and Lead Counsel for the Class*


4851-4012-4980, v.  1

---

[13] In the instance the Court finds any aspect of Plaintiff's Complaint insufficient to properly state a claim, Plaintiff respectfully requests leave to amend. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).