UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

KEVIN CORTINA, et al.,

                              Plaintiffs,

                     -v-

ANAVEX LIFE SCIENCES CORP., et al.,

                           Defendants.

------------------------------------------------------------------ X

:
:
:
:
:
:
:
:
:
:
:
:
:

15-CV-10162 (JMF)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  12/29/2016____

JESSE M. FURMAN, United States District Judge:

      In this putative class action, Plaintiffs bring securities fraud claims against Anavex

Life Sciences Corp., Inc. ("Anavex") and three of its executives, Christopher Missling, Sandra

Boenisch, and Athanasios Skarpelos (collectively, the "Individual Defendants" and, together

with Anavex, "Defendants").  Plaintiffs allege that, by orchestrating a paid promotional

scheme, Defendants committed securities fraud in violation of Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934, 15 U.S.C. §§ 78(b), 78(t)(a), and Securities Exchange

Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.  Defendants now move, pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' claims.  For the reasons

stated below, Defendants' motion is GRANTED and the Amended Complaint is dismissed.

## BACKGROUND

      The following facts, which are taken from the Amended Complaint, documents it

incorporates, and matters of which the Court may take judicial notice, are construed in the

light most favorable to Plaintiffs.  *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152

(2d Cir. 2013); *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009); *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

Anavex is a "biopharmaceutical company" that develops drugs to treat Alzheimer's disease.  (Docket No. 59 ("Am. Compl.") ¶¶ 22-23).  According to the Amended Complaint, the company has generated no revenue since it entered the biopharmaceutical industry in 2007.  (*Id.* ¶ 23).  Indeed, only one of its drugs, Anavex 2-73, has even advanced into clinical trials.  (*Id.*).  As a result of that performance, the company amassed large deficits; its accumulated deficit as of December 31, 2015, for example, was in excess of $67 million.  (*Id.* ¶ 168).  To continue funding its operations, Anavex relied on financing arrangements that were "largely dependent" upon the price of Anavex's stock.  (*Id.* ¶ 24).  Originally, that stock was traded on an over-the-counter market; in October 2015, the company's stock began trading on the NASDAQ.  (*Id.* ¶ 25).

Plaintiffs allege that, between May 17, 2013, and December 30, 2015 (the "Class Period"), Defendants engaged in "an extreme stock promotion and market manipulation scheme" to inflate the price of Anavex's stock.  (*Id.*).  Specifically, Defendants "caused, directed, and authorized" a paid-promotional campaign to increase the price of the company's stock and thus enable the company to receive equity financing.  (*Id.* ¶¶ 60, 169).  The campaign included bulletins, videos, newsletters, and reports from third-party publishers, and was timed to coincide with significant financing events, including Anavex's "uplisting" to the NASDAQ.  (*Id.* ¶¶ 33-59, 60, 170, 180).  One promoter in particular, "Dr. Kanak Kanti De," published at least sixteen reports — including interviews with Missling (Anavex's Chief Executive Officer) and Anavex's clinical trial investigator — and ramped up his unduly

2

positive coverage of Anavex in the weeks leading up to and immediately following the Company's NASDAQ listing. (*Id.* ¶¶ 39-56).

Although some of the promoters disclosed that they had been compensated, others did not, and at no time — either in their public filings or in the media — did Defendants admit to being behind the paid-promotion scheme. (*See*, *e.g*., *id.* ¶¶ 33, 201). In fact, at one point, Missling explicitly denied being responsible for a promotional campaign. (*Id.* ¶ 154). Moreover, according to Plaintiffs, Defendants "[s]neakily" stopped reporting "investor relations" fees as a line item in the company's expense tables and eventually provided no information at all about these fees. (*Id.* ¶ 173). The result of Defendants' efforts, Plaintiffs allege, was a dramatic rise in the price of Anavex's stock, which went from $0.65 per share in late 2014 to more than $14 per share on November 2, 2015. (*Id.* ¶ 181).

Toward the end of 2015, however, market analysts began publishing articles suggesting that Anavex was the beneficiary of a paid-promotion scheme. (*Id.* ¶¶ 148-165). One of the articles also revealed that Dr. De was not, in fact, a medical doctor. (*Id.* ¶ 164). Further, on December 29, 2015, Anavex disclosed in its annual Form 10-K that it had received a subpoena from the SEC and that the SEC was "conducting a formal investigation" based on "recent unusual activity in the market for the Company's shares." (*Id.* ¶ 162).[1] These revelations caused a sharp decline in the company's stock price; on December 30,

---

[1]     In 2013, Anavex was also investigated by the British Columbia Securities Commission ("BSCS"). (Am. Compl. ¶ 184). On June 4, 2013, the BSCS issued a "Halt Trade Order" stating that "circumstances exist[ed] that could result in other than an orderly trading of Anavex's securities." (*Id.* (alteration in original)). On June 20, 2013, the "Halt Trade Order" was revoked following a press release from the company addressing "the recent promotion of its shares by third parties that appeared to have a significant effect on Anavex's share price and trading volume." (*Id.*).

2015, its shares were trading at $5.50.  (*Id.* ¶ 165).  As a result, certain investors in Anavex's stock sustained heavy losses, losses that Plaintiffs claim are directly attributable to Defendants' misconduct.  (*Id.* ¶ 166).

## LEGAL STANDARDS

"In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012). The Court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555. Further, if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed."  *Id.* at 570.

Because they allege securities fraud, Plaintiffs must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the PSLRA, which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pled with particularity, *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted).  To satisfy Rule 9(b), a plaintiff "must '(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

## DISCUSSION

Plaintiffs seek to hold Defendants liable for securities fraud under Section 10(b) of the Securities Exchange Act and various sections of Rule 10b-5.  Section 10(b) of the Securities Exchange Act makes it unlawful "for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5, promulgated thereunder, makes it unlawful (a) "[t]o employ any device, scheme, or artifice to defraud"; (b) "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or (c) "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  Here, Plaintiffs allege that Defendants (1) perpetrated a market manipulation scheme, in violation of Rule 10b-5(a) and (c); and (2) made false and misleading statements and omissions, in violation of Rule 10b-

5(b).  Plaintiffs also allege that each of the Individual Defendants should be held liable as "control persons" under Section 20(a).

A claim of market manipulation under Rule 10b-5(a) and (c) "requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Comm'cns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).  To state a claim that Defendants made material misrepresentations or omissions in violation of Rule 10b-5(b), Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted); *see IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).  Finally, to state a claim under Section 20(a), Plaintiffs must, at a minimum, plead a plausible "primary violation" of Section 10(b).  *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *Total Equity Capital, LLC v. Flurry, Inc.*, No. 15-CV-4168 (JMF), 2016 WL 3093993 (S.D.N.Y. June 1, 2016).

Defendants argue that Plaintiffs' market manipulation claims fail because Plaintiffs do not adequately plead a manipulative act and that their material misrepresentation or omission claim fails because they do not adequately plead a material misrepresentation or omission.  In the alternative, Defendants contend that all claims should be dismissed because Plaintiffs do

not adequately allege scienter under the PSLRA's heightened pleading standards.  The Court will address each of these arguments in turn.

**A.  Rule 10b-5(a) and (c): Market Manipulation**

The Supreme Court has explained that manipulation is "virtually a term of art when used in connection with securities markets."  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (internal quotation marks omitted).  It "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  *Id*.  That is, manipulation "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."  *ATSI Comm'cns*, 493 F.3d at 100 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)); *see also*, *e.g*., *Wilson v. Merrill Lynch & Co*., 671 F.3d 120, 130 (2d Cir. 2011) ("In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure.").  A manipulative act is, therefore, any act — as opposed to a statement — that has such an "artificial" effect on the price of a security.  *See ATSI Comm'cns*, 493 F.3d at 100.  Accordingly, a market manipulation claim "cannot be based solely upon misrepresentations or omissions."  *Id.* at 101.  Moreover, to satisfy the heightened pleading standards for fraud under Rule 9(b), a plaintiff must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  *Id.* at 102 (internal quotation marks omitted).  In other words, "[g]eneral allegations not tied to the defendants or resting upon speculation are insufficient."  *Id*.

Applying these principles here, and mindful of the heightened pleadings standards of Rule 9(b), Plaintiffs' claims fall short.  Plaintiffs fail to identify a single bulletin, video,

newsletter, or report written by, edited by, or commissioned by Defendants.  In fact, far from specifying Defendants' "manipulative acts" with particularity, Plaintiffs resort to broad and conclusory innuendo to place Anavex and its leadership behind the alleged promotional scheme.  Rule 9(b)'s heightened pleading standard for fraud cases, however, requires more than superficial accusations that Defendants "caused, directed, and authorized" a paid promotional scheme.  (Am. Compl. ¶ 60).  It requires Plaintiffs to "set forth the who, what, when, where and how of the alleged fraud." *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014) (internal quotation mark omitted).  Plaintiffs fail to meet that exacting standard because the few allegations they marshal in support of the existence of a scheme — namely, a slew of third-party statements touting Anavex and a corresponding rise in the company's stock price — do not directly implicate the Defendants. The allegations that do relate to Defendants — namely, two interviews that company officials did with promoters and Anavex's generic desire to keep its stock price high (Docket No. 65 ("Pls.' Opp'n") at 8-9) — are even more scarce, and are patently insufficient to nudge Plaintiffs' claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In arguing otherwise, Plaintiffs rely heavily on *In re Galena Biopharma*, *Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1204 (D. Or. 2015), and *In re CytRx Corp. Sec. Litig.*, No. 14-CV-1956 (GHK) (PJW), 2015 WL 5031232 (C.D. Cal. July 13, 2015), in which courts upheld market manipulation schemes based on alleged paid-promotional campaigns.  (Pls.' Opp'n 9). But the differences between the allegations in those cases and those here merely underscore the inadequacy of Plaintiffs' claims.  In both *Galena Biopharma* and *CytRx Corp.*, the plaintiffs alleged particularized facts showing that the defendants had personally reviewed, edited, and approved the promotional pieces before they were published; forbade the

8

promoters from disclosing their involvement in the articles; executed surreptitious stock transactions to enrich themselves; and even took steps to cover up their fraudulent dealings. *See In re Galena*, 117 F. Supp. 3d at 1168-69, 1174; *In re CytRx*, 2015 WL 5031232, at *2. Further, in *In re Galena*, an "undercover" investigator had posed as a writer for the promoter to expose the mechanics of the scheme, and one defendant had even admitted that she had known articles were part of a paid-promotional campaign. *In re Galena,* 117 F. Supp. 3d at 1161, 1168. Similarly, in *In re CytRx*, the plaintiffs' allegations were supported by two whistleblowers who detailed the entire paid-promotion scheme with specificity. *In re CytRx*, 2015 WL 5031232, at *2. By contrast, Plaintiffs here provide only bare assertions and conclusory statements, and thus fail to plausibly allege that Defendants perpetrated a fraudulent stock promotion scheme.

**B.  Rule 10b-5(b): Material Misrepresentations or Omissions**

That leaves Plaintiffs' Rule 10b-5(b) claim based on material misrepresentations and omissions. Significantly, Plaintiffs do not appear to base their claim on the promotional articles or statements themselves. That is wise, as the vast majority of the statements referenced in the Amended Complaint were made by third parties, and the law is clear that a defendant may be held liable under Rule 10b-5(b) only if it "made" the statement itself. *See Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("One 'makes' a statement by stating it. . . .  For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right."); *see also, e.g.*, *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993) (affirming the district court's dismissal of allegedly fraudulent

statements that were unattributed to a particular speaker, even though the plaintiff "allege[d] on information and belief that the unattributed statement was made by an agent of the defendant"); *Zagami v. Cellceutix Corp.*, No. 15-CV-7194 (KPF), 2016 WL 3199531, at *6-7 (S.D.N.Y. June 8, 2016) (rejecting the plaintiffs' claim that statements in an Internet article were attributable to the defendant for lack of a showing that the defendant had "ultimate authority" over the publication of the article in question); *Schwartz v. Novo Indus. A/S*, 658 F. Supp. 795, 799 (S.D.N.Y. 1987) ("[P]laintiff fails to demonstrate how . . . it would be fair to draw an inference of fraud from a statement appearing in a news article over which defendant had less than complete control.").  To the extent that Plaintiffs cite any statements made by Defendants — for example, in interviews — they make no allegation that the statements were false or misleading.  (*See* Pls.' Opp'n 12-16).

Instead, the theory of Plaintiffs' claim is one of omission — namely, that Defendants failed to disclose the alleged paid-promotional scheme in the risk disclosure sections of their SEC filings.  (Pls.' Opp'n 12-16).  But that theory assumes that there was a paid-promotional scheme to disclose.  Yet, as discussed above, the Amended Complaint fails to adequately allege that Defendants orchestrated such a scheme.  *See, e.g.*, *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (dismissing an omission-based claim on the ground that the plaintiffs had "offer[ed] nothing more than conclusory allegations that an anticompetitive scheme existed").  Additionally, it is well established "that an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (internal quotation marks omitted).  Here, however, Plaintiffs fail to identify any duty that Defendants would have owed to disclose even if they had played role in a paid-promotional

scheme.  Notably, Section 17(b) of the Securities Exchange Act imposes a duty to disclose payment on the promoter who receives payment, but *not* on the issuer who hired and paid the promoter.  *See* 15 U.S.C. § 77q(b); *see also United States v. Wenger*, 427 F.3d 840, 850 (10th Cir. 2005) ("[T]he *promoter* must provide a disclaimer as to each security he touts at the time he promotes the security." (emphasis added)).  As another district court reasoned, "[f]or the Court to impose a duty to disclose" on stock issuers in circumstances like those here "would encroach on the drafter's decision to create a duty to disclose on analysts, such as stock promoters, rather than the issuer of a regulated security."  *In re Galectin Therapeutics, Inc. Sec. Litig.*, 157 F. Supp. 3d 1230, 1237-38 (N.D. Ga. 2015); *see also Garvey v. Arkoosh,* 354 F. Supp. 2d 73, 83 (D. Mass. 2005) ("[T]he burden to disclose rests on the person who *publishes* the analyst's report; by contrast, there is no duty imposed by the statute on the *issuer* who has paid for the puffery.").

Plaintiffs' last-ditch effort to salvage their claim is to argue — again relying on *CytRx* and *Galena* — that Defendants had a duty to disclose the existence of a paid-promotional scheme because they disclosed in their SEC filings a "lengthy list" of other reasons "why [Anavex's] stock price might fluctuate."  (Pls.' Opp'n 13-16).  It is true that Rule 10b-5(b) "prohibits the telling of material half-truths, where the speaker 'omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"  *United States v. Laurenti*, 611 F.3d 530, 539 (9th Cir. 2010) (quoting Rule 10b-5(b)) (alteration in original).  Once again, however, *CytRx* and *Galena* are easily distinguished.  In each of those cases, the company's risk disclosure included a detailed list of factors that could explain stock price fluctuations, but omitted any mention of a paid-promotional scheme.  *See In re Galena*, 117 F. Supp. 3d at 1180 ("Galena

then explained that price fluctuations are caused by many reasons and provided twelve possible reasons, none of which included the alleged promotional campaign."); *In re CytRx,* 2015 WL 5031232, at \*9 (finding an actionable omission where the defendants' SEC filing "list[ed] factors that may affect the market price of [defendants'] common stock (internal quotation marks omitted)).  By contrast, the risk disclosure in this case did not contain a list of specific factors; instead, it included only a generic, boilerplate description of why over-the-counter stocks tend be volatile investments.[2]  That statement did not create a duty to disclose if Defendants had engaged in a paid-promotional scheme.  Accordingly, Plaintiff's Rule 10b-5(b) claim must be and is dismissed.

## C.  Scienter

Although the Court could stop there, Plaintiffs' claims under Section 10(b) and Rule 10b-5 are subject to dismissal for a related, albeit independent, reason: failure to adequately

---

[2]     Anavex's disclosure stated in full as follows:

Trading of our common stock may be volatile and sporadic, which could depress the market price of our common stock and make it difficult for our stockholders to resell their shares.  There is currently a limited market for our common stock and the volume of our common stock traded on any day may vary significantly from one period to another.  Our common stock is quoted on OTC Market's OTCOB. Trading in stock quoted on OTC Market's OTCOB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects. The availability of buyers and sellers represented by this volatility could lead to a market price for our common stock that is unrelated to operating performance.  Moreover, OTC Market's OTCOB is not a stock exchange, and trading of securities quoted on OTC Market's OTCOB is often more sporadic than the trading of securities listed on a stock exchange like NASDAQ.  There is no assurance that a sufficient market will develop in the stock, in which case it could be difficult for our stockholders to resell their stock.

(Am. Compl. ¶ 65).

plead scienter.  As noted above, the PSLRA requires a plaintiff to plead scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — with particularity.  *Tellabs*, 551 U.S. at 313 (internal quotation marks omitted).  To meet that requirement, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). Additionally, a plaintiff must "allege facts supporting a strong inference with respect to *each* defendant."  *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (emphasis added).  The "strong inference" must be "more than merely plausible or reasonable."  *Tellabs*, 551 U.S. at 314.  The necessary inquiry is "inherently comparative." *Id.* at 323.  That is, the Court "must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 324.  A complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*

In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Comm'cns*, 493 F.3d at 99.  The former requires a plaintiff to allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation marks omitted).  The latter requires allegations of either actual intent or "conscious recklessness — *i.e.*, a state of mind approximating actual

intent, and not merely a heightened form of negligence." *Stratte-McClure*, 776 F.3d at 106.

More specifically, a plaintiff must allege conduct by a defendant, "which is at the least,

conduct which is highly unreasonable and which represents an extreme departure from the

standards of ordinary care to the extent that the danger was either known to the defendant or

so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131,

142 (2d Cir. 2001) (internal quotation marks omitted).  As a general matter, courts have

approved of claims when plaintiffs "have specifically alleged defendants' knowledge of facts

or access to information contradicting their public statements.  Under such circumstances,

defendants knew or, more importantly, should have known that they were misrepresenting

material facts related to the corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

        In this case, Plaintiffs' allegations fall short under both prongs.  They argue first that

Defendants had a motive to commit fraud because the company's financing was largely

dependent on its stock price; if the stock price fell, they assert, the company and the

Individual Defendants' salaries would have been in jeopardy.  (Pls.' Opp'n 17).  As the

Second Circuit has held, however, "it is not sufficient to allege goals that are 'possessed by

virtually all corporate insiders,' such as the desire to maintain a high credit rating for the

corporation or otherwise sustain the appearance of corporate profitability or the success of an

investment, or the desire to maintain a high stock price in order to increase executive

compensation." *South Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 109 (2d Cir.

2009) (internal quotation marks omitted); *see also Acito v. IMCERA Grp., Inc.,* 47 F.3d 47, 54

(2d Cir. 1995) (noting that, "[i]f scienter could be pleaded" solely on the basis that

"defendants were motivated to defraud the public because an inflated stock price would

increase their compensation," then "virtually every company in the United States that

14

experiences a downturn in stock price could be forced to defend securities fraud actions"). Notably, Plaintiffs make no allegation that any Defendant sold shares during the Class Period. *See, e.g.*, *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) (noting that the failure of some individual defendants to sell stock during class period undermined the plaintiffs' allegations that any defendant intended to inflate stock for personal profit); *see also Rombach*, 355 F.3d at 177 (finding "no personal interest sufficient to establish motive" where "[p]laintiffs [did] not allege that defendants sold stock or profited in any way during the relevant period").[3]  In short, because Plaintiffs fail to allege that Defendants received a "concrete and personal" benefit from the alleged scheme, and certainly do not allege that *each* Defendant received such a benefit, they fail to demonstrate a motive to commit fraud.  *See ECA*, 553 F.3d at 198.

Turning to the conscious-misbehavior-and-recklessness prong of the scienter test, Plaintiffs assert that Defendants "knew facts or had access to information evidencing that a stock promotion scheme was in place."  (Pls.' Opp'n 19 (internal quotation marks omitted)). Specifically, Plaintiffs rely on the following seven "facts" in contending that they have sufficiently alleged Defendants' "knowledge of facts or access to information contradicting their public statements," *Novak*, 216 F.3d at 308: (1) that Missling participated in two

---

[3]     In fact, Missling *purchased* additional shares during the Class Period (*see* Docket No. 63, Ex. 9; *see also* Pls.' Opp'n 18 n.12), a fact that serves to further undermine any plausible allegation of scienter.  *See, e.g.*, *See Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (concluding that the acquisition of stock by three defendants, and a lack of sales by a fourth defendant, did not support a finding of scienter); *Turner v. MagicJack VocalTec, Ltd.*, No. 13-CV-0448, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) ("That three of the four individual Defendants, all high-ranking executives at the Company, did not sell stock during the Class Period, and that two of these Defendants instead purchased stock during the relevant period, rebuts an inference of scienter.").

promotional interviews; (2) that Missling denied the existence of a promotional scheme during one of the interviews; (3) that Anavex's stock price was of "critical importance to the Company"; (4) that "Anavex paid millions of dollars for 'investor relations' and 'consultant' services"; (5) that Anavex "stopped reporting its investor relations expenses"; (6) that Anavex had a history of involvement in stock promotion schemes; and (7) that the company was investigated by both the BCSC (in 2013) and the SEC (in 2015).  (Pls.' Opp'n 19-21). Whether viewed individually or together, however, these "facts" do not constitute sufficiently strong circumstantial evidence of conscious misbehavior or recklessness to satisfy Plaintiffs' burden under the PSLRA.

To begin, the first and second "facts" — that Missling participated in two interviews and denied the existence of a promotional scheme in one — do not constitute "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Comm'cns*, 493 F.3d at 99.  As noted above, Plaintiffs allege no particularized facts suggesting that Missling knew or should have known about the alleged promotional campaign or that the interviewers were participating in any such campaign.  And even if they did make such a showing, Plaintiffs do not point to any statements made during the interviews suggesting that Missling "knew facts or had access to information evidencing that a stock promotion scheme was in place."  (Pls.' Opp'n 19).  If anything, the fact that Missling agreed to be openly interviewed actually cuts against Plaintiffs' claim, as there is no suggestion in the Amended Complaint that he or any other Defendant took steps to distance themselves from the promotion of Anavex stock.  *Cf. In re Galena*, 117 F. Supp. 3d at 1159 (detailing the defendants' elaborate efforts to distance themselves from the promotional schemes, including the use of "many different fraudulent aliases and third parties"); *In re CytRx*, 2015 WL 5031232, at *2

16

(describing how the defendants would heavily edit the promotional pieces but pass them through an intermediary "in an effort to conceal the Insider Defendants' direct involvement in the stock manipulation scheme[]" (footnote omitted)).

Plaintiffs' third and fourth points — that Anavex's stock price was of "critical importance to the Company" and that "Anavex paid millions of dollars for 'investor relations' and 'consultant' services" — implicate the "core operations doctrine," which "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business, which include matters critical to the long term viability of the company and events affecting a significant source of income." *Hensley v. IEC Elecs. Corp.*, No. 13-CV-4507 (JMF), 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (internal quotation marks omitted).  But "there is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid." *Id.*  And even if the doctrine is still valid, it would provide no help to Plaintiffs here for three reasons.  First, core operations allegations "constitute supplementary but not independently sufficient means to plead scienter." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).  Second, Plaintiffs fail to cite any authority for the proposition that Anavex's stock prices or its investor relations expenditures would constitute "core operations" of the company's business.  Finally, courts applying the doctrine generally require "that the operation in question constitute nearly all of a company's business before finding scienter." *Tyler v. Liz Claiborne*, *Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011).  In this case, however, the company at issue is a developer of Alzheimer's drugs, and neither its stock price nor its investor relations budget constitute "nearly all" of its business operations.

Relatedly, Plaintiffs' fifth "fact" — that Anavex changed the way it reported its investor relations expenses and then stopped reporting them altogether — does not give rise to a strong inference that Defendants acted with the required state of mind.  As a general matter, "allegations of . . . accounting irregularities, standing alone, are insufficient to state a securities fraud claim . . . .  Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."  *ECA*, 553 F.3d at 200 (internal quotation marks and alteration omitted).  Here, Plaintiffs do not even allege "accounting irregularities."  Indeed, there is no suggestion that Defendants had a duty to disclose their investor relations expenses in any particular manner.  *See Kalnit*, 264 F.3d at 144 (holding that where a complaint "does not present facts indicating a clear duty to disclose" it does not establish "*strong* evidence of conscious misbehavior or recklessness").  Moreover, Plaintiffs plead no facts to suggest that the decision to change the way the company reported its investor relations expenses was motivated by fraudulent intent.

Sixth, the fact that Anavex had a history of involvement in stock promotion schemes does not come close to suggesting that Defendants had knowledge of the alleged scheme during the Class Period.  As Plaintiffs concede, Anavex's earlier promotion efforts occurred in 2007, well before the Class Period began.  (Pls.' Opp'n 20).  Furthermore, the resignation of the Anavex executive alleged to have initiated those efforts, Harvey Lalach, predated not only the Class Period, but also the dates on which the Individual Defendants joined the company.  *Compare* Amended Compl. ¶ 177 (alleging that Lalach resigned in 2012), *with id.* ¶¶ 18-20 (alleging that Defendants all joined the firm in 2013 or later).  Given that chronology, it is a *non sequitur* to suggest that Defendants knew or should have known about the alleged promotional scheme because Anavex had previously engaged in such a scheme.  If

anything, the timing "actually cuts against a finding of scienter." *Hensley*, 2014 WL 4473373, at *5 (finding that the timing of accounting errors cut against a finding of scienter as to one defendant because the company had restated its financial results dating back to before that defendant had joined the company). The allegations regarding Anavex's stock promotion history certainly falls short of providing "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Comm'cns,* 493 F.3d at 99.

Finally, the BCSC and SEC investigations, by themselves, do not give rise to a compelling inference of scienter. *See, e.g.*, *City of Rockton Retirement Sys. v. Avon Products, Inc.*, 11-CV-4665 (PGG), 2014 WL 4832321, at *24 (Apr. 24, 2015) ("[T]he existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter."). Indeed, "government investigations cannot bolster allegations of scienter that do not exist, and, as currently plead, the government investigations are just that, investigations." *Lipow v. Net1 UEPS Techs., Inc*., 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015). Additionally, the precise nature and outcomes of the investigations are unclear, as Plaintiffs do not plead any facts suggesting that Defendants' actions were even the focus of the inquiries or that Defendants were sanctioned as a result of them.[4] Instead, the Amended Complaint merely asserts in conclusory terms that the investigations were focused on Anavex's

---

[4]      In connection with the SEC investigation, Defendants ask the Court to take judicial notice of two documents: (1) Anavex's Quarterly Report, filed August 11, 2016, and (2) an Anavex press release, also dated August 11, 2016. (Docket No. 69). Both documents state that SEC has "advised the Company's legal counsel that the [Commission] did not intend to recommend enforcement action by the Commission against the Company in connection with the investigation" at issue here.  (*Id.*). The Court need not decide whether it can take judicial notice of them. *See Ganino v. Citizens Utils. Co*., 228 F.3d 154, 168 n.9 (2d Cir. 2000) (refusing to decide whether to take judicial notice when doing so would not affect the outcome of the case).

promotional activity.  (Am. Compl. ¶¶ 184-185 ("[T]he British Columbia Securities Commission previously cited Anavex for involvement in a stock promotion scheme . . . . [T]he SEC has commenced a formal investigation into Anavex's stock manipulation.")). Defendants' fraudulent intent cannot be inferred from the mere existence of two inconclusive investigations separated by over two years, especially in the absence of allegations of motive. *See, e.g., Kalnit,* 264 F.3d at 142 (noting that, in the absence of a motive allegation, "the strength of circumstantial allegations [of scienter] must be correspondingly greater" (internal quotation marks omitted)).

   Even viewing all of the foregoing allegations "holistically," — as the Court must, *Tellabs*, 551 U.S. at 326 — the Amended Complaint falls far short of alleging "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care," *Kalnit,* 264 F.3d at 142.  Additionally, Plaintiffs do not even attempt to establish scienter with respect to each Individual Defendant, as required.  *See, e.g.*, *In re C.D.T.S. v. UBS AG*, No. 12-CV-4924 (KBF), 2013 WL 6576031, *6 (S.D.N.Y. Dec. 13, 2013) (noting that scienter "must be separately pled and individually supportable as to each defendant").  Ultimately, their allegations of misconduct are less "compelling" than the nonculpable explanations presented by Defendants: that the ups and downs of Anavex's stock price were driven by a combination of the company's press releases and the writings of third parties not under the direction of Anavex or its management.  For that reason, Plaintiffs' claims fail to adequately plead scienter as required for suits brought pursuant to Section 10(b) and Rule 10b-5 and must be dismissed.

## CONCLUSION

For all of the reasons stated above, Plaintiffs' claims under Section 10(b) and Rule 10b-5 must be and are dismissed.  It follows that their claims for control person liability under Section 20(a), which depend upon the existence of a "primary violation," also fail.  *See, e.g.*, *First Jersey Sec., Inc.*, 101 F.3d at 1472.  That leaves only the question of whether Plaintiffs' should be granted leave to amend their complaint for a second time, as they perfunctorily request in a footnote at the end of the memorandum of law in opposition to Defendants' motion.  (*See* Pls.' Opp'n 19 n.13).

The Court declines to grant Plaintiffs' request for a combination of three reasons. First, amendment here would likely be futile.  Indeed, given the various grounds for the Court's decision, there is nothing to suggest that Plaintiffs would be able to state a valid claim should the Court grant them leave to amend.  *See, e.g., Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend.").  Second, and related, Plaintiffs have not "given any indication that [they are] in possession of facts that would cure the problems identified in this opinion."  *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014); *see also TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint.").  Finally, in granting leave to file a first amended complaint, the Court expressly warned that Plaintiffs would not be given another opportunity to address the issues raised in Defendants' motion to dismiss.  (*See* Docket No. 64).  *See, e.g.*, *Clark*, 2014 WL 4054284, at *15 (holding that the plaintiff's failure to remedy the complaint's deficiencies identified by an earlier motion to

dismiss "is alone sufficient grounds to deny leave to amend"); *see also, e.g.*, *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (affirming the district court's denial of leave to amend in part because of the previous opportunities that the plaintiff had received to amend the complaint).

The Clerk of Court is directed to terminate Docket Nos. 60, 61, 66, and 69, and to close this case.

SO ORDERED.

Date:   December 29, 2016
        New York, New York

JESSE M. FURMAN
United States District Judge

22